# Exhibit A

**SUMMONS - CIVIL**
JD-CV-1   Rev. 2-20
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| For information on ADA accommodations, contact a court clerk or go to: *www.jud.ct.gov/ADA.* |
|---|

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*

**Instructions are on page 2.**

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☐ Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**
By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)* | Telephone number of clerk | Return Date *(Must be a Tuesday)* |
|---|---|---|
| 123 Hoyt Street, Stamford, Connecticut 06905 | ( 203 ) 965 − 5308 | June 15, 2021 |

| ☒ Judicial District | G.A. | At *(City/Town)* | Case type code *(See list on page 2)* |
|---|---|---|---|
| ☐ Housing Session | ☐ Number: | **Stamford** | Major: **T**   Minor: **90** |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(if attorney or law firm)* |
|---|---|
| Gainey McKenna & Egleston, 501 Fifth Avenue, 19th Floor, New York, New York 10017 | 415732 |

| Telephone number | Signature of plaintiff *(if self-represented)* |
|---|---|
| ( 212 ) 983 − 1300 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book.   ☐ Yes   ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book *(if agreed)*  egleston@gme-law.com |
|---|---|

| Parties | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
|---|---|---|
| First plaintiff | Name: **Merholz, Ryan, B., Derivatively On Behalf Of WORLD WRESTLING ENTERTAINMENT, INC.,**  Address: **c/o Gainey McKenna & Egleston, 501 Fifth Avenue, 19th Floor, New York, New York 10017** | P-01 |
| Additional plaintiff | Name: **Jimenez, Nicholas, Derivatively On Behalf Of WORLD WRESTLING ENTERTAINMENT, INC.,**  Address: **c/o Gainey McKenna & Egleston, 501 Fifth Avenue, 19th Floor, New York, New York 10017** | P-02 |
| First defendant | Name: **McMahon, Vincent K.**  Address: **14 Hurlingham Dr, Greenwich, CT 06831** | D-01 |
| Additional defendant | Name: **McMahon, Stephanie**  Address: **1241 East Main Street, Stamford, CT 06902** | D-02 |
| Additional defendant | Name: **Levesque, Paul**  Address: **123 Lovers Lane, Plainfield, CT 06374** | D-03 |
| Additional defendant | Name: **Riddick, Frank A. III**  Address: **83 Greenleaf Rd, Bluffton, SC 29910** | D-04 |

| Total number of plaintiffs: 2 | Total number of defendants: 13 | ☒ Form JD-CV-2 attached for additional parties |
|---|---|---|

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.

2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.

3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.

4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.

5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

| Date | Signed *(Sign and select proper box)* | ☒ Commissioner of Superior Court | Name of person signing |
|---|---|---|---|
| May 13, 2021 | *Gregory M. Egleston* | ☐ _____ Clerk | Gregory M. Egleston |

If this summons is signed by a Clerk:
a. The signing has been done so that the plaintiff(s) will not be denied access to the courts.
b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law.
c. The court staff is not permitted to give any legal advice in connection with any lawsuit.
d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint.

| | *For Court Use Only* |
|---|---|
| | File Date |

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date | Docket Number |
|---|---|---|---|

[ Print Form ]          **Page 1 of 2**          [ Reset Form ]

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2    Rev. 9-12

STATE OF CONNECTICUT
**SUPERIOR COURT**

First named Plaintiff *(Last, First, Middle Initial)*

**Merholz, Ryan, B., Derivatively On Behalf Of WORLD WRESTLING ENTERTAINMENT, INC.,**

First named Defendant *(Last, First, Middle Initial)*

**McMahon, Vincent K.**

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| | | 03 |
| | | 04 |
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | | 12 |
| | | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| **Goldfarb, Stuart U.** | **37 Fanton Hill Rd, Weston, CT 06883** | 05 |
| **Ong, Laureen** | **588 Bell Street Unit 3903, Seattle, WA 98121** | 06 |
| **Peterson, Robyn W.** | **63 Adams Lane, New Canaan, CT 06840** | 07 |
| **Singh, ManJit** | **1050 Brooklawn Drive, Los Angeles, CA 90077** | 08 |
| **Speed, Jeffery R.** | **492 Rowland Rd, Fairfield, CT 06824** | 09 |
| **Wexler, Alan M.** | **24611 Plover Way, Malibu, CA 90265** | 10 |
| **Barrios, George A.** | **88 Martingale Lane, Fairfield, CT 06824** | 11 |
| **Wilson, Michelle D.** | **14 Ravenglass Drive, Stamford, CT 06903** | 12 |
| **World Wrestling Entertainment, Inc.** | **1241 East Main Street, Stamford, CT 06902** | 13 |
| | | 14 |

*FOR COURT USE ONLY - File Date*

Docket number

**CIVIL SUMMONS-Continuation**

Print Form          Reset Form

RETURN DATE: JUNE 14, 2021

|  |  |  |
|---|---|---|
| RYAN B. MERHOLZ and NICHOLAS JIMENEZ, Derivatively On Behalf Of WORLD WRESTLING ENTERTAINMENT, INC., | : : : : | SUPERIOR COURT JUDICIAL DISTRICT OF |
| Plaintiffs, | : : | STAMFORD/NORWALK |
| v. | : : | AT STAMFORD |
| VINCENT K. MCMAHON, STEPHANIE MCMAHON, PAUL LEVESQUE, FRANK A. RIDDICK, III, STUART U. GOLDFARB, LAUREEN ONG, ROBYN W. PETERSON, MAN JIT SINGH, JEFFREY R. SPEED, ALAN M. WEXLER, GEORGE A. BARRIOS, and MICHELLE D. WILSON, | : : : : : : : : | **VERIFIED COMPLANT** |
| Defendants, | : : | |
| WORLD WRESTLING ENTERTAINMENT, INC., | : : : | |
| Nominal Defendant. | : : : | MAY 13, 2021 |

Plaintiffs Ryan Merholz and Nicholas Jimenez ("Plaintiffs"), derivatively and on behalf of World Wrestling Entertainment, Inc. ("WWE" or the "Company"), by Plaintiffs' undersigned attorneys, for Plaintiffs' verified complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WWE, Company press releases and conference call transcripts, litigation concerning the Company and media and social media reports about the Company. Plaintiffs believe that substantial additional evidentiary

support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of WWE against certain of its officers and directors seeking to remedy Defendants' (defined below) breach of fiduciary duties, waste of corporate assets, and unjust enrichment.

## JURISDICTION AND VENUE

2.      The Court has personal jurisdiction over each of the parties to this action. Defendants Vincent K. McMahon, Stephanie McMahon, Paul Levesque, Robyn W. Peterson, Jeffrey R. Speed, George A. Barrios and Michelle D. Wilson are subject to the jurisdiction of this Court because they are citizens of Connecticut.

3.      Venue is proper because Defendants Vincent K. McMahon, Stephanie McMahon, Paul Levesque, Robyn W. Peterson, Jeffrey R. Speed, George A. Barrios and Michelle D. Wilson reside in Connecticut.  Further, Nominal Defendant WWE is headquartered at 1241 East Main Street, Stamford, CT 06902.

## PARTIES

**Plaintiffs**

4.      ***Plaintiff Ryan Merholz*** ("Plaintiff Merholz") is a current stockholder of the Company stock, he purchased his Company stock on September 9, 2019 and intends to retain ownership of said shares through the prosecution of the instant matter.

5.      ***Plaintiff Nicholas Jimenez*** ("Plaintiff Jimenez") is a current stockholder of the Company stock, he purchased his Company stock on March 26, 2019 and intends to retain ownership of said shares through the prosecution of the instant matter.

**Nominal Defendant**

6.      Nominal Defendant WWE is headquartered in Stamford, Connecticut.  WWE Class A common stock is listed and trades on the NYSE under the ticker symbol "WWE."  The holders of WWE Class A common stock generally have the same rights as holders of WWE Class B common stock, except that holders of Class A common stock are entitled to one vote per share, whereas holders of Class B common stock are entitled to ten votes per share.   Nominal Defendant WWE is a citizen of Connecticut.

7.      Defendants (defined below) admit that because "[a] substantial majority of the issued and outstanding shares of Class B common stock is owned beneficially by [Defendant V.] McMahon," "he controls a majority of the voting power of [WWE] common stock and can effectively exercise control over [WWE's] affairs."

**Directors**

8.      *Defendant Vincent K. McMahon* ("V. McMahon") has been the Chairman of the Board of Directors ("Board") and Chief Executive Officer ("CEO") of the Company since 1980. Defendant V. McMahon is a citizen of Connecticut.

9.      *Defendant Stephanie McMahon* ("S. McMahon") is a director and Chief Brand Officer of the Company since 2015.  Defendant S. McMahon is the daughter of Defendant V. McMahon.  Defendant S. McMahon is a citizen of Connecticut.

10.      *Defendant Paul Levesque* ("Levesque") is a director and the EVP of Global Talent Strategy & Development since 2015.   Defendant Levesque is the husband of Defendant S. McMahon.  He is also the son-in-law of Defendant V. McMahon.  Defendant Levesque is a citizen of Connecticut.

11.      *Defendant Frank A. Riddick, III* ("Riddick") is a director and Interim Chief Financial Officer ("CFO") of the Company since 2008.  Defendant Riddick was recently replaced

as CFO of the Company.

12.     **Defendant Stuart U. Goldfarb** ("Goldfarb") is a director of the Company since 2011.  Defendant Goldfard is also a member of the Audit Committee and the Governance and Nominating Committee.

13.     **Defendant Laureen Ong** ("Ong") is a director of the Company.  Defendant Ong is also the Chair of the Compensation Committee and the Governance and Nominating Committee.

14.     **Defendant Robyn W. Peterson** ("Peterson") is a director of the Company. Defendant Peterson is also a member of the Governance and Nominating Committee.  Defendant Peterson is a citizen of Connecticut.

15.     **Defendant Man Jit Singh** ("Singh") is a director of the Company.  Defendant Singh is also a member of the Audit Committee.

16.     **Defendant Jeffrey R. Speed** ("Speed") is a director of the Company.  Defendant Speed is Chair of the Audit Committee and a member of the Compensation Committee.  Defendant Speed is a citizen of Connecticut.

17.     **Defendant Alan M. Wexler** ("Wexler") is a director of the Company.  Defendant Wexler is a member of the Compensation Committee.

18.     Defendants V. McMahon, S. McMahon, Levesque, Riddick, Goldfarb, Ong, Peterson, Singh, Speed, and Wexler are collectively hereinafter referred to as the "Director Defendants."

**<u>Officer Defendants</u>**

19.     **Defendants George A. Barrios** ("Barrios") was a Co-President of the Company, its principle financial officer and a member of the Company's Board.  On January 30, 2020, the Company announced that Defendant Barrios had abruptly left the Company "effective

4

immediately."  Defendant Barrios is a citizen of Connecticut.

20.     ***Defendant Michelle D. Wilson*** ("Wilson") was a Co-President of the Company and a member of the Company's Board.  On January 30, 2020, the Company announced that Defendant Wilson had abruptly left the Company "effective immediately."  Defendant Wilson is a citizen of Connecticut.

21.     The Director Defendants and Defendants Barrios and Wilson are herein referred to as "Defendants."

**Non-Parties**

22.     ***Non-Party Steve Pamon*** was appointed to the Board in or around September 2020. Defendants admit that because "[a] substantial majority of the issued and outstanding shares of Class B common stock is owned beneficially by [Defendant V.] McMahon," "he controls a majority of the voting power of [WWE] common stock and can effectively exercise control over [WWE's] affairs."  Non-Party Steve Pamon is not independent and owes his appointment to the Board to Defendant V. McMahon who is the controlling shareholder of the Company.

23.     ***Non-Party Erika Nardini*** was appointed to the Board in or around October 2020. Upon information and belief, Nardini travels on V. McMahon's personal plane.  Defendants admit that because "[a] substantial majority of the issued and outstanding shares of Class B common stock is owned beneficially by [Defendant V.] McMahon," "he controls a majority of the voting power of [WWE] common stock and can effectively exercise control over [WWE's] affairs."  Non-Party Erika Nardini is not independent and owes her appointment to the Board to Defendant V. McMahon who is the controlling shareholder of the Company.

## THE AUDIT COMMITTEE CHARTER

24.     The Audit Committee Charter states in relevant part:

The Audit Committee shall provide assistance to the Directors in fulfilling their responsibility to the stockholders, potential stockholders, and investment community relating to corporate accounting, reporting practices of the Company and the quality and integrity of financial reports of the Company. In so doing, the Audit Committee shall assist the Board in overseeing:

- *the accounting and financial reporting practices* of the Company;

- the audits of the Company's financial statements including without limitation the performance of the *Company's internal controls and internal audit function* and the independent auditor's qualifications, independence and performance;

- *the integrity of the Company's financial statements*;

- the Company's compliance with legal and regulatory requirements; and

- the Company's system of disclosure controls and system of internal controls regarding finance, accounting, legal compliance and ethics that management and the Board have established.

While certain duties and responsibilities of the Audit Committee are more specifically set forth below, the general function of the Audit Committee is oversight.

Management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements. In addition, management is responsible for maintaining appropriate accounting and financial reporting principles and policies and internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations.

Each member of the Audit Committee may rely on (i) the integrity of those persons and organizations within and outside the Company from which it receives information; and (ii) the accuracy of the financial and other information provided to the Audit Committee by such persons or organizations absent actual knowledge to the contrary (which shall promptly be reported to the Board).

As more fully described in "Responsibilities" below, the outside auditors for the Company are accountable to the Audit Committee. The outside auditors shall submit to the Audit Committee and the Company annually a formal written statement delineating all relationships between the outside auditors and the Company ("Statement as to Independence"), addressing at least the matters set forth in Independence Standard No. 1 adopted by the Independence Standards Board.

\*     \*     \*

RESPONSIBILITIES

The Audit Committee will primarily fulfill its responsibilities by carrying out the activities enumerated in this Section below. The Audit Committee will report regularly to the Board regarding the execution of these duties and responsibilities, including, without limitation, its (i) evaluation of the independent auditors; (ii) the quality and integrity of the Company's financial statements; (iii) the Company's compliance with legal  and regulatory requirements; (iv) the qualifications, performance and independence of the Company's independent auditors; and (v) the performance of the internal audit function. The Audit Committee has the authority, without seeking Board approval, to, and shall, obtain advice and assistance from outside legal, accounting and/or other advisors as deemed appropriate by the Committee to fully execute its duties and responsibilities. The Company shall provide appropriate funding, as determined by the Audit Committee, for compensation for the independent auditors for the purpose of preparing or issuing an audit report or performing other audit, review or attestation services and for any outside legal, accounting and other advisers that the Audit Committee may choose to engage and for ordinary administrative expenses of the Audit Committee that are necessary or appropriate in carrying out its duties. None of the Committee's responsibilities may be delegated to any other committee of the Board.

The Audit Committee shall:

Documents/Reports/Accounting Information Review

1.    Review this Charter at least annually, and recommend to the Board any necessary amendments as conditions dictate.

2.    Review and discuss with management and the independent auditor the Company's audited financial statements, quarterly financial statements and all internal controls reports (or summaries thereof). Review any other relevant reports or financial information submitted by the Company to any governmental body, or the public, including management certifications as required by the SarbanesOxley Act of 2002 (Sections 302 and 906) and relevant reports rendered by the independent auditors (or summaries thereof).

3.    Review with financial management and the independent auditor each Quarterly Report on Form 10-Q and each Annual Report on Form 10-K (including, without limitation, the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") prior to its filing.

4.    Review and discuss earnings press releases with management, including the type and presentation of information, paying particular attention to any use of "proforma", "adjusted" or other information which is not required by

generally accepted accounting principles ("GAAP").

5.    Review and discuss with management financial information and earnings guidance provided to analysts and rating agencies. Such discussions may be on general terms (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not be in advance of each earnings release or earnings guidance.

6.    Review the regular internal reports (or summaries thereof) to management prepared by the internal auditing department and management's response.

7.    Recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

8.    Obtain from the outside auditor assurance that the audit was conducted in a manner consistent with Section 10A of the Securities Exchange Act of 1934, as amended, which sets forth certain procedures to be followed in any audit of financial statements required under the Securities Exchange Act of 1934.

Independent Auditors

9.    Have sole authority to appoint (subject to stockholder ratification), compensate, retain and oversee the work performed by the independent auditor engaged for the purpose of preparing and issuing an audit report or performing other audit, review or attest services for the Company. The Audit Committee shall have the ultimate authority to approve all audit engagement fees and terms. The Audit Committee shall have sole authority to review the performance of the independent auditor and remove the independent auditor if circumstances warrant. The independent auditor shall report directly to the Audit Committee and the Audit Committee shall oversee the resolution of any disagreement between management and the independent auditor in the event that any may arise.

10.   Review with the independent auditor (without representatives of management when deemed necessary) reports or communications (and management's and/or the internal audit department's response thereto) submitted to the Audit Committee by the outside auditors required by or referred to in PCAOB AU 380 and SEC Rule 2-07 of Regulation S-X; review any problems or difficulties with an audit and management's response, including any restrictions on the scope of the independent auditor's activities or access to requested information, and any significant disagreements with management; and review and hold timely discussions with the independent auditor regarding the following:

•    all critical accounting policies and practices and other major issues

Regarding accounting principles and financial statement presentations, including significant changes in accounting principles;

- all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;

- other material written communications between the independent auditor and management including, but not limited to, any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditor and schedule of unadjusted differences;

- the scope of the annual audit;

- the audited financial statements and disclosures made in Management's Discussion and Analysis;

- significant risks and exposures, if any, and the steps taken to monitor and minimize such risks;

- any other significant matters arising from any audit or report or communication referred to in items 2 or 3 above, whether raised by management, the internal audit department or the outside auditor, relating to the Company's financial statements;

- review the form of opinion the outside auditor proposes to render to the Board and stockholders;

- any accounting adjustments that were noted or proposed by the independent auditor but were "passed" (as immaterial or otherwise); and

- any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement.

11. At least annually, obtain and review a report by the independent auditor to allow the Committee to evaluate the independent auditor's qualifications, performance and independence. The independent auditor's report shall describe:

- the firm's internal quality control procedures, the budget, staffing and responsibilities of the internal audit department and any

recommended changes in the planned scope of the internal audit;

- any material issues raised by the most recent internal quality-control review or peer review of the independent auditor, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues;

- (to assess the auditor's independence) all relationships between the independent auditor and the Company;

This Committee's evaluation of the independent auditor shall include the review and evaluation of the lead partner and shall take into account the opinions of management and the Company's internal auditor (or other personnel responsible for the internal audit functions). The Audit Committee shall present its conclusions with respect to the independent auditor to the full Board.

12.  Review audit services and approve in advance non audit services to be provided by the independent auditor, taking into consideration SEC rules regarding permissible and impermissible services by such independent auditor. This duty may be delegated to one or more designated members of the Audit Committee with any such preapproval reported to the Audit Committee at its next regularly scheduled meeting. Approval of non audit services shall be disclosed to investors in periodic reports to the extent required by Section 13(a) of the Securities Exchange Act of 1934.

13.  Set clear hiring policies, compliant with governing laws or regulations, for employees or former employees of the independent auditor.

14.  Review and evaluate the lead audit partner of the independent auditor.

15.  Assure the regular rotation of the lead audit partner as required by law, and further consider whether regular rotation of the independent auditor itself is advisable to assure continuing auditor independence.

25.  Further, the Audit Committee's charter mandates specific areas over which the Audit Committee is tasked in assisting the Board with oversight. Specifically, the Audit Committee's charter highlights the specific relevant areas of responsibility which include, *inter alia*, "[r]eview and discuss earnings press releases with management, including the type and presentation of information, paying particular attention to any use of "proforma", "adjusted" or

other information which is not required by generally accepted accounting principles ('GAAP')."

## FACTS

### Background

26.     The Company engages in the sports entertainment business in North America, Europe, the Middle East, Africa, the Asia Pacific, and Latin America.  As in other professional wrestling promotions, the Company's shows are not legitimate contests, but are entertainment based and feature storyline-driven, scripted, and choreographed matches.

27.     Company personnel consist of professional wrestlers, managers, play-by-play and color commentators, ring announcers, interviewers, referees, trainers, producers, script writers, and various other positions.

28.     Personnel can also appear on the Company's other weekly television programming, as well on pay-per-view and untelevised live events.

29.     The Company reports revenues in three segments: (1) Live Events; (2) Media; and (3) Consumer Products.

30.     Live Events provides ongoing content for the Company's media platforms and Live Event segment revenues consist primarily of ticket sales, including primary and secondary distribution, revenues from events for which the Company receives a fixed fee, as well as the sale of travel packages associated with the Company's global live events.

31.     The Media segment reflects the production and monetization of long-form and short-form media content across various platforms, including WWE Network, pay television, digital and social media, as well as filmed entertainment.  Across these platforms, revenues principally consist of content rights fees, subscriptions to WWE Network, and advertising and sponsorships. Media net revenues were $683.4 million, $535.6 million, and $476.9 million,

representing 73%, 67%, and 65% of the Company's total net revenues in fiscal years 2018, 2017, and 2016, respectively.

32.      By the early 2000s, the Company was intent on international expansion.  Although the brand continued to have success in the domestic market, it experienced bouts of ratings dips and lowered attendance at its live events, and so the Company recognized the need to expand its global presence and further diversify its fan base.

33.      The Company's brand of professional wrestling made for an ideal export.  The Company's Executive VP of Marketing, Kurt Schneider, provided a number of reasons why in an October 2005 interview, explaining that, unlike major sports leagues, there are no game "rules" to understand—it's simply a straightforward depiction of good (the "faces") versus evil (the "heels"); fans do not need to understand any one language to consume it; most countries have had wrestling in some form as part of their culture; and WWE wrestling is seen as a uniquely American export.

34.      Although the Company already had an international presence by the early 2000s, it was mostly via television deals in international markets.  Television deals in international markets were one of the Company's many wrestling-related revenue streams.

35.      Another business model of the Company is to sponsor live events internationally.  The Company leverages these live events to more effectively grow and monetize its content.

36.      As Defendant V. McMahon explained in 2004:

From an international standpoint, I don't think we've done a very good job, quite frankly, of exploiting the international market like we really should.  We're on television in many, many markets and do extremely well television ratings-wise, but that's only one aspect of what we do.  We do licensing; we do merchandising, and live events, and publications, and DVD's and everything else imaginable.  And we haven't integrated all of that in our international platforms, and [doing that] is one of our goals.[1]

---

[1]      Joshua A. Shuart, Ph.D. & Peter A. Maresco, *World Wrestling Entertainment: Achieving Continued Growth and Market Penetration through International Expansion*, THE SPORT JOURNAL, dated Sept. 6, 2006   at   https://thesportjournal.org/article/world-wrestling-entertainment-achieving-continued-growth-

37.     This strategy was formally outlined in the Company's 2005 Form 10-K, dated July 13, 2005:

> *Continue to expand internationally*.   International expansion represents an important part of our business strategy. The broad appeal of our content has yielded high international demand for our television programs and live events. To further nurture this demand, we plan to continue to expand our international television distribution. Increasing our television penetration around the world will likely increase the demand for live events abroad, which, in turn, should increase sales of our branded merchandise.  Our dual brands enable us to execute this strategy by freeing up schedules for talent to perform at more events in more countries. Fiscal 2005 included 49 international events, including six productions of our flagship television shows from the international stage, which is up from 32 international events, with no televised events, in fiscal 2004.

38.     The Company started to increase the number of tours and live events it held internationally, growing its presence in Europe and Asia, and expanding into other regions, including the Middle East, Latin America, Australia, and New Zealand.

39.     The Company also continued to expand its television distribution internationally, which it used to support its live events and merchandise sales, and to more generally grow the popularity of the sport in new markets.  Further, selling the rights to air WWE content in international markets proved to be a significant revenue generator of its own.

40.     An important part of the Company's international expansion involved extending the Company's reach into countries within the Middle East and North Africa ("MENA") region.

41.     An entity known as Orbit Showcase Network ("OSN") is a direct-broadcast satellite provider serving the MENA region.  OSN has traditionally offered popular entertainment content such as movies, sporting events, and various TV shows from major U.S. and international networks and studios, in addition to local versions specifically for the MENA region.

---

and-market-penetration-through-international-expansion/.

42.     On July 21, 2014, the Company and OSN announced a five-year exclusive media agreement, reporting that "WWE's flagship television program Monday Night Raw [would] air live on OSN, WWE's exclusive pay TV partner in the Middle East and North Africa through 2019."  According to a press release, "[u]nder this new agreement, fans [could] now enjoy all of WWE's programming, including Raw, SmackDown®, NXT™ and Main Event™, as well as WWE pay-per-view events including WrestleMania® and SummerSlam®, in one place on OSN Sports 2 HD."  The press release further stated:

> "OSN and WWE have a long-standing relationship and we are very excited to be taking that to the next level," said Andy Warkman, OSN's VP of Sport & Production. "For the first time in the region, all core WWE programming will be available in one place, making OSN the home of WWE, reaching an audience across more than 20 countries.  This deal furthers our commitment to bringing our customers the best content."

> "WWE is very excited to be extending and expanding its deal with OSN in the Middle East," said Carlo Nohra, General Manager of WWE Middle East. "OSN hosts some of the very best international entertainment and sports programming and is the perfect home for WWE programming. Together with OSN, we will continue to grow our TV, pay-per-view, live event and consumer products businesses across the Middle East."

43.     On February 15, 2015, the Company and OSN jointly issued a press release reporting that they were adding WWE Network to the five-year agreement as part of an expanded partnership.

44.     The international expansion proved successful.  The Company's international revenues increased from $87.6 million in 2005 to $135.3 million in 2010.  After a decline over the next few years, the Company's international revenues increased to $169.8 million in 2015, $189 million in 2016, and $201 million in 2017—the increase during these more recent years driven, in part, by the 2014 launch of the WWE Network—a subscription streaming network available in more than 170 countries.

45.     The Company's growing international revenue began to represent an increasingly large percentage of its total revenue.  For instance, in 2017, the Company's international segment represented 25%, with North America representing 75% of revenues.  In 2018, the international segment increased to *34%* of total revenues (with North America revenues falling to 66%).  While the international segment slightly decreased to *32%* of total revenues in 2019 (with North America revenues at 68%), the Company stated "***WWE is well positioned to take advantage of significant growth opportunities, including the rising value of live sports content, the growth of media and entertainment in international markets, and the evolution of other businesses, specifically WWE Network***."[2]

46.     Defendant V. McMahon told shareholders that the Company's goal was to increase its presence in large international markets.  For instance, in May 2017, Defendant V. McMahon told investors: "The recent production of WrestleMania set records for network viewership as well as digital and social engagement.  As we leverage continuing innovation to extend our reach in India, China and around the world, we are confident that the enduring and increasing global power of our brands will provide a solid foundation for long-term growth."[3]

47.     Expansion into the MENA region became an increasingly important part of the Company's business plans and growth initiatives, as the Middle East grew to become the Company's second largest market by monetization.

48.     The Company is popular in the Middle East, and it has had a presence in the region for many years, initially via distribution of its programming to regional television networks.  The

---

[2]     Emphasis added throughout unless noted otherwise.
[3]     Darren Heitner, *The WWE Is Exploring Overseas Opportunitis For Further Revenue Growth,* FORBES, dated July 17, 2017 at https://www.forbes.com/sites/darrenheitner/2017/07/17/the-wwe-is-exploring-overseas-opportunities-for-further-revenue-growth/#145d47b522bd.

Company also has been holding live events in the Middle East for nearly a decade, starting in 2011.

49.     In March 2018, the Saudi Press Agency announced that WWE and the Saudi General Sports Authority had signed a 10-year multi-platform partnership with WWE to hold wrestling events in the country.  The market believes this partnership was worth approximately $500 million to WWE.  A press release issued by the Company and the Saudi General Sports Authority described the deal as follows:

> The Saudi General Sports Authority in partnership with WWE will present the Greatest Royal Rumble event at the King Abdullah Sports City in Jeddah, Saudi Arabia on Friday, April 27.  For the first time ever, the Royal Rumble match will feature 50 WWE Superstars.  As part of this historic event, fans will see WWE Superstars John Cena™, Triple H™, Roman Reigns™, AJ Styles™, Braun Strowman™, The New Day™, Randy Orton™, Bray Wyatt™ and Shinsuke Nakamura™, among others.
>
> *      *      *
>
> Ticket and broadcast information will be available in the coming weeks.  This event is part of a 10-year strategic multiplatform partnership in support of Vision 2030, Saudi Arabia's social and economic reform program.[4]

50.     "The Greatest Royal Rumble will be a spectacle of historic proportions," said Defendant V. McMahon.  "Our partnership with the Saudi General Sports Authority reflects a long-term commitment to present WWE's world-class entertainment to a global audience on a grander scale than ever before."[5]

51.     The first event held under the Saudi partnership was the Greatest Royal Rumble, which took place on April 27, 2018 at the King Abdullah International Stadium in Jeddah, Saudi Arabia.  The Company hailed the event as the largest "outside the U.S. in the past 16 years" and a major contributor to the Company's "record" second quarter 2018 results.  Speaking during an

---

[4]     Saudi Arabia to Host the Greatest Royal Rumble, *Business Wire News*, dated March 5, 2018 at https://www.businesswire.com/news/home/20180305005764/en/Saudi-Arabia-Host-the%C2%A0Greatest-Royal-Rumble%C2%AE.

[5]     *Id.*

earnings call with investors, Defendant Wilson stated that, "[a]s added proof of the compelling nature of our content, last Friday, we held one of our largest events ever outside the United States, with a sold-out crowd at the Greatest Royal Rumble event in Jeddah, Saudi Arabia."  Defendant Wilson continued, stating that "[t]he April 27th event marked the successful beginning of a 10-year partnership with the Kingdom of Saudi Arabia."

52.    The Company's expansion into Saudi Arabia must be understood in the context of Vision 2030—a strategic initiative launched in 2016 by the current Crown Prince of Saudi Arabia (at the time, the Deputy Crown Prince), Mohammed bin Salman, to institute social reforms in Saudi Arabia and diversify its economy.

53.    Vision 2030 is principally an economic initiative aimed at reducing the country's dependence on oil, but it also includes a progressive reform program that seeks to modernize certain elements of the country's religious society.  Part of this initiative has included significant investment in Saudi Arabia's entertainment sector, including bringing international sporting events to the country.

54.    Sports have become a central feature of the Vision 2030 program, so much so that the Saudis retained an American lobbying firm (Churchill Ripley) to arrange meetings with representatives from the National Basketball Association, Major League Soccer, World Surf League and Formula One auto racing to discuss bringing international sports to the kingdom.  The chairman of the Saudi General Sports Authority ("SGSA"), Prince Abdulaziz bin Turki Al-Faisal, has explained that making Saudi Arabia a hub of global sports could boost the country's economic growth and create thousands of jobs: "A big part of the change within the kingdom is the sector of sport and growing the sector of sport."[6]  While the sports expansion is central to the Crown Prince's

---

[6]    Alan Rappeport, *Saudi Arabia Embraces Western Sports to Rehabilitate Global Image,* N.Y. TIMES, dated Dec. 2, 2019 at https://www.nytimes.com/2019/12/02/business/economy/saudi-arabia-

effort to attract foreign investment and convince the world that the country is making important changes to its society, it has been viewed by critics as an attempt to distract attention from the country's continued human rights abuses—called "sportswashing" by some.[7]

55.     The financial support behind the efforts to bring Western sports to Saudi Arabia is the country's Sports Development Fund, which provides capital to build new sports facilities and attract and promote international sports events. Events have included Saudi Arabia's first international motorsport event, the two-day Race of Champions, conducted in Riyadh in February 2018, as well as an international boxing event conducted in Jeddah in May later that year.

56.     The 10-year partnership agreement between the Company and the SGSA was part of this same effort, as it was designed to bring large-scale international sporting events to Saudi Arabia, in this case, professional wrestling.

57.     Not only did the partnership serve the Saudi government's needs, but it also benefited the Company.  The Company's brand of professional wrestling is extremely popular in Saudi Arabia.

58.     On April 2018, Defendant Barrios was asked about the partnership on a "WWE Post-WrestleMania Call."  Defendant Barrios explained that the Company's content is popular in Saudi Arabia on its social media channels (for instance, YouTube), which popularity the Company believed it could more effectively monetize by signing the 10-year partnership.

59.     The partnership agreement also was announced at a time when the Company was working to increase its profile in the Middle East by signing and promoting talent from within the region.  These signings included the Company's first Kuwaiti and Egyptian wrestlers, signed in December 2017 and January 2018, respectively, as well as the Company's first female wrestler

image-sports.html.

[7]     *Id.*

from the Arab world—the Jordanian Shadia Bseiso—signed in October 2017.

60.     The Company also hosted recruitment events throughout the MENA region, including Saudi Arabia, in an effort to not only grow and diversify the talent pool, but also to localize the content around the world.

61.     These efforts to build its brand in the MENA region was successful, considering that by February 2019, the Middle East grew to become the Company's second largest market by monetization.

62.     The Company's full-year 2018 results also benefited significantly from the two events held pursuant to the Saudi partnership.  Market participants estimated that the *Greatest Royal Rumble* (held in April 2018) and the *Crown Jewel* (held in November 2018) together generated revenues for the Company in the range of $70 to $80 million.[8]  These results are significant considering that the Company announced that its revenues for 2018 were "***the highest in the Company's history,***" increasing 16% from the prior year to $930.2 million.  The Company also announced that "international revenue increased 58% to $317.8 million from $201.3 million in the prior year, the highest in the Company's history and the first-time international revenue has exceeded $300 million."[9]

63.     More specifically, the February 7, 2019 press release revealed that revenues in the Media segment for 2018 "increased by $147.8 million, or 28%, to $683.4 million in 2018 over the prior year, ***primarily driven by the $95.8 million increase of Other media revenues, due to the***

---

[8]     Ray Giri, *How Much WWE May Have Made With Saudi Arabia Deal In 2018,* WRESTLINGINC.COM, dated Feb. 7, 2019 at https://www.wrestlinginc.com/news/2019/02/how-much-wwe-may-have-made-with-saudi-arabia-deal-in-2019-650684/.
[9]     *WWE® Reports Record Results For Fourth Quarter and Full Year 2018*, dated Feb. 7, 2019 at https://www.businesswire.com/news/home/20190207005303/en/WWE%C2%AE-Reports-Record-Results-Fourth-Quarter-Full.

*addition of certain live, in-ring programming content in international markets*."[10]  The Company therefore generated an additional $95.8 million in the Media segment (as compared to the prior year) from "certain live, in-ring programming content in international markets," the vast majority of which was estimated to be from the two events in Saudi Arabia.[11]

64.     The Company's Media segment, which is the Company's largest segment in terms of revenue, includes a number of different revenue streams, including revenue from content rights fees, subscriptions to WWE Network, and advertising and sponsorships.

65.     With respect to content rights fees, the Company generates revenues from fees earned on the Company's "core content," which refers to the Company's two long-running weekly live television programs, called *Raw* (a three-hour weekly show) and *SmackDown Live* (a two-hour weekly show).  Both are live wrestling shows that feature WWE talent and portray the brand's wrestling-related storylines.

66.     The Company generates revenue on this content by selling the exclusive right to air *Raw* and *SmackDown Live* (as well as other WWE content) in the applicable region.  In the United States, *Raw* airs on the *USA Network*, which is owned by NBC Universal.  *SmackDown Live* had for years aired domestically also on the *USA Network*, but began airing on the *Fox Network* in October 2019.

---

[10]     *Id.*  The press release included the following note describing what "Other" revenues for the Media segment is defined to mean: "Other forms of media monetization reflect revenues earned from the distribution of other content, including, but not limited to, certain live in-ring programming content in international markets, scripted, reality and other programming, theatrical and direct-to-home video releases."

[11]     Ray Giri, *How Much WWE May Have Made With Saudi Arabia Deal In 2018,* WRESTLINGINC.COM (Feb. 7, 2019) at https://www.wrestlinginc.com/news/2019/02/how-much-wwe-may-have-made-with-saudi-arabia-deal-in-2019-650684/#:~:text=WWE%20held%20the%20Greatest%20Royal,Saudis%20for%20that%20event%20itself.

67.     The Company enters into separate international distribution agreements with television providers throughout the world.

68.     In the Middle East, the Company's exclusive provider of its content had for years been OSN.

69.     On July 21, 2014, the Company and OSN entered into a five-year exclusive media rights agreement which provided OSN with exclusive access to WWE programming (*i.e.*, *Raw* and *SmackDown Live*) and pay-per-view events, including WrestleMania and SummerSlam, through 2019.  From the Company's perspective, the deal meant that the Company would have even greater access to the MENA region, which it viewed as crucial to its efforts to continue its international expansion.

70.     On February 12, 2015, the Company and OSN jointly issued a release stating they were adding WWE Network, the Company's subscription streaming app service (like Netflix), to the five-year agreement as part of an expanded partnership.  In the announcement, Andy Warkman, OSN's Vice President, Sport and Production, stated that:

> We will be co-branding the linear channel OSN WWE Network HD and following on from our enhanced TV deal renewal last year, this is great news for WWE fans in the Middle East & North Africa region.  We are looking forward to launching the Network in the coming weeks and cementing our position as the Home of WWE in the region.[12]

71.     The WWE Network agreement with OSN meant that OSN subscribers would now have access to the WWE Network content independent of any WWE Network subscription.

72.     During a February 12, 2015 earnings call, Defendant Barrios indicated that OSN subscribers who access the WWE Network for free, via the linear premium channel, are included

---

[12]     *OSN To Launch WWE® Network in the Middle East*, dated Feb. 12, 2015 https://www.businesswire.com/news/home/20150212005115/en/OSN-Launch-WWE%C2%AE-Network-Middle-East.

in the Company's reported WWE Network subscriber figures:

> ***Regarding future subscriber growth***, we continue to expect a gradual ramp-up over time as consumer awareness grows and consumers change behavior and adopt new technology. As we've said before, we're executing a 5-part strategy that includes implementing high-impact customer acquisition and marketing programs, making the network available in new geographies, creating new content, expanding distribution platforms and developing new features. As part of that strategy, we continue to broaden our global distribution of WWE Network. Beginning January 19, we made the network available in the U.K. and Ireland, which, almost overnight, became our second largest market globally. We're also expanding WWE Network distribution in Canada, the Middle East and North Africa. Rogers Communications, our exclusive network distribution partner in Canada, has reached agreements with Cogeco Cable in Canada, Eastlink, Shaw and Shaw Direct, TELUS Optik TV and TELUS Satellite and Videotron, ensuring WWE Network will be available nationally in Canada before WrestleMania on March 29.
>
> ***Additionally, we reached an agreement with OSN, the leading pay-TV network in the Middle East and North Africa, to distribute WWE Network in the region as a premium linear channel, also launching before WrestleMania.***

73.     Thus, the Company's reported WWE Network subscriber numbers were at least in part dependent on those individuals in the MENA region who had access to the WWE Network by virtue of the OSN agreement.

74.     The market believed that the OSN agreement with the Company was worth millions of dollars a year to WWE.   In addition, the deal with OSN offered the additional benefit of growing the sport in the MENA region.

75.     At the same time, the Company was telling investors that it expected to significantly grow the revenue which it earns from its media rights agreement between 2018 and 2020.  In the presentation accompanying its June 27, 2018 conference call, the Company stated that it "expects [that] revenue from existing and new 'key content agreements,' . . . will grow to approximately $311M in 2019 and $462M in 2021."[13]   The Company's "total revenue from 'key content

---

[13]     *WWE's 'key content agreements' reflect the licensing of WWE's flagship programs, Raw and SmackDown in the U.S., U.K., India, Canada, LATAM, Middle East and South Africa*, dated June 27, 2018 Conference   Call   Presentation   at   https://corporate.wwe.com/~/media/Files/W/WWE/company-

agreements' would increase to \$314M in 2019 and \$542M in 2021." *Id.*

76.     The Company's effort to grow its media-rights related revenues reflects its ongoing strategy of transforming itself into a media company—something it has done with relative success in recent years.  This transformation has been widely covered by the mainstream financial press, with one media outlet characterizing the WWE in early 2018 as not "just scripted wrestling matches," but rather "a media powerhouse."[14]

77.     A January 19, 2018 *CNBC* article[15] stated:

With nearly \$800 million in revenues, a \$2.6 billion market cap and 850 million social media followers, World Wrestling Entertainment isn't the tiny ticketing business it was 35 years ago.

A massive overhaul of the wrestling network in 2013 and 2014 drove the "wave of growth" that made it a central player in digital media despite its seemingly niche content, CFO George Barrios told CNBC.

"Content, continued global growth and the direct-to-consumer digital has turned us into a data powerhouse," Barrios told "Mad Money" host Jim Cramer in a Friday interview. "We've seen about 70 percent growth since 2008, and we think there's a lot more runway."

78.     On February 7, 2019, the Company announced its fourth-quarter and full-year 2018 financial results.  On that same day, the Company also provided its full-year 2019 financial guidance, reporting in a press release that the Company expected to achieve revenue of approximately \$1.0 billion and was targeting Adjusted OIBDA of at least \$200 million.  Defendants informed investors that this financial outlook depended on the Company's ability to

---

new/2018/wwe-us-deals-and-outlook-presentation-06-27-18.pdf.

[14]     Nathaniel Meyerssohn, *Why WWE is a media juggernaut,* MONEY, dated Feb. 7, 2018 at https://money.cnn.com/2018/02/07/news/companies/wwe-vince-mcmahon-wrestling/index.html.

[15]     Lizzy Gurdus, *WWE is a 'data powerhouse' thanks to content, growth and digital, CFO says CNBC*, dated Jan. 19, 2018 at https://www.cnbc.com/2018/01/19/wwe-is-a-data-powerhouse-thanks-to-content-growth-and-digital-cfo.html.

renew a number of expiring media-rights agreements, including in the Middle East.[16]

79.    As a result, the Company was forced to try to find an entirely new media partner in the Middle East and would be left without revenues on a MENA-region media-rights deal effective April 1, 2019.  Despite knowing this, Defendant Barrios told the market, during a presentation to analysts at UBS on December 3, 2018, as follows:

> I mentioned the major markets for us. U.K., India, the **Middle East**, China, Latin America, Germany and a variety of other markets, those being the biggest, **will be up for renewal here over the next 12 to 18 months**. The expectation has been that we'd announce the distribution deal in the U.K. towards the end of this year; in India, in the beginning, first half of next year, we always tell people that can happen quicker than people expect, it could also take a little bit longer, but our kind of best estimate are these time lines. **And as I mentioned, Middle East, Latin America, China and several other markets, we'll announce as well over the next several months**.

80.    The Company representatives have since stated that the OSN deal was prematurely terminated in December 2018.  According to Carlo Nohra, VP and General Manager of WWE – Middle East, who was the self-described principal point of contact with OSN regarding the applicable media-rights agreements, in early 2018, OSN became delinquent in the payments of rights fees to the Company.

81.    Nohra explained that in September 2018, the Company sent OSN a "Notice of Material Breach" based on the delinquent payments.[17]

---

[16]    WWE® Reports Record Results For Fourth Quarter and Full Year 2018 at https://corporate.wwe.com/investors/news/press-releases/2019/02-07-2019-135807128.

[17]    According to a recent news article entitled *New Details on Lawsuit Against WWE Over Saudi Arabia TV Negotiations*, dated June 16, 2020 by Jeremy Thomas:

> "WWE was allegedly looking for a new broadcast partner and tries to secure a deal with Middle East Broadcasting Center (MBC).  An employee of MBC said that WWE had "wildly unreasonable expectations of the revenue it expected from a potential broadcast partner," claiming that WWE proposed an $80 million annual licensing fee. They said that WWE projected over 100 million OTT subscribers, based on the number of OSN subscribers who watched WWE.  However, MBC's projections allegedly were that WWE would get 6.5 million subscribers "at most."  WWE rejected this estimate and MBC raised their estimate to 10 million subscribers in order to be cooperative, then to 15 million "only to please WWE, not because MBC felt the projections were realistic."

82.     OSN responded with a letter dated November 5, 2018, in which OSN's general counsel informed the Company that OSN was contemplating the future long-term funding of its business and hoped to respond to the Company about the missed payments after an upcoming Board meeting.

83.     According to Nohra, in November 2018, OSN sent the Company an unsolicited settlement proposal, in which OSN's general counsel informed the Company that it intended to exit its sport content business and conclude its sports coverage in early 2019.

84.     Negotiations followed, and, according to Nohra, the Company and OSN entered into a settlement agreement dated December 18, 2018 pursuant to which OSN and the Company agreed to the early termination of their media-rights agreements effective March 31, 2019, and OSN agreed to pay the Company all rights fees owed for 2018 and through March 31, 2019.

85.     These facts are further confirmed by Andrew Warkman—who is the Company's current VP and General Manager of WWE UK & Ireland, but who worked at OSN through March 2019.  Warkman explained that, in his role at OSN, he was responsible for managing the OSN's relationship with the Company.

86.     Warkman states that by 2018, OSN's business was struggling, and the OSN board of directors made the decision to shut down the network's sport channels.  Warkman was directed to discuss early terminations and settlements with OSN's sports rights holders, including the WWE.

87.     According to Warkman, on December 18, 2018, the Company and OSN entered

---

The employee said that WWE dropped their asking price for licensing to $50 million, which was still well above the $14.5 million that MBC felt was its upper limit. Negotiations ended there. WWE has yet to announce a new TV deal in the area despite informing investors that they planned to have the deal done by the end of 2019.

into a settlement agreement pursuant to which OSN and the Company agreed to the early termination of their operative agreement effective March 31, 2019.

88.    In reality, and unbeknownst to the market, the Company tried to find a replacement partner for the OSN agreement—which had already been canceled, effective March 31, 2019. According to Nohra,  after WWE and OSN agreed to terminate the OSN Media Rights Agreements as of March 31, 2019, WWE entered into discussions with the Saudi General Sports Authority and/or Saudi General Entertainment Authority ("GEA") regarding a potential new exclusive media rights agreement in the MENA region upon the termination of the OSN Media Rights Agreements. According to Nohra, this potential new exclusive media rights agreement did not involve OSN in any respect.

89.    But Defendants knew all along, or were deliberately reckless in disregarding, that negotiating a ***brand new*** agreement with a ***new*** provider, would take time, and would not be completed by the end of 2019—as Defendants had assured the market.

90.    When discussing its full-year guidance on the July 25, 2019 call, Defendant Barrios stated "This guidance assumes continued improvement in our engagement metrics, a second large-scale event in the MENA region and the completion of a media rights deal in the MENA region. We believe we have agreements in principles with the Saudi – in principle with the Saudi General Sports Authority on the broad terms for the latter 2 items."

91.    On the same call, Defendants also announced that they had completed certain other international media rights agreements that were up for renewal, and Defendant V. McMahon assured investors that the MENA deal would get done "very soon": "We have completed our content distribution agreements in BT Sport in the U.K., Latin America Fox Sports, and in China, PP Sports.  We're excited about that.  Excited we can influence or they can influence as well, the

ability to do localized content in addition to enhance the content that they currently have in a more in-depth capacity.  And importantly, it's another way and a deeper way of reaching our audience and a new audience as well.  Obviously, there's India and MENA to do, and ***we are going to be close to announcing those deals very soon***."

92.     Although the Company disclosed on the July 25, 2019 earnings call that the Company's existing media-rights agreement in the MENA region had terminated, the Company also assured the market that a new deal would get done "very soon," which they claimed would allow the Company to meet its full-year 2019 guidance.

93.     On February 6, 2020, the Company announced its disappointing financial results and lower-than-expected full-year 2020 guidance. The earnings release issued by the Company revealed that consumer engagement metrics had continued to deteriorate in the fourth quarter, and that the Company had achieved just $180 million in adjusted OIBDA for the year due to the failure to complete the MENA distribution agreement with the Saudis.  On an earnings call to discuss its results, Defendant Riddick confirmed that the Company's 2020 financial guidance did not include any revenues related to a prospective MENA deal since the deal had not been finalized and continued delay was expected.

94.     Defendants acknowledged that the Company's full-year 2020 financial projections presumed that a media-rights agreement with the Saudi government would ***not*** be completed at all in 2020.

95.     Since February 2020 it is believed that the Saudi government has little incentive to enter into a media-rights agreement with the Company because the Saudi government is

purportedly backing a local pirate television and streaming service.[18]

96.     A report by the World Trade Organization ("WTO") has recently surfaced that "firmly establishes that the Saudi government is behind beoutQ," which is a "pirate satellite TV and streaming service that offers illegal access to sporting events."[19]   Since its inception in 2017, BeoutQ illegally transmitted at least "ten encrypted channels via the Riyadh-based satellite provider Arabsat and [sold] set-top boxes across Saudi Arabia and other Arab-speaking countries."[20]   The stolen content on these channels "included all the major international football competitions, as well as other major international sports, such as Tennis, NFL, NBA, Formula 1, Olympics, and WWE."[21]

## THE COMPANY'S PUBLIC STATEMENTS

97.     Plaintiffs allege that the statements below were materially false and misleading because they omitted to disclose material information of which Defendants were aware or were reckless in not knowing.   As alleged herein, such statements artificially inflated or artificially maintained the price of WWE securities and operated as a deceit on the Company in connection with the share repurchases that Defendants caused the Company to engage in during the time period in issue.   Because Defendants chose to speak on the issues described herein, it was important that they not mislead or withhold material information.  As described below, Defendants

---

[18]     Mark Sweney, *Saudi Arabia criticised over pirate TV service 'that airs Premier League'*, dated Jan. 27, 2020 at https://www.theguardian.com/media/2020/jan/27/saudi-arabia-pirate-tv-premier-league-eu-beoutq.

[19]     Sean Ingle, *Newcastle takeover in serious doubt as WTO rules pirate TV channel is Saudi*, THE GUARDIAN, dated May 26, 2020 at https://www.theguardian.com/football/2020/may/26/newcastle-takeover-in-serious-doubt-as-wto-rules-pirate-tv-channel-is-saudi.

[20]     Sam Carp, *Walking the plank: Why the BeIN-BeoutQ piracy saga has implications beyond Qatar*, SPORTSPROINSIDER.COM, dated Dec. 14, 2018 at https://www.sportspromedia.com/from-the-magazine/bein-sports-beoutq-piracy-qatar-saudi-arabia-interview-feature.

[21]     Paul Nichoson, *Saudis lose first round of beoutQ battle at WTO after EU and China speak against*, *Inside World Football*, dated Dec. 19, 2018 at http://www.insideworldfootball.com/2018/12/19/saudis-lose-first-round-beoutq-battle-wto-eu-china-speak/.

created an impression of a state of affairs at the Company that differed in a material way from the one that actually existed.

98.     On February 7, 2019, the Company issued a press release announcing its fourth quarter and fiscal 2018 ("4Q18" and "FY18") financial results for the period ended December 31, 2018 and providing fiscal year 2019 ("FY19") financial guidance.  The press release stated that during FY18, the Company had successfully "[p]roduced new, large-scale international events (Greatest Royal Rumble, Crown Jewel, and Super ShowDown) and compelling content across platforms."  The press release also stated that the Company expected to achieve "Adjusted OIBDA of at least $200 million" for the year, stating:

> **Financial Outlook 2019**
>
> *In 2019, WWE management expects the Company to achieve* another year of record revenue of approximately $1.0 billion and, as previously communicated, is targeting Adjusted *OIBDA of at least $200 million*, which would also be *an all-time record* (up at least 12% from Adjusted OIBDA of $178.9 million in 2018)
>
> Management believes that increasing fan engagement over the next few years can enhance WWE's brand value and strengthen the Company's ability to optimize the value of its content over the long-term.  *Given the potential magnitude of this opportunity and its importance to long-term growth, the Company plans to continue to invest in* content, digitization and *international development*.
>
> \*       \*       \*
>
> Achieving the targeted range of full year results assumes substantial revenue, which supports Adjusted *OIBDA of at least $100 million* in the fourth quarter. (Footnote omitted.)

99.     On February 7, 2019, the Company held a conference call with analysts, media representatives and investors to discuss the Company's 4Q18 results.  During the earnings call, which Defendants V. McMahon, Wilson and Barrios participated in, Defendant V. McMahon stated: "Our international revenue surpassed $300 million for the first time in history . . . [as] we performed large-scale record-breaking events, [including] *Greatest Royal Rumble*."

100.    On the call, Defendant Barrios tied the $200 million adjusted OIBDA guidance to

the Company's continued success and efforts in the Middle East region. Defendant Barrios stated:

> So if we're moving revenue at a faster clip than we anticipate, we may put some
> additional investments in the fourth quarter but ***all geared towards hitting that $200
> million in OIBDA for the year***.
>
> And as we talked about in the prepared remarks, ***it really is on those areas of
> continuing to drive content, especially the localization of our current content and
> potentially local content in some of our key international markets***.
>
> We just think that's a big addition to the flywheel that we've built. We'll continue
> to invest in digital products and digitization kind of writ large, the network being
> kind of one of the largest manifestations of that. And we'll continue to put more
> people, more kind of functional roles in our key markets, in India, in the Middle
> East, in China, in Latin America. So that's what we're going to do. As we said
> again in the prepared remarks, we think there's a long tail for us in the monetization
> of content, both in the U.S. and outside the US. And we think the opportunity is
> one we want to make sure we take advantage of.
>
> ***In terms of the rights renewal process outside the U.S., obviously, there's a lot of
> key markets that we're still working on, U.K., India, China, Latin America, the
> Middle East. We'll announce those as the deals get done or shortly thereafter***.

101.    On February 7, 2019, the Company also filed its FY18 Annual Report on Form 10-

K with the SEC ("FY18 10-K"), which was signed by Defendants V. McMahon, S. McMahon,

Levesque, Wilson, Goldfarb, Ong, Peterson, Riddick, Singh, Wexler and Barrios. Defendants V.

McMahon and Barrios also certified the accuracy of the report pursuant to the Sarbanes Oxley Act

of 2002. The FY18 10-K emphasized the continuing importance of the Company's Saudi business

dealings, stating as follows:

> **Customers**
>
> Our customers include content distributors of our media content through their
> networks and platforms, fans who purchase tickets to our live events, purchase our
> merchandise at venues or online through our eCommerce platforms and subscribers
> to WWE Network, advertisers and sponsors, consumer product licensees, and film
> distributors/buyers. ***As noted elsewhere, we have several important partners,
> including*** NBCU who carries the domestic television distribution of Raw and, until
> October 2019, SmackDown Live, the Fox Network which beginning October 2019
> will begin distributing SmackDown Live, and ***the General Sports Authority of the***

*Kingdom of Saudi Arabia who, among other things, hosts our live events in the Middle East*.

102.    In addition, the FY18 10-K highlighted the importance of the Saudi relationship, reporting that "[i]n 2018, WWE embarked on an important long-term partnership with the General Sports Authority of the Kingdom of Saudi Arabia for, among other things, a series of live events in that region." It also stated that WWE had "an important partnership with the General Sports Authority of the Kingdom of Saudi Arabia" that was then "***expected to continue to constitute a significant percentage of [WWE's] revenues***."

103.    In the FY18 10-K, the Company also identified the following relevant risk factors:

***Our failure to maintain or renew key agreements could adversely affect our ability to distribute our media content, WWE Network, our films and/or other of our goods and services, which could adversely affect our operating results***.

Our media content is distributed by cable, satellite and broadcast television networks and digital platforms around the globe. As detailed below, we depend on third parties for many aspects of the operation and distribution of WWE Network. Our films are generally also distributed by other, more established film companies. Because a large portion of our revenues are generated, directly and indirectly, from this distribution, any failure to maintain (such as due to a breach or alleged breach by either party) or renew arrangements with distributors and platforms, the failure of distributors or platforms to continue to provide services to us or the failure to enter into new distribution opportunities on terms favorable to us could adversely affect our financial outlook, liquidity, business and operating results. We regularly engage in negotiations relating to substantial agreements covering the distribution of our media content by carriers located in the United States and abroad. We have a substantial relationship with NBCU as they distribute the vast majority of our television programming domestically through their cable networks.

As previously announced, we have reached an agreement under which beginning October 2019, the domestic distribution of our program, SmackDown Live, will move to broadcast television on the Fox Network. Raw will continue to be carried by NBCU on USA Network. ***We also have an important partnership with the General Sports Authority of the Kingdom of Saudi Arabia***. These relationships are expected to continue to constitute a significant percentage of our revenues. The number of subscribers and ratings of television networks and advertising revenues in general have been reported as being impacted by viewers moving to alternative media content providers, a process known as "cord cutting" and "cord shaving". Many well-funded digital companies have been competing with the traditional

television business model and, while it has been widely reported that they are paying significant amounts for media content, it is not clear that these digital distributors will replace the importance (in terms of money paid for content, viewer penetration and other factors) of television distribution to media content owners such as WWE. ***We have significant relationships outside the United States with distributors nearing the end of their terms, including in the United Kingdom, India, Latin America and the Middle East***. Many of our other goods and services, such as our toys, video games and home video offerings are manufactured and sold by other parties under licenses of our intellectual property or distribution agreements. Our inability for any of the reasons set forth in these Risk Factors to maintain and/or renew or replace these agreements on terms favorable to us could adversely affect our financial outlook, liquidity, business and/or operating results.

104.    Defendants' above referenced statements were materially false and/or misleading when made in that they failed to disclose that:

(a)    ***OSN had informed the Company in November 2018 that it would not renew its media rights agreement*** and the parties had entered into a settlement dated December 18, 2018 formally terminating the contract effective March 31, 2019, meaning the renewal of that particular media agreement for distribution of the Company's content in its key MENA market was impossible, and forcing the Company to seek a new media partner for distribution of its content in the Middle East, which put in serious jeopardy the ability to finalize a media-rights agreement for the MENA region by the end of 2019.

105.    Analysts at Wolfe Research stated in a February 7, 2019 report that the Company had a "Heckuva Q4 beat, but the read-thru on 2020 is what gets us excited." The Wolfe Research report also noted that "[t]he Saudi deal is proving to be an Intercontinental champ," with "Rev., OIBDA, and EPS beat across the board . . . thanks to a Saudi partnership that has more juice than we imagined." In addition, analysts at MKM Partners stated: "Outperformance came almost entirely from the Media segment and likely reflected the positive impact associated with the Crown Jewel PPV event, which was held in Saudi Arabia as well as modest upside from TV rights."

**February 26, 2019 – Company Conference Presentation**

106.   On February 26, 2019, Defendant Barrios presented to investors at the Morgan Stanley Technology, Media & Telecom Conference.   Defendant Barrios stated that the negotiations on the MENA distribution rights deal were "***ongoing***," with a target to "***get that locked down by the middle of the year***."  Defendant Barrios also stated that the "Middle East is now #2 in 2018 after the U.S." in terms of gross monetization and that (referring to media-rights agreements) "***locking those down [is] obviously, important for us strategically because our distribution partners for the core content is a key part of the value creation for the business, important for us financially.  We'll have a lot of visibility over the next several years for a pretty significant portion of our revenue, so really important***."

107.   In response to a question from an analyst from Morgan Stanley about wrapping up negotiations on outstanding media rights deals and whether those deals would contribute revenue as soon as 4Q19, Defendant Barrios confirmed they would:

**Benjamin Daniel Swinburne, Morgan Stanley, Research Division**

Yes, and then just to wrap up on this – on the rights front.  ***Once we get all these deals done, revenue will step up nicely in '20 and in the fourth quarter this year***.  These projects that you've got going on are stuff that you guys are making determinations that are worth spending money on.

**George A. Barrios, Co-President & Director**

***That's right***

\*       \*       \*

**Benjamin Daniel Swinburne, Morgan Stanley, Research Division**

Okay.  We're out of time.  George, good luck with all the international renewals.  I'm sure they'll visit.

**George A. Barrios, Co-President & Director**

Great. Guys, thank you.

108.    Defendants' statements above contained in ¶¶ 106-07 were materially false and/or misleading for the same reasons set forth in ¶ 104(a).

**June 26, 2019 – Company Conference Presentation**

109.    On June 26, 2019, Senior Vice President of Investor Relations Michael Weitz presented to investors at the 6th Annual Bernstein Future of Media Summit Conference, stating that the media deal in the Middle East is an "important deal[]," and while not completed, he touted that "***there are elements to those that we feel really good about***." He stated in pertinent part:

> ***We've also been very public that there's another series of deals that are important to us right now. So we – just to answer your question about kind of what's around the corner. The deals that we talked about U.K., India, China, Latin America and the Middle East.*** And so we put out some releases over the past 2 weeks that we've been successful in completing deals in the U.K., we've been successful in completing it in Latin America, and we've been successful, whom am I missing, in China. So those are the 3. ***So there's still a few to go, India, in particular, and the Middle East, in particular.*** And by the way, next – somewhere down the path will be Germany. ***So those are coming and important deals for us. So we're not going to talk terms, but there's really interesting elements of those that become really important. The ability to expand reach through elements like free-to-air, the ability to offer – to commit our partners to localize content really important. That helps build the engagement. So the – so*** while I'm not talking about direct economic terms, there are elements to those that we feel really good about. So that's that. So...

110.    The statement Defendants caused WWE to make contained in ¶ 109 was materially false and/or misleading for the same reasons set forth in ¶ 104(a).

**July 25, 2019 – 2Q19 Financial Results**

111.    On July 25, 2019, the Company reported its financial results for 2Q19, ended June 30, 2019. The press release stated that "[d]uring the quarter, WWE continued to demonstrate success in staging large-scale, action packed events for its fans, including . . . Super ShowDown in Jeddah, Saudi Arabia." The Super ShowDown event had occurred on June 7, 2019, and the release touted the event as a major driver of the Company's results and portrayed its successful

operations in Saudi Arabia as a pillar of its FY19 financial guidance.  The press release stated:

> George Barrios, Co-President, added "In the quarter, our earnings exceeded guidance, however we anticipate a portion of this to reverse and we continue to target full-year Adjusted OIBDA of at least $200 million. The guidance presupposes the staging of a second large scale international event and the completion of a media rights deal in the MENA region.  As we optimize near-term results, we will continue to focus on content creation, localization and digitization, including the evolution of our direct-to-consumer network, to drive long-term growth."

> **Second-Quarter Consolidated Results**

> \*     \*     \*

> Adjusted OIBDA (which excludes stock compensation) was $34.6 million as compared to $43.5 million and the Company's Adjusted OIBDA margin was 13% as compared to 15% in the prior year quarter, respectively. The current period results exceeded guidance primarily due to enhanced revenue recognized in conjunction with the Company's recent event in Saudi Arabia, which is expected to reverse in connection with an anticipated fourth quarter event in that country.

> \*     \*     \*

> **Cash flows used in operating activities** were $7.6 million as compared to $74.2 million of cash generated in the prior year quarter driven by unfavorable changes in working capital, ***which was primarily related to the timing of the Saudi event in June as the prior year event was held in April***, as well as lower operating performance.

112.    The Company press release also stated that the Company had reached non-binding

"***agreements in principle*** with the Saudi General Sports Authority on the broad terms" for a second

large scale live event and a media rights deal for the MENA region.  It stated:

> **<u>Financial Outlook 2019</u>**

> ***The Company reiterated its full year guidance, which targets revenue of approximately $1 billion and Adjusted OIBDA of at least $200 million. This guidance assumes continued improvement in WWE's engagement metrics, a second large scale event in the MENA region, and the completion of a media rights deal in the MENA region. The Company believes it has agreements in principle with the Saudi General Sports Authority on the broad terms for the latter two items***; however, this understanding is nonbinding. It is possible that either or both of these business developments do not occur on expected terms and/or that

engagement does not improve as assumed. The Company has evaluated these potential outcomes and currently believes that the most likely downside to its Adjusted OIBDA would be approximately $10 million to $20 million below its current outlook.

***The Company's full year guidance reflects strong fourth quarter results with substantial revenue growth from*** both the Company's new content distribution agreements in the U.S., which become effective in that period, ***and the aforementioned media rights deal in the MENA region.***

113.    On July 25, 2019, the Company held a conference call with analysts, media representatives and investors to discuss the Company's 2Q19 results.  During the earnings call, which Defendants V. McMahon, Wilson and Barrios participated in, Defendant V. McMahon stated, with respect to the media-rights agreement in the Middle East: "Obviously, there's India and MENA to do, and ***we are going to be close to announcing those deals very soon***."

114.    Also, Defendant Barrios stated that, "[d]uring the quarter, we achieved adjusted OIBDA of $34.6 million, which exceeded our guidance, ***primarily due to enhanced revenue recognized in conjunction with our recent event in Saudi Arabia.  That enhanced revenue is expected to reverse in connection with an anticipated fourth quarter event in that country***."

115.    Defendant Wilson stated: "***During the quarter, we continue[d] to successfully stage large-scale events for our fans, including . . .  Super ShowDown in Jeddah, Saudi Arabia.***"

116.    Defendant Barrios also spoke further as to the Company's guidance and the positive impact of the Saudi relationship, stating:

> ***For the full year, we continue to target record revenue of approximately $1 billion and adjusted OIBDA of at least $200 million. This guidance assumes*** continued improvement in our engagement metrics, ***a second large-scale event in the MENA region and the completion of a media rights deal in the MENA region. We believe we have agreements in principles with the Saudi – in principle with the Saudi General Sports Authority on the broad terms for the latter 2 items***.
>
> However, this understanding is nonbinding. It is possible that either or both of these business developments do not occur on expected terms and/or the engagement does not improve as assumed. We valuated these potential outcomes and currently

believe that [the] most likely downside to our adjusted OIBDA would be approximately $10 million to $20 million below our current outlook. ***Our full year guidance reflects strong fourth quarter results, substantial revenue growth*** from both our new content distribution agreements in the U.S. which become effective in that period, ***and the aforementioned media rights deal in the MENA region***.

As you know, ***we're in the process of finalizing our distribution plans for Raw and SmackDown*** in 2 international markets, India and ***the Middle East. As we stated in our last earnings call, we expect to finalize these plans later this year***.

117.    Defendant Barrios also added that "[i]n the Middle East, our pay TV agreement has been terminated, but our free-to-air agreement continues to be in place."

118.    In response to an analyst question regarding "what's going on in Saudi Arabia under the deal terms," Defendant Barrios stated:

Yeah

So we just had an event on June 7. That event was part of the 10-year agreement that we've signed. And Laura, what we're saying is right now in our forecast, which is what suspends our guidance, our guidance is our internal forecast, we are assuming that we'll do a second event in the region and that we will also complete a media rights deal in the region. And if those 2 comes to fruition, we believe we'll hit our $200 million. And what we're saying on the downside is, if some combination – obviously, it's not the ultimate downside case, but our best estimate of a downside case, around either those developments not coming to fruition or the engagement not improving to the level we expect it to.

We estimate the most likely downside at $10 million to $20 million. On the free cash flow side in the quarter, because of the timing of the event and the accounts receivable, our collection of that, because it happens so much later in the quarter. Last year, the MENA event happened on April 27. So we collected in the second quarter, so we didn't have an outstanding AR at the end of the quarter.

At this time, we expect to collect in the third quarter, which is why you see that so you see that reverse.

119.    As a result of Defendants' misrepresentations and omissions, the Company's stock price was artificially inflated. Defendants' statements drove the price of the Company's shares up $1.31 per share, or about 1.75%, to close at $75.99 per share on July 26, 2019.

120.    Defendants' statements contained in ¶¶ 111-18 were materially false and/or

misleading when made in that they failed to disclose that the new media-rights agreement the Company purportedly began negotiating in 2019 with a different media company would not be completed in 2019. *See also* ¶ 104(a).

121. Analysts reacted positively to Defendants' statements and their guidance. Analysts at JP Morgan stated as follows in a July 25, 2019 report: "Overall, we view today's commentary and guidance positively." The report continued: "we're further encouraged to learn that the MENA deal is being negotiated with the Saudi General Sports Authority, whose ten year partnership with WWE clearly reflects interest in the content," and also stated that the WWE's "outlook is dependent on a second Saudi event and media rights agreement covering the MENA region (for which it has nonbinding understandings with the Saudi General Sports Authority)."

**October 31, 2019 – 3Q19 Financial Results**

122. On October 31, 2019, the Company issued a press release providing its third quarter 2019 ("3Q19") financial results. The press release stated that the Company's revenues and operating income had continued to decline year over year to $186.3 million and $6.4 million, respectively. The Company also announced that it was lowering its FY19 adjusted OIBDA guidance to a range of $180 million to $190 million due in large part to the Company's failure to complete a MENA distribution agreement with the Saudis. The press release stated:

> *The Company has modified its full year 2019 guidance to an Adjusted OIBDA range of $180 million to $190 million, which would be an all-time record. The change is attributable to the delay in completing a previously contemplated agreement in the MENA region and the impact of accelerated investment to support content creation*. While the Company continues to work toward the completion of a MENA agreement, no assurances can be given in this regard. The Company expects to have clarity on this point in advance of providing guidance for 2020.

123. On October 31, 2019, the Company held a conference call for analysts, media representatives and investors to discuss its 3Q19 results. During the earnings call, which

38

Defendants Wilson and Barrios participated in, Defendant Barrios reiterated that the new media rights agreement for the MENA region, announced on July 25, 2019, has not yet been completed. Barrios stated:

> ***Our previous full year guidance, which targeted adjusted OIBDA of at least $200 million, to continued improvement in our engagement metrics, second, large-scale event in the MENA region and the completion of a media rights deal in the MENA region. Although we are holding a second large-scale event today in Riyadh, Saudi Arabia, our previously contemplated agreement for the region has not yet been completed.***
>
> Additionally, we've also accelerated investment to support the creation of our core In Ring content, while reducing or delaying other expenses to lessen the impact of that spending. ***Given these developments, we've modified our full year guidance to an adjusted OIBDA range of $180 million to $190 million.***

124.    On the call, Defendant Barrios reiterated that "***no assurances***" could be given that the deal would ever be completed.

125.    In response to a question regarding whether the lowered guidance was related to the Saudi media deal, Defendant Barrios stated "***we had anticipated the deal would have been completed early in the quarter, it hasn't***" and "***that has an impact on the guide.***"

**David Karnovsky, JP Morgan Chase & Co, Research Division**

[…] On the lower outlook for 2019, I think there's been some confusion on the guide since you are holding the Crown Jewel event today. Can you bucket out the $10 million to $20 million between the Middle East deal, the performance of some areas that are more transactional and content investment? And then just on the pull forward of spend, can you just talk about where you're investing more in content now? […]

**George A. Barrios**

***Yes. So we can't bucket out within them. Giving a little bit more color, we had anticipated the deal would have been completed early in the quarter, it hasn't. So that has an impact on the guide***. And then as I mentioned, we brought forward some investments into our core In Ring content. As I said before, those investments really – or the production of that content really has 3 components. It has the creation of the storyline, second is attracting, developing and retaining talent, and then the third is the production elements that go into what our fans experience at the event

and also what they watch on video. And so we accelerated some investments across all 3 of those core In Ring content elements.

126.    In response to a question regarding whether the Saudi media deal was dead,

Defendant Barrios confirmed that "*discussions are ongoing*."

### Eric Isaac Katz, Wolfe Research, LLC

Okay. And then, I know it was mentioned in the release and you kind of said it upfront on the call regarding the deal that no assurances can be given, and I know you can't guarantee a deal, but I guess the last line about insurances didn't necessarily need to be in there. So it sounds like to us, there's a scenario where a deal might not get done, even though there's an agreement in principle. So I guess maybe just trying to be clear on what are the sticking points that could potentially cause a deal to die, even though you have a 10-year partnership with the Kingdom?

### Defendant Barrios

*I think it's like any other discussion you're having with a partner, you're trying to find a common ground that works for you. 3 months ago, we expected that deal to be finalized. As I characterized it now is discussions are ongoing.  So I'll leave it at that.  I'm not sure there's much more I can add than that. But I would say it's similar to all discussions, you're just trying to find common ground.*

127.    On the call, Defendant Barrios added that "*we never really talked about a timeline on the MENA region so I'll stay away from that.*"

128.    On this news, the Company's stock price fell $10.40 per share, or 15.65%, to close at $56.04 per share on October 31, 2019.

129.    Defendants' statements above were materially false and/or misleading when made in that they failed to disclose that the new media-rights agreement the Company began negotiating in 2019 with a different media company owned would not be completed in 2019, nor was it reasonable for the Company to believe it would be completed in 2020 given the circumstances present. *See also* ¶ 104(a).

130.    Analysts were collectively critical of the Company, especially regarding the MENA

deal, or lack thereof.  For example, analysts at Wolfe Research stated as follows in an October 31,

2019 report:

> Well, that was frustrating. Again.  We're all in a tough spot because we have even less visibility into 2020 given the new overhang called MENA and the pull-forward of investment spend. We don't necessarily think the lower 2019 guide has an impact on 2020 – but we got nothing to go on, hence the stock's -16% reaction. What did we decide to do? Well, we lowered Q4 '19 to $112MM vs. the $108-118MM guide – so we now sit at $185MM for 2019. We removed MENA from our 2020 and beyond – which took our revenue down by ~$15MM annually (~1%). We also took out a recurring 2nd Saudi event - ~$50MM in rev. and $20MM in OIBDA. And we left our underlying expenses relatively unchanged (excl. the removal of a 2nd Saudi event), at ~+3% y/y – recall that we incorporate ~+1% of regular opex and ~+2% of investment spend. This takes our '20 EBITDA down to $439MM from $475MM – we remind you that before this call, Consensus was at $436MM.

> How much is MENA? The prior deal with OSN ended earlier in 2019, which we estimate was ~$9MM/yr. We were thinking that the new deal steps up 1.5x to around $15MM/yr, which would all be incremental at this p int. If we're right, then ~$4MM of the Q4 miss is MENA-related.

## November 4, 2019 – Press Release

131.    On November 4, 2019, just days after the *Crown Jewel* live event in Riyadh, Saudi

Arabia, the Company issued a press release reporting that it had finalized a deal with the Saudi

GEA to add a second live event each year throughout the duration of the 10-year agreement. The

press release also noted that "***WWE and GEA also continue to work towards the completion of a***

***media agreement in the MENA region,***" stating:

> Following the historic Crown Jewel event in Riyadh, WWE (NYSE: WWE) and the Saudi General Entertainment Authority (GEA) have expanded their live event partnership through 2027 to include a second annual large-scale event.  ***WWE and GEA also continue to work towards the completion of a media agreement in the MENA region.***

> ***This long-term partnership demonstrates WWE and GEA's commitment to bring sports entertainment to the region and supports Saudi Arabia's Vision 2030.***

132.    As a result of Defendants' misrepresentations and omissions, the Company's stock

price was artificially inflated.  Defendants' statements drove the price of the Company's shares up $2.61 per share, or about 4.91%, to close at $55.77 per share on November 5, 2019.

133.    Defendants' statements contained in ¶ 131 were materially false and/or misleading when made in that they failed to disclose that the new media-rights agreement the Company began negotiating in 2019 with a different media company owned would not be completed in 2019, nor was it reasonable for the Company to believe it would be completed in 2020 given the circumstances present.  *See also* ¶ 104(a).

**December 9, 2019 – Company Conference Presentation**

134.    On December 9, 2019, Defendant Barrios presented to investors at the UBS Global TMT Conference.  During the conference and in response to an analyst question regarding "international renewals," Defendant Barrios continued to mislead the market about the prospects of completing the Saudi media deal, stating that it was still "***working through [the deal]***."

> **Unknown Analyst**
>
> Last question I got is probably one of your favorites. Any updates on international renewals, India, Middle East? Or when do you expect to have an update?
>
> **George A. Barrios**
>
> ***Yes. I mean so we mentioned on the last call that we were working through those. So at this point, nothing really to update.***

135.    Defendant Barrios' statements about contained in ¶ 134 were materially false and/or misleading for the reasons set forth in paragraphs ¶ 104(a).

**January 7, 2020 – Company Conference Presentation**

136.    On January 7, 2020, Defendant Barrios presented to investors at the Citi 2020 Global TMT West Conference.  During the conference, Defendant Barrios admitted that the Company prematurely announced the near completion of a media rights deal with the Saudi

government in July 2019, stating in pertinent part:

> *Yes. So – and probably the better way to describe it is, would be Middle East-North Africa rights, primarily for Raw and SmackDown. So we – which we've had agreements in that region, both free-to-air with MBC and Pay with OSN. In the second quarter, I believe we said when we confirmed or supported the guidance for full year 2019 was that one of the things that subtended that was our expectation of a new deal in the market. That didn't come to fruition. So we talked about it in the third quarter that we continue to work with GSA on those rights. We think we'll get a deal then, but it didn't come to fruition in the time frame that we thought.*

137.   Even at the time of this conference, analysts were still confused as to the various

deals the Company had in Saudi Arabia, requesting more details:

**Unknown Analyst**

Okay. But then that's separate and apart from any sort of broadcast of live content in Saudi Arabia, it's a totally separate deal. Is that right?

**Defendant Barrios**

Well, we have 2 agreements for 2 events that we've been doing large events. Those have media elements to those. But separate and apart from that, there's the rights to the core content, which is Raw and SmackDown, and also the content that currently lives on WWE Network.

138.   Defendant Barrios' statements about contained in ¶¶ 136-37 were materially false

and/or misleading in that they failed to disclose that the new media-rights agreement the Company

began negotiating in 2019 with a different media company owned would not be completed in 2019,

nor was it reasonable for the Company to believe it would be completed in 2020 given the

circumstances present. *See also* ¶ 104(a).

**January 30, 2020 – Defendants Barrios and Wilson Forced Out of Company**

139.   On January 30, 2020, WWE announced that *two of its most senior and longest*

*serving executives, Defendants Barrios and Wilson, had abruptly left the Company*. Analysts

and market commentators reacted with shock at the sudden loss of two key figures who had long

43

been part of the public face of the Company.  For instance, *Forbes* described the departures as a "bloodbath" that had caused "[p]anic and uncertainty" throughout the Company's corporate offices.

140.    In addition, the Company preannounced its 4Q19 results and revealed for the first time that it "***expects its full year 2019 Adjusted OIBDA to be approximately $180 million***" which was at the lower end of guidance of $180 million to $190 million provided by the Company on October 31, 2019.

141.    On this news, the Company's stock price fell $13.42 per share, or 21.54%, to close at $48.88 per share on January 31, 2020.

142.    The full truth about the Company's inability to secure a media rights deal with the Saudi Arabian government and its effects on the Company's revenues was not revealed until February 6, 2020 when the Company issued a press release, reporting disappointing financial results for 4Q19 and reduced guidance for full year 2020.  The press release revealed that consumer engagement metrics had continued to deteriorate in the fourth quarter, and that the Company had achieved just $180 million in adjusted OIBDA for the year (which was preannounced a week prior) due to the failure to complete the MENA distribution agreement with the Saudis.  The press release stated:

> *"For the year, we achieved record revenue and Adjusted OIBDA. However, with the delay in completing a Middle East distribution agreement as well as lower business performance than anticipated, our results were at the low-end of guidance," added Frank Riddick, interim Chief Financial Officer. "As we work to strengthen engagement in 2020, we are pursuing several strategic initiatives that could increase the  monetization of our content, including the distribution of content in the Middle East and India as well as strategic alternatives for our direct-to-consumer service, WWE Network. Excluding the potential impact of these initiatives, we expect significant revenue growth based on the full year impact of our new content distribution agreements in the U.S. and anticipate Adjusted OIBDA of $250 to $300 million. Management believes it has the potential to exceed this range but is unable to provide additional guidance at this*

*time."*

143.    Later in the day, the Company held a conference call with analysts, media representatives and investors to discuss its results.  During the earnings call, in which Defendants V. McMahon and Riddick confirmed that the Company's 2020 financial guidance did not include any revenues related to a prospective MENA deal. When asked if "guidance for 2020 assumes . . . 0 revenues associated with your rights -- TV rights or media rights in India and the Middle East," Defendant Riddick responded "Well, *on MENA, you're correct*."

144.    When asked later in the call to confirm whether the MENA media-rights deal assumptions were included in the 2020 guidance, Defendant Riddick confirmed that the MENA deal was not included—and, thus, if the deal was completed in 2020, it would be an addition to the projections: "Yes, we're still pursuing those new agreements.  And from our perspective, as quickly as we can get them done, that's what we're aiming for.  And I think, as I explained earlier, the India rights are – we already have existing India rights and they are in the guidance because we're already doing, being paid under that arrangement. It would be the increment on India.  *But yes, there's – for MENA, it would be an addition to their guidance.*"

145.    Later in the call, an analyst asked: "[W]hat's taking so long for the MENA and India because we thought those were going to be done like early in '19.  And is there – do we have –will we be done by the end – will we be done with those deals by the end of the first quarter when you're going to give us this comprehensive overview of WWE, do you think?"

146.    In response, with respect to the MENA deal, Defendant Riddick stated: "*The MENA rights, just the intricacies dealing with the Saudi Arabian government and their own ways of going about and doing business, I think we don't want to predict a specific date.  But as I said before, the uncertainty is around the timing and the amount, not that these deals will*

*eventually be done*."

147.   Also on the call, referring now to the Company's 2019 performance, Defendant V. McMahon stated: "***our performance was at the low end of recent guidance as we work through our Middle East distribution agreement and our ongoing efforts to strengthen our brand and customer engagement.***"

148.   Finally, Defendant Riddick disclosed that the Company's WWE Network subscribers were down for 2019: "***WWE Network's average paid subscribers decreased 10% to approximately 1.42 million . . . primarily by the impact of lower subscriber additions earlier in the year.***" This news reflected that the OSN deal had terminated earlier that year, meaning the Company lost WWE Network subscribers who previously had accessed it for free as OSN subscribers when the OSN deal was still in place.

149.   On this news, the Company's stock price fell another $4.50 per share, or 9.18%, to close at $44.50 per share on February 6, 2020.

## CONFIDENTIAL WITNESSES' STATEMENTS FOUND CREDIBLE BY THE COURT IN THE SECURITIES CLASS ACTION

150.   According to Judge Rakoff in the Securities Class Action:

Plaintiff first supports its claim that defendants' statements about the imminence of a media rights agreement with Saudi Arabia were misleading by providing testimony from a confidential witness ("CW-1") regarding the distance between the parties during their negotiations. Plaintiff alleges that CW-1 is a former employee of MBC, a media company partially owned by Saudi Arabia that was charged with negotiating on Saudi Arabia's behalf the proposed media agreement with WWE. […] Plaintiff alleges that when CW-1 joined MBC in the fall of 2019, he worked on a feasibility study related to a possible broadcast partnership between WWE and MBC, estimating the "value of the partnership" between the companies. […] According to the [plaintiff's complaint], CW-1 reported that in Fall 2019, MBC and WWE "were still worlds apart in terms of projected WWE subscribers as well as the annual licensing fees" by tens of millions of subscribers and dollars. […] Plaintiff alleges that this testimony indicates that in July 2019 WWE could not, contrary to its representation, have "believe[d] it ha[d] an agreement[] in principle with the Saudi General Sports Authority on the broad terms for" "a media rights

deal in the MENA region" and likewise had no basis to believe any such deal would be completed in 2019.

As an initial matter, and contrary to defendants' claim, the Court may properly take account of the alleged testimony of CW-1, even though some of his testimony is based on hearsay and indirect knowledge.  For a complaint to rely on information provided by confidential sources, such a source need only be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  This liberal standard make sense; the heightened demands of the PSLRA will often require plaintiffs to rely on the testimony of confidential sources, even where those sources offer indirect knowledge, that is, information and belief that is hearsay but plausible.  Here, the [plaintiff's complaint] alleges that CW-1 worked for the company negotiating on Saudi Arabia's behalf, worked specifically on analysis related to the contemplated media rights agreement, and talked to others at MBC about developments in the deal during his time at MBC. […]  It is thus probable that CW-1 would have had access to information about the prior status of the MBC deal.[]  The Court may thus take account of on CW-l's testimony.

When credited, CW-l's testimony supports the notion that WWE's stated belief that it had an "agreement in principle" for the MENA region in July 2019 was false and misleading.  Drawing all reasonable inferences in plaintiff's favor, the fact that the parties had not agreed on fundamental terms of a contract by the Fall 2019 strongly supports the inference that the defendants could not have had a near-final agreement a few months earlier.

\*\*\*

Plaintiff's allegations that there was an undisclosed deteriorating relationship between Saudi Arabia and WWE also support its claim that defendants' statements about the imminence of a replacement media rights agreement were misleading.  Plaintiff alleges that tension between the parties began when the Saudi government failed to make a timely payment of about $60 million to WWE for a June 2019 event WWE held in Saudi Arabia.  […]. This tension escalated in October 2019, when WWE held an event entitled "Crown Jewel" in Saudi Arabia.  […]  Plaintiff claims that in retaliation for the late payments, defendant McMahon cut the live feed for the Crown Jewel event, which angered the Crown Prince of Saudi Arabia.  […]  As a result, according to plaintiff, the Crown Prince refused to let certain wrestlers leave the country, holding them "hostage" for some hours in an airplane before letting them take off.  […]  The CAC relies for these latter allegations on the testimony of an unnamed former wrestler for WWE ("CW-2") who was allegedly on the flight delayed by the Crown Prince. The CAC also relies on news sources reporting the incident.  […].

Defendants dedicate much of their briefing to disputing the truth of these

47

allegations, suggesting that the relationship between Saudi Arabia was amicable throughout the class period. […]. As previously explained, however, the Court must accept as true the complaint's well-pleaded allegations, without regard to defendants' competing accounts. For the same reason, the Court is unmoved by defendants' protestations that plaintiff's allegations are based on hearsay and unreliable news sources. […] While the quality of supporting evidence may impact plausibility of a plaintiff's claim, a plaintiff need not offer admissible proof of its allegations for the Court accept them as true at this stage. Once appropriately accepted as true, plaintiff's allegations about the deteriorating relationship between WWE and Saudi Arabia plausibly support plaintiff's claims that WWE's statements were misleading. Parties with a relationship as unworkably tense as plaintiff describes are unlikely to have reached an "agreement in principle" at any point. Taken together with plaintiff's allegations that the parties had not even agreed to basic terms of a contract by Fall 2019, this second allegation supports with particularity plaintiff's claims that the defendants' statements about the status of a replacement MENA deal were misleading.

Securities Class Action Order attached hereto as Exhibit I.

## DEFENDANTS' KNOWLEDGE

151.    The following allegations support a strong inference of Defendants' knowledge:

(a)    Statements of current Company employees and others with knowledge corroborate that the Company was informed in November 2018 that the media-rights agreement with OSN would not be renewed;

(b)    Expansion in the MENA region and the relationship with the Saudi government was an extremely important part of the Company's growth plans and Defendants spoke of it frequently;

(c)    Certain Defendants' stock sales were highly unusual and suspicious in timing and amounted to more than $280 million; and

(d)    The abrupt departures of Defendants Barrios and Wilson.

152.    Defendants had told investors in 2018 that the Company expected to significantly grow its revenues earned on media-rights agreements in its seven largest markets, including the Middle East, over the next two years. On June 27, 2018, Defendants told investors that the

Company "expects [that] revenue from existing and new 'key content agreements,' . . . will grow to approximately $311M in 2019 and $462M in 2021,"[22] and a related presentation disclosed that the Company projected WWE's "***total*** revenue from 'key content agreements' [to] increase to $314M in 2019 and $542M in 2021."

153.   Defendants therefore touted the importance of renewing and finalizing its media-rights agreements in its largest markets, including the Middle East, and investors were heavily focused on it.

154.   Defendants also spoke about the importance of the relationship with the Saudi government and their ongoing negotiations to finalize a media rights agreement.  In fact, on July 25, 2019, Defendants specifically tied the Company's ability to meet its full-year 2019 guidance to the Company's negotiations with the Saudi government.  A press release issued that day stated: "The Company reiterated its full year guidance, which targets revenue of approximately $1 billion and Adjusted OIBDA of at least $200 million.  This guidance assumes continued improvement in WWE's engagement metrics, a second large scale event in the MENA region, and the completion of a media rights deal in the MENA region.  The Company believes it has agreements in principle with the Saudi General Sports Authority on the broad terms for the latter two items."  Because the Company's full-year guidance depended on the outcome of these negotiations, Defendants had to have been aware of the status of those discussions.

155.   Given the critical importance of the MENA region to the Company's overall business and projected growth, including specifically the importance of finalizing a new media-

---

[22]     "WWE's 'key content agreements' reflect the licensing of WWE's flagship programs, Raw and SmackDown in the U.S., U.K., India, Canada, LATAM, Middle East and South Africa." June 27, 2018 Conference Call Presentation at https://corporate.wwe.com/~/media/Files/W/WWE/company-new/2018/wwe-us-deals-and-outlook-presentation-06-27-18.pdf.

rights agreement in the region, the problems detailed herein could not have occurred without Defendants' knowledge.

156.   In addition, Defendant V. McMahon sold 3,204,427 shares of WWE stock from February 2019 through February 2020 for proceeds of more than $261 million.  Moreover, during this same time period, 12,627 shares of Defendant V. McMahon's stock worth $886,794 were withheld by the Company to pay for his personal taxes in connection with Company-issued stock. ***Through these transactions, Defendant V. McMahon disposed of approximately 10.1% of his total shares that were available for sale during this time period.***

157.   Defendant V. McMahon sold more than 3.2 million Company shares for over $261 million in gross insider trading proceeds on March 27, 2019, with only a few days left in the Company's disappointing 2019 first quarter and while Defendant V. McMahon had known, or was deliberately reckless in not knowing, that OSN had informed the Company in November 2018 that it would not renew its media rights agreement and the parties had entered into a settlement dated December 18, 2018, formally terminating the contract effective March 31, 2019.   Thus documenting that renewal of that particular media agreement for distribution of the Company's content in its key MENA market was impossible, forcing the Company to seek a new media partner for distribution of its content in the Middle East, which put in serious jeopardy the ability to finalize a media-rights agreement for the MENA region by the end of 2019.

158.   The abrupt nature of Defendants Barrios and Wilson's departure from the Company—mere days before the announcement of the disappointing financial results in the fourth quarter—provides additional evidence of Board knowledge.

159.   Defendant V. McMahon was one of the Company's largest shareholders, served as the Company's CEO, and was the Chairman of the Board.   He clearly possessed unmatched

control over the Company. Defendant V. McMahon has served at all relevant times as the CEO of the Company and Chairman of the Board.

160. Defendant Barrios was a Co-President of the Company, its principle financial officer and a member of its Board. Prior to his abrupt termination on January 30, 2020, he clearly had considerable control over the Company. Defendant Barrios also sold 114,678 shares of WWE stock during the relevant period for proceeds of more than $8.6 million. In addition, during the relevant period, 64,497 shares of Barrios' WWE stock worth $4.5 million were withheld by the Company to pay for his personal taxes in connection with Company-issued stock. Through these transactions, ***Barrios disposed of approximately 74.1% of the total shares***, including vested stock units, he had available for sale during the relevant period.

161. Defendant Wilson was a Co-President of the Company and a member of its Board. Prior to her abrupt termination on January 30, 2020, she clearly had considerable control over the Company. Defendant Wilson sold 158,134 shares of WWE stock during the relevant period for proceeds of approximately $11 million. In addition, during the relevant period, 65,318 shares of Wilson's WWE stock worth $4.6 million were withheld by the Company to pay for her personal taxes in connection with Company-issued stock. Through these transactions, ***Wilson disposed of 100% of the total shares***, including vested stock units, she had available for sale during the relevant period.

162. These Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company.

163. These Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or

51

had the ability and opportunity to prevent their issuance or cause them to be corrected.

164.    Accordingly, these Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

165.    These Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about the Company's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board meetings and committees thereof, and reports and other information provided to them in connection therewith.

166.    As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, these Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. These Defendants' wrongdoing violated these specific requirements and obligations.

167.    These Defendants are liable as primary participants in a wrongful scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired the Company's publicly traded securities, which included the dissemination of materially false and misleading statements (both affirmative statements, misleading statements and material omissions) regarding the Company's business in the MENA region, including renewal of a key media-rights agreement.

168.     The scheme: (a) deceived the investing public regarding the Company's operations and the true value of the Company's common stock, and (b) caused the Company to repurchase the Company's common stock at artificially inflated prices, which fell as the true condition of the Company's business in Saudi Arabia and the MENA region was revealed.

169.     Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit by disseminating materially false and misleading statements and/or concealing material information.

## THE SECURITIES ACTION IS SUSTAINED

170.     As a result of the foregoing, WWE and Defendants V. McMahon, Barrios, and Wilson have been named as defendants in the Securities Action.  On August 6, 2020, Judge Rakoff issued an order in the Securities Action, denying the defendants' motion to dismiss. In the Securities Order, Judge Rakoff held that a claim for securities fraud had been stated against WWE, V. McMahon, Barrios and Wilson based upon alleged misrepresentation about WWE's media-rights contracts in the MENA region.

## DAMAGES

171.     WWE revealed that the Company closed on a $39 million settlement for a Securities Action lawsuit filed by the City of Warren, Michigan Police & Fire Retirement System.

## DUTIES OF THE DIRECTOR DEFENDANTS

172.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are

required to act in furtherance of the best interests of the Company and its investors.

173.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

174.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)        ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)        conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)        properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)         remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)         ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)         ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

175.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

176.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## **DERIVATIVE ALLEGATIONS**

177.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, waste of corporate assets, and unjust enrichment by Defendants.

178.    Plaintiffs will adequately and fairly represent the interests of WWE in enforcing and prosecuting its rights.

179.    Plaintiffs were shareholders of WWE common stock at the time of the wrongdoing of which Plaintiffs complain and have been continuously since.

180.    Before filing this derivative action, Plaintiff Merholz first demanded that the Board take action to investigate the misconduct alleged herein and, if warranted, to commence litigation against Defendant. Specifically, on February 24, 2021, Plaintiff Merholz made a written demand on the Board to investigate and address the misconduct and, if warranted, to commence litigation against Defendants. A true and correct copy of Plaintiff Merholz's demand letter is attached hereto as Exhibit A (the "Merholz Litigation Demand").

181.    In response to the Litigation Demand, Plaintiff Merholz counsel received a letter dated February 26, 2021 (the "February 26, 2021 Letter"), from Ms. Susannah S. Geltman.  The February 26, 2021 Letter stated: "Please be advised that the Independent Board has created a committee of outside directors who are, and have been, reviewing the issues raised in your Demand, in order to assist the Independent Board in assessing and determining the appropriate actions to take. The committee will review your Demand and take it into account."  The February 26, 2021 Letter further requested: "We would appreciate it if you would please provide evidence of your client's continuous ownership of WWE stock from the date of first purchase through the present."  A true and correct copy of the February 26, 2021 Letter is attached hereto as Exhibit B.

182.    In response to the February 26, 2021 Letter, Plaintiff Merholz's counsel sent a

letter, dated March 23, 2021 (the "March 23, 2021 Letter"), attaching Plaintiff Merholz's trade confirmations and also requesting the names of the committee reviewing the Merholz Demand. A true and correct copy of the March 23, 2021 Letter is attached hereto as Exhibit C.

183.   In response to the March 23, 2021 Letter, Ms. Geltman emailed Plaintiff Merholz's counsel on April 8, 2021 stating that "the committee created by the Independent Board is comprised of Steve Pamon and Erika Nardini." A true and correct copy of the April 8, 2021 email is attached hereto as Exhibit D.

184.   On April 30, 2021, Plaintiffs' Counsel sent a letter to Ms. Susannah S. Geltman requesting the following:

> Dear Ms. Geltman:
>
> We write on behalf of our clients Ryan Merholz and Nicholas Jimenez, who each have made a demand upon the Board of Directors ("Board") of World Wrestling Entertainment Inc. ("WWE"). We are in receipt of your email dated April 8, 2021 giving us the names of the members of the Board of WWE appointed to the Independent Board ("IB") and thank you for same. Please let us know on what date the IB was formed and please provide us with any Board minutes on how Steve Pamon and Erika Nardini were appointed to the Board and the IB. Please also provide us with the documents sufficient to show the power, authority, and/or mandate of the IB, and any changes thereto from formation to the present. Please also let us know if you have an estimate as to when the IB will conclude its investigation and issue its report.
>
> Upon the conclusion of the IB's investigation, please have the IB produce to us, subject to a reasonable confidentiality agreement, any final written IB investigation report or presentation, if any, as well as any documents identified or referenced therein. If you have a form of confidentiality agreement you wish to use, please send it to us now so we can vet it and be ready to sign it.
>
> In addition, please produce to us once the IB concludes its investigation, the following additional materials, unless they are produced to us with the IB's final investigation report:
>
> 1.   All minutes of each meeting of the WWE's Board discussing the formation of the IB and the reasons therefor.
>
> 2.   All minutes of any IB meeting(s) addressing the IB's investigation or its

findings, including documents, presentations, meeting books, or other written or graphic material provided to and/or considered by the IB during and/or with respect to such meeting(s).

3.      A list of those persons, firms or entities retained by the IB to assist or advise it in the course of its investigation, including but not limited to, all counsel, accountants, investment bankers, experts, or other advisors.

4.      Copies of any tolling agreements entered into between the IB and any officer of director of the Company.

5.      All correspondence or emails sent or received from the formation of the IB through the conclusion of the IB's investigation and final determination(s), between or among: (i) any member of the IB and (ii) any non-IB member(s) of the Board concerning (a) our clients' demands, (b) any pending derivative litigation involving the Company and/or the Board, or (c) the matters investigated by the IB.

6.      A list of all persons interviewed by the IB or its agents or attorneys, setting forth (i) the name of each person interviewed, (ii) their title, (iii) the company or entity they worked for at the time in issue, (iv) the date(s) of the interview, and (v) whether any members of the IB were present during the interview(s).

7.      All documents concerning the Board's decision to form the IB and the reasons therefor.

8.      All documents and materials used by the Board to determine whether the members of the IB were independent and the reasons for any conclusions reached by the Board as to this issue of independence.

9.      All documents concerning any personal or business relationships, or other affiliations between and/or among any member of the IB and any officer of the Company, or any member of the IB and any of the members of the Board, current or former.

10.     All documents concerning any current or past transactions or ownership interests by any member of the IB in any WWE assets, subsidiaries, related parties, debt instruments, derivatives, equity, or securities of any type or form, including, without limitation, current and/or prior ownership of WWE common stock.

Please let us know within five (5) business days if you will agree to produce the Materials listed above at the conclusion of the IB's investigation.

A true and correct copy of the April 30, 2021 Letter is attached hereto as Exhibit E.

185.    On May 3, 2021, Defendants' Counsel responded by email stating: "We have reviewed your correspondence from Friday, April 30, 2021, requesting information on behalf of shareholders Ryan Merholz and Nicholas Jimenez.  We are able to share additional information after you have signed a non-disclosure agreement.  We will send you the agreement for your review and signature."   A true and correct copy of the May 3, 2021 Email is attached hereto as Exhibit F.

186.    On May 4, 2021, Plaintiffs' Counsel responded by email stating: "Hi Elizabeth: Thank you for the quick response.  Please send along the confidentiality agreement so we can review.  Also, please let me know what you intend to produce."  A true and correct copy of the May 4, 2021 Email is attached hereto as Exhibit G.

187.    On May 46, 2021, Plaintiffs' Counsel further responded by email stating: "When you have a chance, please send the confidentiality agreement.  Also, can you please let me know what you mean by: "We are able to share additional information"? Further, our April 30th letter asks for specific documents and we would like to know what you plan on producing.  Please specify and let us know by the end of business today."  A true and correct copy of the May 6, 2021 Email is attached hereto as Exhibit H.  Plaintiffs' Counsel has never received documents from Defendants' Counsel in this action so Defendants' Counsel statement that "We are able to share additional information" is unfounded as no previous information/documents were produced. Further, Defendants' Counsel refuse to specify which documents that they are willing to produce in order to determine the independence of the IB.  Those documents can easily be identified and produced.

188.    Further, before filing this derivative action, Plaintiff Jimenez first demanded that the Board take action to investigate the misconduct alleged herein and, if warranted, to commence litigation against Defendant.  Specifically, on March 23, 2021, Plaintiff Jimenez made a written

demand on the Board to investigate and address the misconduct and, if warranted, to commence litigation against Defendants.  A true and correct copy of Plaintiff Jimenez's demand letter is attached hereto as Exhibit J (the "Jimenez Litigation Demand").

189.    In response to the Litigation Demand, Plaintiff Jimenez's counsel received a letter dated March 30, 2021 (the "March 30, 2021 Letter"), from Ms. Susannah S. Geltman, which stated: "As you are aware, the Independent Board has created a committee of outside directors who are, and have been, reviewing the issues raised in the Demand, in order to assist the Independent Board in assessing and determining the appropriate actions to take. The committee will review the Demand and take it into account."  A true and correct copy of the March 30, 2021 Letter is attached hereto as Exhibit K.

190.    On May 12, 2021, the Demand Review Committee's counsel sent Plaintiffs' Counsel by email, a three-page document, setting forth the Demand Review Committee's powers to review Plaintiffs' demand.  According to the document, the Demand Review Committee does not have the power to commence litigation but rather can recommend to the Board what course of action they (the Board) should take.  Without plenary authority over the disposition of the derivative claims, independent of the WWE Board, the Demand Review Committee is nothing more than a powerless advisory committee.  Defendants' failure to delegate full authority to the Demand Review Committee – and in turn abdicate the Board's authority – renders the Demand Review Committee powerless and its so-called investigation futile.

## COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

191.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

192.    The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

193.    The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

194.    The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

195.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

196.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against the Director Defendants for Waste of Corporate Assets)

197.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

198.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

199.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

200.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

201.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

<u>**COUNT III**</u>

<u>**(Against Defendants V. McMahon, Barrios, and Wilson For Unjust Enrichment)**</u>

202.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

203.    By their wrongful acts and the omissions of material fact that they caused to be made, Defendants V. McMahon, Barrios and Wilson were unjustly enriched at the expense of, and to the detriment of, the Company.

204.    Defendant V. McMahon sold 3,204,427 shares of WWE stock from February 2019 through February 2020 for proceeds of more than $261 million.  Moreover, during this same time period, 12,627 shares of Defendant V. McMahon's stock worth $886,794 were withheld by the Company to pay for his personal taxes in connection with Company-issued stock.  Through these transactions, Defendant V. McMahon disposed of approximately 10.1% of his total shares that

were available for sale during this time period.

205.    Defendant Barrios also sold 114,678 shares of WWE stock during the relevant period for proceeds of more than $8.6 million.  In addition, during the relevant period, 64,497 shares of Barrios' WWE stock worth $4.5 million were withheld by the Company to pay for his personal taxes in connection with Company-issued stock.  Through these transactions, Barrios disposed of approximately 74.1% of the total shares, including vested stock units, he had available for sale during the relevant period.

206.    Defendant Wilson sold 158,134 shares of WWE stock during the relevant period for proceeds of approximately $11 million.  In addition, during the relevant period, 65,318 shares of Wilson's WWE stock worth $4.6 million were withheld by the Company to pay for her personal taxes in connection with Company-issued stock.  Through these transactions, Wilson disposed of 100% of the total shares, including vested stock units, she had available for sale during the relevant period.

207.    Plaintiffs, shareholders and representatives of the Company, seek restitution from Defendants V. McMahon, Barrios and Wilson and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by Defendants V. McMahon, Barrios, and Wilson due to their wrongful conduct and breach of their fiduciary duties.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 13, 2021

GAINEY McKENNA & EGLESTON

By: */s/ Gregory M. Egleston*
    Gregory M. Egleston (CT19709)
Thomas J. McKenna
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiffs*

<u>VERIFICATION</u>

      I, RYAN MERHOLZ, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of World Wrestling Entertainment, Inc. common stock at all relevant times.

      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

RYAN MERHOLZ

## <u>VERIFICATION</u>

I, NICHOLAS JIMENEZ, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of World Wrestling Entertainment, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

*/s/Nicholas Jimenez*
NICHOLAS JIMENEZ

# EXHIBIT A

# GAINEY McKENNA & EGLESTON

ATTORNEYS AT LAW

www.gme-law.com

501 FIFTH AVENUE
19th FLOOR
NEW YORK, NEW YORK 10017
TEL: (201) 983-1300
FAX: (201) 983-0383

95 ROUTE 17 SOUTH
SUITE 310
PARAMUS, NEW JERSEY 07652
TEL: (201) 225-9001
FAX: (201) 225-9002

Please Reply To The New York Address

February 24, 2021

**By U.S. Mail**

Mr. Vincent K. McMahon
Chairman and Chief Executive Officer
World Wrestling Entertainment, Inc.
1241 East Main Street
Stamford, CT 06902

Re:     **Shareholder Litigation Demand**

Dear Mr. McMahon:

The law firm of Gainey McKenna & Egleston represents Mr. Ryan B. Merholz.  He is a current owner of the stock of World Wrestling Entertainment, Inc. ("WWE" or the "Company") and he purchased his WWE shares on September 19, 2019 and currently still holds those shares.

Mr. Merholz intends to retain his ownership interest through the conclusion of any further proceedings relating to the contents of this letter.  This letter constitutes a formal demand on behalf of our client that WWE's Board of Directors (the "Board") investigate and commence legal proceedings against the following former and/or current directors, executive officers and agents of the Company: you, Stephanie McMahon, Paul Levesque, Frank A. Riddick, III, Stuart U. Goldfarb, Laureen Ong, Robyn W. Peterson, Man Jit Singh, Jeffrey R. Speed, Alan M. Wexler, George A. Barrios ("Barrios"), and Michelle D. Wilson ("Wilson")[1] for breach of fiduciary duties, corporate waste, and unjust enrichment (insider trading).  The Board should also consider and implement corporate governance reforms designed to address and prevent the sort of wrongdoing described in this letter.

## Background and Improper Statements To The Market

In 2014, WWE's international expansion hit a major milestone when it struck a deal with the Orbit Showcase Network ("OSN"), a Kuwaiti-controlled direct broadcast satellite provider serving the Middle East and North Africa ("MENA") region.  OSN traditionally offered popular entertainment content such as movies, sporting events, and various TV shows from major U.S. and international networks and studios, in addition to local versions specifically for the MENA region.

---

[1]     Barrios and Wilson are former Co-Presidents of the Company.

Mr. Vincent K. McMahon
Chairman and Chief Executive Officer
World Wrestling Entertainment, Inc.
February 24, 2021
Page 2

On July 21, 2014, WWE and OSN formally announced a five-year exclusive media agreement, stating that WWE's flagship television program Monday Night Raw would air live on OSN, WWE's exclusive pay-per-view partner in the Middle East and North Africa through 2019.

On February 15, 2015, WWE and OSN jointly issued a release stating they were adding WWE Network to the five-year agreement as part of an expanded partnership. In the years that followed, expansion into the MENA region became a critical part of WWE's business plans and growth initiatives, as the Middle East grew to become the WWE's second-largest market by monetization. WWE's international revenues increased from $87.6 million in 2005 to $135.3 million in 2010. After a decline over the next few years, WWE's international revenues increased to $169.8 million in 2015, $189 million in 2016, and $201 million in 2017—the increase during these more recent years driven, in part, by the 2014 launch of the WWE Network—a subscription streaming network available in more than 170 countries.

In March 2018, the Saudi Press Agency announced that WWE and the Saudi General Sports Authority ("SGSA") had signed a 10-year multi-platform partnership with WWE to hold wrestling events in the country. The first event held under the Saudi partnership was the Greatest Royal Rumble, which took place on April 27, 2018. WWE hailed the event as the largest outside the U.S. in the past 16 years and a major contributor to WWE's record second quarter 2018 results. The second event was the Crown Jewel held on November 2, 2018. WWE viewed business dealings with the Saudi government as a lucrative entrance point into the MENA region and a key pillar of its business plans.

The Company routinely touted the international market and the MENA region specifically as the future of WWE's revenue generation. The Company specifically cited the partnership deals with OSN and the SGSA as a driver of adjusted OIBDA – the non-GAAP metric that WWE states "is the primary measure used by management of the Company to evaluate segment performance and make decisions about allocating resources." By early 2019, the Company was touting record breaking OIBDA of $200 million for fiscal year 2019 based primarily on revenue generated from the Middle East.

## The OSN Agreement Is Quietly Terminated

The OSN deal was prematurely terminated in December 2018. According to Carlo Nohra ("Nohra"), Vice President and General Manager of WWE – Middle East, who was the self-described principal point of contact with OSN regarding the applicable media-rights agreements, in early 2018, OSN became delinquent in the payments of rights fees to WWE. Nohra explained that in September 2018, WWE sent OSN a "Notice of Material Breach" based on the delinquent payments. OSN responded with a letter dated November 5, 2018, in which OSN's general counsel informed WWE that OSN was contemplating the future long-term funding of its business and hoped to respond to WWE about the missed payments after an upcoming board meeting.

Mr. Vincent K. McMahon
Chairman and Chief Executive Officer
World Wrestling Entertainment, Inc.
February 24, 2021
Page 3

According to Nohra, in November 2018, OSN sent WWE an unsolicited settlement proposal, in which OSN's general counsel informed WWE that it intended to exit its sport content business and conclude its sports coverage in early 2019. Negotiations followed, and, according to Nohra, WWE and OSN entered into a settlement agreement dated December 18, 2018 pursuant to which OSN and WWE agreed to the early termination of their media-rights agreements effective March 31, 2019, and OSN agreed to pay WWE all rights fees owed for 2018 and through March 31, 2019.

## The Company Misrepresents The Status Of WWE's Agreements In The Middle East

As early as February 2019, the Company regularly told the market that a "renewal" of a broadcasting agreement in the Middle East was forthcoming. The only such agreement was that with OSN, which was set to expire in the summer of 2019. Yet before these statements were made, the former and/or current directors listed above knew, or were reckless in not knowing, that as early as November 2018, OSN had informed WWE that the network was shutting down its sports coverage.

The true state of WWE's financial future in the Middle East went undisclosed. Despite specifically warning in public filings with the SEC that "failure to maintain or renew key agreements could adversely affect our ability to distribute our media content, WWE Network, our films and/or other of our goods and services, which could adversely affect our operating results" the Board signed a SEC filing they knew omitted material information.

During this time, the Company scrambled to find another media rights broadcaster. They settled on the SGSA. In an attempt to blunt the impact of the loss of the OSN Agreement, the Company would, starting in July 2019, publicly shift focus away from the (secretly) defunct OSN venture and begin promoting the prospects of their negotiations of a media rights agreement with the SGSA. Such a deal was critical for WWE to reach its highly publicized goal of full-year $200 million fiscal year 2019 OIBDA guidance.

To that end, by the summer of 2019, the Board caused the Company to state that an "agreement in principle" had been reached with the SGSA for a new media rights deal in the MENA region and that negotiations would be wrapped up "very soon." They were not. And according to WWE insiders, a year later a deal had yet to be finalized.

## The Truth Emerges

The truth would ultimately emerge in *October 2019*, after Mr. Merholz purchased his WWE's stock. On Halloween, the Company announced that it was lowering its fiscal year 2019 adjusted OIBDA guidance from $200 million to a range of $180 million to $190 million. This was in large part due to its failure to complete a distribution agreement with the SGSA. On a conference call to discuss the results, Barrios now stated that "no assurances" could be given that the deal would ever be completed.

Mr. Vincent K. McMahon
Chairman and Chief Executive Officer
World Wrestling Entertainment, Inc.
February 24, 2021
Page 4

On January 30, 2020, the purpose of the misrepresentations was made clear: After an entire year of promising, predicting, and promoting expected adjusted OIBDA of $200 million – heads rolled. WWE announced that two of its most senior and longest serving executives, Barrios and Wilson, abruptly left WWE. Days later, on February 6, 2020, the Board caused WWE to announce that WWE achieved just $180 million in adjusted OIBDA for the year.

Yet not every shareholder was harmed by the drop in WWE stock price. While in possession of material inside information regarding the true picture of WWE's Middle East media rights efforts, three WWE insiders would liquidate their personal WWE stock for proceeds in excess of $270 million. *See* Securities Order[2] at 28 ("McMahon's March 27, 2019 sale was also suspiciously timed, as it occurred only a few days before the OSN Agreement ended and a month before the issuance of lower-than-expected income projections for the second-quarter of 2019, which resulted in a drop in WWE's stock price.").

**The Securities Class Action**

As a result of the foregoing, WWE and V. McMahon, Barrios, and Wilson have been named as defendants in the Securities Action. On August 6, 2020, Judge Rakoff issued an Order in the Securities Action, denying the defendants' motion to dismiss. In the Securities Order, Judge Rakoff held that a claim for securities fraud had been stated against WWE, V. McMahon, Barrios and Wilson based upon alleged misrepresentation about WWE's media-rights contracts in the MENA region. Recently, as you are aware, WWE settled in principle with the Securities Class Action plaintiffs for $39,000,000, subject to Court approval

**Shareholder Litigation Demand**

As you are aware, by virtue of their positions as directors and/or officers of the Company and because of their ability and duty to control the business and corporate affairs of the Company, the directors and officers of WWE owe the Company and its shareholders the fiduciary duties of loyalty, due care, and candor.

As noted above, on behalf of Mr. Merholz, we demand that a full corrective action be brought, including commencing legal proceedings against each of the current and former officers, executives and members of the Board named above, all of whom have been responsible for harming the Company as a result of the wrongdoing outlined in this letter. Claims against the disloyal directors, officers and executives should be pursued for, *inter alia*, breaches of fiduciary duty, corporate waste, and unjust enrich (insider trading). The Board should also consider and implement corporate governance reforms designed to address and prevent the breaches of fiduciary duty and lack of internal controls described herein.

---

[2]    *City of Warren Police & Fire Retirement System v. World Wrestling Entertainment, Inc., et al.*, Case 1:20-cv-02031-JSR (S.D.N.Y.) ("Securities Class Action") (D.E. 68).

*Mr. Vincent K. McMahon*
*Chairman and Chief Executive Officer*
*World Wrestling Entertainment, Inc.*
*February 24, 2021*
*Page 5*

The action that should be brought against the above-mentioned officers and directors should seek a monetary recovery for damages that include, but are not limited to:

      (a)     damage to the Company's reputation and good will (including irreparable damage to the Company's reputation and credibility, banking, insurance and securities regulators, and to the Company's reputation and credibility, insurance, and financial communities);

      (b)     resultant loss of business and business opportunities;

      (c)     increased costs of capital;

      (d)     the costs of internal investigations, auditors and outside counsel; and

      (e)     legal fees, costs, and potentially substantial amounts payable in settlement or satisfaction of lawsuits.

Mr. Merholz requests that he receive a response to the demands made herein no later than ten (10) days from receipt of this letter. Mr. Merholz is prepared to cooperate with the Board in its investigation and would be happy to have his counsel meet with the members of the Board, if they would find that helpful.

To those ends, we look forward to your prompt response.

Very truly yours,

**GAINEY McKENNA & EGLESTON**

*/s/ Gregory M. Egleston*

Gregory M. Egleston

cc:    Daniel J. Kramer, Esq. (By Email: dkramer@paulweiss.com)
       Jerry S. McDevitt, Esq. (By Email: jerry.mcdevitt@klgates.com)
       Thomas J. McKenna, Esq. (By Email: tjmckenna@gme-law.com)

 MᴄKENNA & EGLESTON
501 FIFTH AVENUE
19th FLOOR
NEW YORK, NEW YORK 10017



UNITED STATES POSTAGE

PITNEY BOWES

$000.51ᴰ
02 1P
0006934344   FEB 24 2021
MAILED FROM ZIP CODE 10017

Mr. Vincent K. McMahon
Chairman and Chief Executive Officer
World Wrestling Entertainment, Inc.
1241 East Main Street
Stamford, CT 06902

# EXHIBIT B

# Simpson Thacher & Bartlett LLP

425 LEXINGTON AVENUE
NEW YORK, NY 10017-3954

TELEPHONE: +1-212-455-2000
FACSIMILE: +1-212-455-2502

Direct Dial Number                                                                                          E-mail Address
212-455-2762                                                                                          sgeltman@stblaw.com

February 26, 2021

BY E-MAIL & EXPRESS MAIL

Gregory M. Egleston
Gainey McKenna & Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017

Dear Mr. Egleston:

Your February 24, 2021 Litigation Demand on behalf of Ryan B. Merholz has been referred to us as independent counsel for the independent directors of the Board of Directors of World Wrestling Entertainment, Inc. (the "Independent Board").

Please be advised that the Independent Board has created a committee of outside directors who are, and have been, reviewing the issues raised in your Demand, in order to assist the Independent Board in assessing and determining the appropriate actions to take. The committee will review your Demand and take it into account.

We would appreciate it if you would please provide evidence of your client's continuous ownership of WWE stock from the date of first purchase through the present.

Please let us know if you have any questions.

Very truly yours,

Susannah S. Geltman

cc:    Thomas J. McKenna (*via email*)
       Paul C. Curnin (*via email*)

BEIJING     HONG KONG     HOUSTON     LONDON     LOS ANGELES     PALO ALTO     SÃO PAULO     TOKYO     WASHINGTON, D.C.

# EXHIBIT C

# GAINEY McKENNA & EGLESTON

ATTORNEYS AT LAW

www.gme-law.com

501 FIFTH AVENUE
19th FLOOR
NEW YORK, NEW YORK 10017
TEL: (201) 983-1300
FAX: (201) 983-0383

95 ROUTE 17 SOUTH
SUITE 310
PARAMUS, NEW JERSEY 07652
TEL: (201) 225-9001
FAX: (201) 225-9002

Please Reply To The New York Address

March 23, 2021

By Email: sgeltman@stblaw.com

Susannah S. Geltman, Esq.
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
NY, NY 10017-3954

Re:     Shareholder Litigation Demand

Dear Ms. Geltman:

      We are in receipt of your February 26, 2021 letter requesting evidence of Mr. Ryan B. Merholz's continuous ownership of World Wrestling Entertainment, Inc. ("WWE") stock. Although we are not obligated to provide you with this requested information, please see Exhibit A attached hereto. In addition, please also provide us with the names on the committee reviewing Mr. Merholz's demand.

Very truly yours,

**GAINEY McKENNA & EGLESTON**

*/s/ Gregory M. Egleston*

Gregory M. Egleston

cc:     Paul C. Curnin, Esq. (By Email: pcurnin@stblaw.com)
        Thomas J. McKenna, Esq. (By Email: tjmckenna@gme-law.com)

EXHIBIT A

**Robinhood**

Ryan Mertholz Account #

09/09/2019

| EQUITIES/OPTIONS | B/S | TRADE DATE | SETTLE DATE | ACCT TYPE | PRICE | QTY | PRINCIPAL | COMM | TRAN FEE | NET AMOUNT | MKT | CAP | U/S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WWE WWE CUSIP: 98156Q108 | B | 09/09/2019 | 09/11/2019 | M | $71.0000 | 1 | $71.00 | $0.00 | $0.00 | $71.00 | OTC | 1 | U |
| WWE WWE CUSIP: 98156Q108 | B | 09/09/2019 | 09/11/2019 | M | $71.0000 | 70 | $4,970.00 | $0.00 | $0.00 | $4,970.00 | OTC | 1 | U |

**Total Quantity Bought:** 71   **Total Dollars Bought:** $5,041.00

**Total Quantity Sold:** 0   **Total Dollars Sold:** $0.00

MR_CE_BKPQKCBBCDCVL_BBBBB 20210226

S

INVESTMENT REPORT
February 12, 2021 - February 28, 2021

Fidelity Account RYAN B MERHOLZ - INDIVIDUAL
▶ **Account Number:** 5074

## Your Account Value:

Change from Last Period:

|  | This Period | Year-to-Date |
|---|---|---|
| **Beginning Account Value** | - | - |
| Additions | | |
| Subtractions | | |
| Change in Investment Value * | | |
| **Ending Account Value **** | | |
| Accrued Interest (AI) | 0.00 | |
| Ending Account Value Incl. AI | | |

\* Reflects appreciation or depreciation of your holdings due to price changes, transactions from Other Activity In or Out and Multi-currency transactions, plus any distribution and income earned during the statement period.

\*\* Excludes unpriced securities.

Envelope # BKPQKCBBCDCVL

RYAN BRADLEY MERHOLZ

## Contact Information

| Online | Fidelity.com |
|---|---|
| FAST℠-Automated Telephone | (800) 544-5555 |
| Customer Service | (800) 544-6666 |

Brokerage services provided by Fidelity Brokerage Services LLC (FBS), Member NYSE, SIPC (800) 544-6666. Brokerage accounts carried by National Financial Services LLC (NFS), Member NYSE, SIPC.

H01581448202102226

**Fidelity Investments**

INVESTMENT REPORT
February 12, 2021 - February 28, 2021

Account # ███ 5074
RYAN BRADLEY MERHOLZ - INDIVIDUAL

## Account Summary

### Account Value:

$ ▬▬

### Change in Account Value

| | This Period | Year-to-Date |
|---|---|---|
| **Beginning Account Value** | | |
| **Additions** | | |
| Deposits | | |
| Securities Transferred In | | |
| **Subtractions** | | |
| Withdrawals | | |
| **Change in Investment Value \*** | | |
| **Ending Account Value** | | |
| Accrued Interest (AI) | | |
| **Ending Account Value Incl. AI** | | |

Total Account Trades Mar 2020 - Feb 2021: 0

\*  Reflects appreciation or depreciation of your holdings due to price changes, transactions from Other Activity In or Out and Multi-currency transactions, plus any distribution and income earned during the statement period.

### Investment Activity

**Total Investment Activity**

### Account Holdings

100% Stocks ($15,648)

### Top Holdings

| Description | Value | Percent of Account |
|---|---|---|
| World Wrestling Entertainment INC | 3,507 | 22 |
| **Total** | | |

Please note that, due to rounding, percentages may not add to 100%.

MR_CE_BKP.OKCOBBCDCVL_BBBBB 20210226

2 of 8

INVESTMENT REPORT
February 12, 2021 - February 28, 2021

Account # 5074
RYAN BRADLEY MERHOLZ - INDIVIDUAL

## Core Account and Credit Balance Cash Flow (continued)
Core Account: CASH

| Cash Management Activity | This Period | Year-to-Date |
|---|---|---|
| Deposits | | - |
| Withdrawals | | - |
| Total Cash Management Activity | - | - |
| Ending Balance | - | - |

## Holdings

### Stocks

| Description | Beginning Market Value Feb 12, 2021 | Quantity Feb 28, 2021 | Price Per Unit Feb 28, 2021 | Ending Market Value Feb 28, 2021 | Total Cost Basis | Unrealized Gain/Loss Feb 28, 2021 | EAI ($) / EY (%) |
|---|---|---|---|---|---|---|---|
| **Common Stock** | | | | | | | |
| WORLD WRESTLING ENTERTAINMENT INC (WWE) | unavailable | 71.000 | 49.4000 | 3,507.40 | unknown | unknown | 34.08 / 0.970 |
| Total Common Stock (100% of account holdings) | | | | | | | |
| Total Stocks (100% of account holdings) | | | | | | | |
| **Total Holdings** | | | | | | | |

*All positions held in cash account unless indicated otherwise.*



MR_CE_BKPGKCBBCDCVL_BBBBB 20210226

INVESTMENT REPORT
February 12, 2021 - February 28, 2021

# Holdings

Account # 5074
RYAN BRADLEY MERHOLZ - INDIVIDUAL

EAI  *Estimated Annual Income (EAI) & Estimated Yield (EY)* - EAI is an estimate of annual income for a specific security position over the next rolling 12 months. EAI may be negative on short
& EY positions. EY is calculated by dividing the current EAI for a security position by its statement closing date market value. EAI and EY are estimates only and may include return of principal
and/or capital gains, which would render them overstated. Actual income and yield might be lower or higher than the estimated amounts. *For calculation details, refer to the*
*"Additional Information and Endnotes" section.*

Total Cost Basis does not include the cost basis on core, money market or other positions where cost basis is unknown or not applicable.

# Activity

## Securities Transferred In



| Settlement Date | Security Name | Symbol/CUSIP | Description | Quantity | Price | Amount |
|---|---|---|---|---|---|---|
| 02/19 | WORLD WRESTLING ENTERTAINMENT INC | 98156Q108 | Transfer Of Assets | 71.000 | 46.8100 | |
| | ACAT RECEIVE VALUE OF TRANSACTION $3,323.51 | | | | | |

**Total Securities Transferred In**

## Deposits

| Date | Reference | Description | Amount |
|---|---|---|---|

**Total Deposits**

MR_CE_BKPGKCBBCDCVL_BBBB 20210226    S

4 of 8



INVESTMENT REPORT
February 12, 2021 - February 28, 2021

Account # ████ 5074
RYAN BRADLEY MERHOLZ - INDIVIDUAL

## Activity

### Withdrawals

| Date | Reference | Description | Amount |
|---|---|---|---|
| Total Withdrawals | | | |

### Net Adjustments



| Settlement Date | Security Name | Symbol/CUSIP | Description | Quantity | Price | Transaction Cost | Amount |
|---|---|---|---|---|---|---|---|
| 02/22 | WORLD WRESTLING ENTERTAINMENT INC 205-735074-2: VALUE OF TRANSACTION: $3,388.83 | 98156Q108 | Journaled | 71.000 | 47.7300 | | |
| 02/22 | WORLD WRESTLING ENTERTAINMENT INC 205-735074-1: VALUE OF TRANSACTION: $3,388.83 | 98156Q108 | Journaled | -71.000 | 47.7300 | | |
| Total Net Adjustments | | | | | | | |

MR_CE_BKP0KCGBBDCDVL_BBBB8 20210226

INVESTMENT REPORT
February 12, 2021 - February 28, 2021

Account # 5074
RYAN BRADLEY MERHOLZ - INDIVIDUAL

## Estimated Cash Flow (Rolling as of February 28, 2021)

| Month | Bond & CD Income | Bond & CD Principal | Stock Income | ETP Income | Mutual Fund Income | Other Income | Total Est. Cash Flow |
|---|---|---|---|---|---|---|---|
| March 2021 | -- | -- | | -- | -- | -- | |
| April | -- | -- | | -- | -- | -- | |
| May | -- | -- | | -- | -- | -- | |
| June | -- | -- | | -- | -- | -- | |
| July | -- | -- | -- | -- | -- | -- | |
| August | -- | -- | | -- | -- | -- | |
| September | -- | -- | | -- | -- | -- | |
| October | -- | -- | -- | -- | -- | -- | |
| November | -- | -- | | -- | -- | -- | |
| December | -- | -- | | -- | -- | -- | |
| January 2022 | -- | -- | -- | -- | -- | -- | |
| February | -- | -- | -- | -- | -- | -- | |
| Total | -- | -- | | -- | -- | -- | |

This table presents the estimated monthly interest and dividend income and return of principal that your current holdings may generate over the next rolling 12 months. The cash flows displayed are estimates provided for informational purposes only and there is no guarantee that you will actually receive any of the amounts displayed. These estimates should not be relied upon for making investment, trading or tax decisions. The estimates for fixed income are calculated using the security's coupon rate. The estimates for all other securities are calculated using an indicated annual dividend (IAD). The IAD is an estimate of a security's dividend payments for the next 12 months calculated based on prior and/or declared dividends for that security. IADs are sourced from third party vendors believed to be reliable, but no assurance can be made as to accuracy. There are circumstances in which these estimates will not be presented for a specific security you hold. **Please refer to Help/Glossary on Fidelity.com for additional information on these calculations.**

**Bond & CD Income** includes interest payments for fixed and variable rate bonds, international bonds that pay in USD, and Certificates of Deposit (CDs).

**Bond & CD Principal** includes maturing principal payments for fixed and variable rate bonds, international bonds that pay in USD, and Certificates of Deposit (CDs).

**Stock Income** includes estimated dividend payments for common stocks, preferred stocks, ADRs, closed-end mutual funds, and MLPs.

**ETP Income** includes estimated dividend payments for Exchange Traded Funds (ETFs) and Exchange Traded Notes (ETNs).

**Mutual Fund Income** includes estimated dividend payments for Fidelity and non-Fidelity mutual funds.

**Other Income** includes, but is not limited to estimated dividend payments for Unit Investment Trusts (UITs), REITs, and LPs.

This table does not include cash flow from foreign denominated fixed income.

-- not available

Account # 5074
RYAN BRADLEY MERHOLZ - INDIVIDUAL

# Additional Information and Endnotes

▲ Due to current events, mail may be delayed by circumstances beyond our control. You can always view your statements and other documents online. Learn more about paperless options at www.Fidelity.com/edelivery.

**Estimated Annual Income (EAI) & Estimated Yield (EY)** - EAI for fixed income is calculated using the coupon rate. For all other securities, EAI is calculated using an indicated annual dividend (IAD). The IAD is an estimate of a security's dividend payments for the next 12 months calculated based on prior and/or declared dividends for that security. EY reflects only the income generated by an investment and not changes in its price which may fluctuate. Interest and dividend rates are subject to change at any time and may be affected by current and future economic, political and business conditions. EAI and EY are provided for informational purposes only and should not be used or relied on for making investment, trading or tax decisions. EAI and EY are based on data obtained from information providers believed to be reliable, but no assurance can be made as to accuracy, timeliness or completeness. **Please refer to the Help/Glossary on Fidelity.com for additional information regarding these calculations.**

For more information about your statement, please refer to our **Frequently Asked Questions** document at **Fidelity.com/statements** .

# Information About Your Fidelity Statement

TDD Service for the Hearing-Impaired Call 800-544-0118, 9 am–9 pm ET, 7 days a week.

**Lost or Stolen Cards** For 24-Hour worldwide customer service, call 800-529-2164 for Charge or 800-323-5353 for Gold or Cash Card.

**Additional Investments with Fidelity** Make checks payable to Fidelity Investments. Include your account number on the check. For retirement and non-retirement accounts, use the memo field. Write your contribution for the current or prior year. Mail checks or other inquiries to: Fidelity Investments, P.O. Box 770002, Cincinnati, OH 45277-0002.

**Income Summary** Shows income by tax status for the statement and year-to-date periods. Except for interest income earned on, or distributed by, tax-exempt securities, Fidelity reports dividends and capital gains held in taxable accounts as taxable income. A portion of income reported as tax-exempt income may be subject to alternative minimum taxes and/or state and local taxes. In Traditional IRAs, Rollover IRAs, SEP-IRAs, SIMPLE IRAs, Roth IRAs and Keoghs, earnings are reported as tax-deferred. In Fidelity HSAs, Roth IRAs, and 529 plans, earnings are reported as tax-exempt. Shows income as they may be federally tax-exempt if certain conditions are met.

**Cost Basis, Gain/Loss, and Holding Period Information** NFS is required to report certain cost basis and holding period information to the IRS on Form 1099-B. Unless otherwise specified, NFS applies the average cost method for open-end mutual funds and the first-in, first-out (FIFO) method for all other securities. The cost basis is adjusted for wash sales on securities with the same CUSIP held in the same account (unless your transactions are in a retirement account). Your statement may not reflect all adjustments required for tax purposes. Customers should consult their tax advisors for further information. Cost Fidelity provides purchase cost information for securities held in retirement and HSA accounts. Such information may be adjusted for certain transactions and does not reflect dividends or capital gains reinvestments. Transaction profit or loss is calculated by subtracting purchase cost from sales proceeds

# Additional Information About Your Brokerage Account, If Applicable

**Free credit balances (FCB)** are funds payable to you on demand. FCB are subject to open commitments such as deposits from sales proceeds from sales of certificated securities without delivery of the certificate. If your FCB is swept to a core position, your position and the amount of any check you write is sent to you or held in your account subject to the terms of your account agreement. Required rule (0b-0101) information not contained herein will be provided on written request. Fidelity may use this free credit balance in securities in the margin portion of your brokerage account to the extent permitted by applicable law. Other Assets, which may be reported on your statement, including insurance products that are distributed by FBS and Fidelity Insurance Agency, Inc. and mutual fund only accounts held directly with the fund (Fidelity Mutual Fund Accounts Only). Securities Investor Protection Corporation (SIPC) and do not count toward your margin and maintenance requirements. Short Account Balances Securities that you do not contribute to your margin and maintenance requirements. Assets in your account that are sold short are marked-to-market weekly for your margin purposes, and any increase or decrease from the previous week's value is transferred weekly to your margin account. Fidelity represents your short account balance as of the last weekly mark-to-market, not as of the statement end date. See below for additional information. Each transaction confirmation previously delivered to you contains full information. Assets Separate from your Fidelity Brokerage Account Certain short positions held in your brokerage account contribute to margin and maintenance requirements. Short positions in American-style and European-style options are allocated upon customer short request. Assignments of American and European-style options are allocated when an option is subject to exercise assignment anytime. The writer of a European-style option is subject to exercise assignment prior to the expiration date. Equity Dividend Reinvestment Shares credited to your account resulted from transactions by FBS acting as agent for your account, or the Depository Trust Company (DTC). Price for Reinvestment is the Market Value of the shares reinvested, or the average of the highest and lowest actual prices. Fidelity at 800-544-6666. Equity Dividend Reinvestment The individual unit price is displayed in 8 decimal places. The Total Market Value, however, the individual unit price is displayed in 8 decimal places. The Total Market Value, however, the individual unit price is displayed. Prices received from pricing vendors are generally based on current market data such prices are not guaranteed. Prices for certain securities may reflect a factor applied to the market value. These estimates, particularly for fixed income securities, may be based on certain amounts (e.g. $1 million) and may not reflect all of the factors that affect the security, including where the price is generally not available from a pricing source. The Market Value of the security, including those priced at par value, may differ from its purchase price and may reflect N/A or unavailable value at which the security may be sold or purchased based on various market factors. The sale or redemption of your statement are generally estimates and are not based on actual market prices. You should always request a current valuation for your securities prior to making a financial decision or placing an order.

using the FIFO method. If shares were purchased at different times or prices. Statement Mailing We deliver statements at least four times during the calendar year for any account with a balance.

**Inquiries, concerns or questions** regarding your brokerage account or the activity therein should be directed to FBS by calling 800-544-6666, and NFS, who carries your brokerage accounts, by calling 866-408-1138. Any oral communications regarding inaccuracies or discrepancies should be reconfirmed in writing to protect your rights, including those under the Securities Investor Protection Act (SIPA).

**Material Changes** Please advise us of material changes in your investment objectives or financial situation related to your brokerage account(s).

**Mutual Funds and Performance** Before investing, consider the funds' investment objectives, risks, charges and expenses. Contact Fidelity for a prospectus or, if available, a summary prospectus containing this information. Read it carefully. Performance data shown represents past performance and is no guarantee of future results. Investment return and principal value will fluctuate, so you may have a gain or loss when shares are sold. Current performance may be higher or lower than that quoted. Visit Fidelity.com/performance for the most recent month-end performance.

**Sales Loads & Fees** Each fund reserves the right to terminate or modify the exchange privilege in the future. In connection with (i) access to, purchase or redemption of, and/or maintenance of positions in mutual funds and other investment products such as alternative investments in private placements, "funds", (ii) infrastructure needed to support such funds, some non-Fidelity fund investment affiliates pay FBS and/or its affiliates for these services, start-up fees, infrastructure support and maintenance, and marketing, engagement and analytics programs. Additional information about this compensation and the amount of compensation received by FBS or NFS will be furnished to you upon written request. At the time you purchase shares of funds received by FBS or NFS will be furnished to you upon written request. At the time you purchase shares of funds that carry a sales load or redemption fee, the amount of the load or transaction fee (NTF) or no transaction fee (NTF) status. When you subsequently sell those shares, any fees applicable to your transaction will be assessed based on the status assigned to the shares at the time of purchase.

**Executing Orders on the Floor of the NYSE** The Floor broker may permit the Designated Market Maker to permission would not be inconsistent with the best execution of your order, where such permission would not be inconsistent with the best execution of your order.

**SIPC** Securities in accounts carried by NFS, a Fidelity Investments company, are protected in accordance with the SIPC up to $500,000 including cash claims limited to $250,000. For details, including the SIPC brochure, please ask your NFS financial representative or visit www.sipc.org. NFS has arranged for additional protection for cash and covered securities to supplement its SIPC coverage. Neither coverage protects against a decline in the market value of securities.

Fidelity also distributes Fidelity Distributors Company LLC (FDC), is the distributor for Fidelity Funds with marketing agreements, Fidelity Brokerage Services LLC (FBS), Member NYSE, SIPC, and/or National Financial Services LLC (NFS) which clears all transactions through its affiliate. NFS. NFS carries all brokerage accounts. Both FBS and NFS are members of the NYSE and SIPC. Upon written request, Fidelity will mail an NFS financial statement, which is also available for inspection at its office. Fidelity Investments (with pyramid logo) is a trademark of FMR LLC.

**FPWA Services** Fidelity Go®, Fidelity® Personalized Planning & Advice and Fidelity® Strategic Disciplines are advisory services offered by Fidelity Personal and Workplace Advisors LLC (FPWA), a registered investment adviser. Fidelity® Strategic Disciplines includes the Fidelity® Equity-Income Strategy, the Fidelity® Tax-Managed U.S. Equity Index Strategy, the Fidelity® U.S. Large Cap Equity Strategy, the Fidelity® Intermediate Municipal Strategy, and the Fidelity® Core Bond Strategy. Fidelity Go®, Fidelity® U.S. Large Cap Equity Strategy, the Fidelity® Intermediate Municipal Strategy and the Fidelity® Core Bond Strategy. Fidelity® Wealth Services provides non-discretionary financial planning and discretionary investment management through one or more Portfolio Advisory Services accounts. These advisory services are provided for a fee. FBS and products and trust services offered by FPTC and its affiliates are not mutual fund or insurance products.

**Deposit Insurance** Corporation or any other government agency, are not obligations of any bank, end are NFS, FDIC, FPWA and FPTC are Fidelity Investments companies.

**Ratings** from Standard & Poor's ("S&P") may not be reproduced. S&P credit ratings are neither statements of opinion and are not statements of fact or recommendations to purchase, hold, or sell securities, nor do they address the suitability of an investment. S&P assumes no obligation to update any information following publication. Users should not rely on an credit rating in making any investment decision. Ratings are based on information received by S&P. S&P does not perform an audit and undertakes no duty of due diligence or independent verification of any information. S&P and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Parties are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, for the results obtained from the use of the Content, or for the security, maintenance or performance of any information. S&P gives no express or implied warranties, including, but not limited to, any warranties of merchantability or fitness for a particular purpose or use. S&P Parties shall not be liable for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including lost income or profits and opportunity costs) in connection with any use of ratings.

**Miscellaneous** Mutual fund shares, other securities held in your account, and insurance products are neither deposits or obligations of, nor endorsed or guaranteed by, any bank or other depository institution, nor are they federally insured by the FDIC or any other agency. If you request a reprint of your statement, the disclosure information may not be the same as the information originally provided. To confirm that an authorized, direct deposit has been made to your Fidelity Account or Fidelity Mutual Fund Account, call Fidelity at 1-800-544-5555.

# EXHIBIT D

## Greg Egleston

| | |
|---|---|
| **From:** | Geltman, Susannah <SGeltman@stblaw.com> |
| **Sent:** | Thursday, April 8, 2021 9:09 PM |
| **To:** | Greg Egleston |
| **Cc:** | Curnin, Paul C.; T.J. McKenna |
| **Subject:** | RE: WWE -- Shareholder Litigation Demand -- Merholz |

Greg,

Regarding your inquiry, the committee created by the Independent Board is comprised of Steve Pamon and Erika Nardini.

Thanks,
Susannah

---

Susannah Geltman
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

T: +1-212-455-2762
sgeltman@stblaw.com

**From:** Greg Egleston <egleston@gme-law.com>
**Sent:** Tuesday, March 23, 2021 10:13 AM
**To:** Geltman, Susannah <SGeltman@stblaw.com>
**Cc:** Curnin, Paul C. <pcurnin@stblaw.com>; T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** Shareholder Litigation Demand -- Merholz

*** External Email ***
Susannah: Please see attached. Regards, Greg

Gregory M. Egleston, Esq.
**Gainey McKenna & Egleston**
501 Fifth Avenue, 19th Floor
New York, New York 10017
Tel: 212-983-1300
Fax: 212-983-0383
www.gme-law.com

This transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you suspect that you have received this communication in error, please notify Gainey McKenna & Egleston immediately by telephone at 212-983-1300, or e-mail gegleston@gme-law.com and immediately delete this message and all its attachments.

# EXHIBIT E

# GAINEY McKENNA & EGLESTON

ATTORNEYS AT LAW

www.gme-law.com

501 FIFTH AVENUE
19th FLOOR
NEW YORK, NEW YORK 10017
TEL: (212) 983-1300
FAX: (212) 983-0383

375 ABBOTT ROAD
PARAMUS, NEW JERSEY 07652
TEL: (201) 225-9001
FAX: (201) 225-9002

Please Reply To The New York Address

April 30, 2021

**Via Email: sgeltman@stblaw.com**

Susannah S. Geltman, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Ave.
New York, NY 10017-3954

      Re:    Shareholder Litigation Demands on Board of World Wrestling
             Entertainment, Inc.

Dear Ms. Geltman:

      We write on behalf of our clients Ryan Merholz and Nicholas Jimenez, who each have made a demand upon the Board of Directors ("Board") of World Wrestling Entertainment Inc. ("WWE"). We are in receipt of your email dated April 8, 2021 giving us the names of the members of the Board of WWE appointed to the Independent Board ("IB") and thank you for same. Please let us know on what date the IB was formed and please provide us with the following information regarding the IB:

    1.     All documents granting the Board the authority to appoint the IB.

    2.     All documents concerning the Board's decision to form the IB and the reasons therefor.

    3.     All documents and materials used by the Board to determine whether the members of the IB were independent and the reasons for any conclusions reached by the Board as to the issue of independence.

    4.     All documents concerning any personal or business relationships, or other affiliations between and/or among any member of the IB and any officer of the Company, or any member of the IB and any of the members of the Board, current or former.

*Susannah S. Geltman, Esq.*
*April 30, 2021*
*Shareholder Litigation Demands on Board of World Wrestling Entertainment, Inc.*
*Page 2*

5.   All documents concerning any current or past transactions or ownership interests by any member of the IB in any WWE assets, subsidiaries, related parties, debt instruments, derivatives, equity, or securities of any type or form, including, without limitation, current and/or prior ownership of WWE common stock.

Please let us know by Monday (May 3rd) if you will agree to produce the materials listed above and, if yes, when those documents will be produced. Further, we are willing to sign a confidentiality agreement to assure the privacy of any document(s) produced.

Very truly yours,

**GAINEY McKENNA & EGLESTON**

*/s/ Gregory M. Egleston*

Gregory M. Egleston

GME/nr

cc:   Paul C. Curnin, Esq. (By Email: pcurnin@stblaw.com)
      Thomas J. McKenna, Esq. (By Email: tjmckenna@gme-law.com)

# EXHIBIT F

## Greg Egleston

| | |
|---|---|
| **From:** | Wilkerson, Elizabeth <Elizabeth.Wilkerson@stblaw.com> |
| **Sent:** | Monday, May 3, 2021 6:08 PM |
| **To:** | Greg Egleston |
| **Cc:** | Curnin, Paul C.; Geltman, Susannah; T.J. McKenna |
| **Subject:** | RE: WWE Shareholder Demand |

Counsel:

We have reviewed your correspondence from Friday, April 30, 2021, requesting information on behalf of shareholders Ryan Merholz and Nicholas Jimenez.  We are able to share additional information after you have signed a non-disclosure agreement.  We will send you the agreement for your review and signature.

Thank you,
Elizabeth

Elizabeth Wilkerson
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

T: +1-212-455-3505
elizabeth.wilkerson@stblaw.com

**From:** Greg Egleston <egleston@gme-law.com>
**Sent:** Friday, April 30, 2021 9:07 AM
**To:** Geltman, Susannah <SGeltman@stblaw.com>
**Cc:** Curnin, Paul C. <pcurnin@stblaw.com>; T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** WWE Shareholder Demand

*** External Email ***

Counsel:  Please see attached.  Regards, Greg

Gregory M. Egleston, Esq.
*Gainey McKenna & Egleston*
501 Fifth Avenue, 19th Floor
New York, New York 10017
Tel: 212-983-1300
Fax: 212-983-0383
www.gme-law.com

This transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential.  If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited.  If you suspect that you have received this communication in error, please notify Gainey McKenna & Egleston immediately by telephone at 212-983-1300, or e-mail gegleston@gme-law.com and immediately delete this message and all its attachments.

# EXHIBIT G

# Greg Egleston

| | |
|---|---|
| **From:** | Greg Egleston |
| **Sent:** | Tuesday, May 4, 2021 8:59 AM |
| **To:** | Wilkerson, Elizabeth |
| **Cc:** | Curnin, Paul C.; Geltman, Susannah; T.J. McKenna |
| **Subject:** | RE: WWE Shareholder Demand |

Hi Elizabeth:  Thank you for the quick response.  Please send along the confidentiality agreement so we can review.  Also, please let me know what you intend to produce.  Regards, Greg

Gregory M. Egleston, Esq.
*Gainey McKenna & Egleston*
501 Fifth Avenue, 19th Floor
New York, New York 10017
Tel: 212-983-1300
Fax: 212-983-0383
www.gme-law.com

This transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential.  If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited.  If you suspect that you have received this communication in error, please notify Gainey McKenna & Egleston immediately by telephone at 212-983-1300, or e-mail gegleston@gme-law.com and immediately delete this message and all its attachments.

**From:** Wilkerson, Elizabeth <Elizabeth.Wilkerson@stblaw.com>
**Sent:** Monday, May 3, 2021 6:08 PM
**To:** Greg Egleston <egleston@gme-law.com>
**Cc:** Curnin, Paul C. <pcurnin@stblaw.com>; Geltman, Susannah <SGeltman@stblaw.com>; T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** RE: WWE Shareholder Demand

Counsel:

We have reviewed your correspondence from Friday, April 30, 2021, requesting information on behalf of shareholders Ryan Merholz and Nicholas Jimenez.  We are able to share additional information after you have signed a non-disclosure agreement.  We will send you the agreement for your review and signature.

Thank you,
Elizabeth

Elizabeth Wilkerson
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

T: +1-212-455-3505
elizabeth.wilkerson@stblaw.com

**From:** Greg Egleston <egleston@gme-law.com>
**Sent:** Friday, April 30, 2021 9:07 AM
**To:** Geltman, Susannah <SGeltman@stblaw.com>
**Cc:** Curnin, Paul C. <pcurnin@stblaw.com>; T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** WWE Shareholder Demand

*** External Email ***

Counsel:  Please see attached.  Regards, Greg

Gregory M. Egleston, Esq.
*Gainey McKenna & Egleston*
501 Fifth Avenue, 19th Floor
New York, New York 10017
Tel: 212-983-1300
Fax: 212-983-0383
www.gme-law.com

This transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential.  If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited.  If you suspect that you have received this communication in error, please notify Gainey McKenna & Egleston immediately by telephone at 212-983-1300, or e-mail gegleston@gme-law.com and immediately delete this message and all its attachments.

# EXHIBIT H

## Greg Egleston

| | |
|---|---|
| **From:** | Greg Egleston |
| **Sent:** | Thursday, May 6, 2021 8:25 AM |
| **To:** | Wilkerson, Elizabeth |
| **Cc:** | Curnin, Paul C.; Geltman, Susannah; T.J. McKenna |
| **Subject:** | RE: WWE Shareholder Demand |

Hi Elizabeth:  When you have a chance, please send the confidentiality agreement.  Also, can you please let me know what you mean by: "We are able to share additional information"? Further, our April 30th letter asks for specific documents and we would like to know what you plan on producing.  Please specify and let us know by the end of business today.  Thank you.  Greg

Gregory M. Egleston, Esq.
*Gainey McKenna & Egleston*
501 Fifth Avenue, 19th Floor
New York, New York 10017
Tel: 212-983-1300
Fax: 212-983-0383
www.gme-law.com

This transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential.  If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited.  If you suspect that you have received this communication in error, please notify Gainey McKenna & Egleston immediately by telephone at 212-983-1300, or e-mail gegleston@gme-law.com and immediately delete this message and all its attachments.

**From:** Greg Egleston
**Sent:** Tuesday, May 4, 2021 8:59 AM
**To:** Wilkerson, Elizabeth <Elizabeth.Wilkerson@stblaw.com>
**Cc:** Curnin, Paul C. <pcurnin@stblaw.com>; Geltman, Susannah <SGeltman@stblaw.com>; T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** RE: WWE Shareholder Demand

Hi Elizabeth:  Thank you for the quick response.  Please send along the confidentiality agreement so we can review.  Also, please let me know what you intend to produce.  Regards, Greg

Gregory M. Egleston, Esq.
*Gainey McKenna & Egleston*
501 Fifth Avenue, 19th Floor
New York, New York 10017
Tel: 212-983-1300
Fax: 212-983-0383
www.gme-law.com

This transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential.  If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is

strictly prohibited.  If you suspect that you have received this communication in error, please notify Gainey McKenna & Egleston immediately by telephone at 212-983-1300, or e-mail gegleston@gme-law.com and immediately delete this message and all its attachments.

**From:** Wilkerson, Elizabeth <Elizabeth.Wilkerson@stblaw.com>
**Sent:** Monday, May 3, 2021 6:08 PM
**To:** Greg Egleston <egleston@gme-law.com>
**Cc:** Curnin, Paul C. <pcurnin@stblaw.com>; Geltman, Susannah <SGeltman@stblaw.com>; T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** RE: WWE Shareholder Demand

Counsel:

We have reviewed your correspondence from Friday, April 30, 2021, requesting information on behalf of shareholders Ryan Merholz and Nicholas Jimenez.  We are able to share additional information after you have signed a non-disclosure agreement.  We will send you the agreement for your review and signature.

Thank you,
Elizabeth

Elizabeth Wilkerson
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

T: +1-212-455-3505
elizabeth.wilkerson@stblaw.com

**From:** Greg Egleston <egleston@gme-law.com>
**Sent:** Friday, April 30, 2021 9:07 AM
**To:** Geltman, Susannah <SGeltman@stblaw.com>
**Cc:** Curnin, Paul C. <pcurnin@stblaw.com>; T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** WWE Shareholder Demand

*** External Email ***

Counsel:  Please see attached.  Regards, Greg

Gregory M. Egleston, Esq.
*Gainey McKenna & Egleston*
501 Fifth Avenue, 19th Floor
New York, New York 10017
Tel: 212-983-1300
Fax: 212-983-0383
www.gme-law.com

This transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential.  If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is

strictly prohibited.  If you suspect that you have received this communication in error, please notify
Gainey McKenna & Egleston immediately by telephone at 212-983-1300, or e-mail gegleston@gme-
law.com and immediately delete this message and all its attachments.

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ CITY OF WARREN POLICE & FIRE         │
│ RETIREMENT SYSTEM,                   │
│ individually and on behalf of        │
│ all others similarly                 │
│ situated,                            │
│                                      │
│              Plaintiff,              │
│                                      │
│         -against-                    │
│                                      │
│ WORLD WRESTLING ENTERTAINMENT        │
│ INC. et al,                          │
│                                      │
│              Defendants.             │
└─────────────────────────────────────┘
```

20-cv-2031 (JSR)

ORDER

JED S. RAKOFF, U.S.D.J.

Lead Plaintiff Firefighters' Pension System of the City of
Kansas City, Missouri Trust brings a putative class action
against defendants World Wrestling Entertainment, Inc. ("WWE"),
its CEO Vincent K. McMahon, and its former Co-Presidents George
A. Barrios and Michelle D. Wilson for alleged securities fraud
based on defendants' purported misrepresentations about its
media contracts in the Middle East and North Africa. Defendants
have now moved to dismiss plaintiff's consolidated amended
complaint ("CAC" or "the complaint") for failure to state a
claim under Rule 12(b)(6). Ultimately, however, none of
defendants' numerous arguments succeeds. Basically, this is
because the complaint, while not a model of clarity, adequately

1

alleges an overall claim of securities fraud that is not only plausible, but also complies with the relevant heightened pleading requirements applicable to this kind of action.

I.    The Complaint's Allegations

WWE is an international sports entertainment and media organization, CAC ¶¶ 41-45, the growth of which has been partly fueled in recent years by expansion into international markets, id. ¶¶ 67-69. The complaint's allegations surround WWE's recent expansion into the region comprising the Middle East and North Africa ("MENA"), id. ¶¶ 70-85, and, particularly, its representations surrounding the status of its media rights agreements in the MENA region during the class period of February 7, 2019 to February 5, 2020. The complaint alleges that prior to the class period, in 2014, WWE signed a five-year media rights contract (the "OSN Agreement") with the Orbit Showcase Network ("OSN"), a TV provider operating in the MENA region. Id. ¶ 72. In March 2018, WWE announced that it had separately signed a 10-year partnership with the Saudi General Sports Authority to hold large wrestling events in the Kingdom of Saudi Arabia ("Saudi Arabia") that it intended to broadcast. Id. ¶ 73-75. Plaintiff alleges that although this latter partnership was somewhat controversial, id. ¶¶ 91-99, 106-17, it proved highly lucrative for WWE, id. ¶ 101-05, 118-20, and was emblematic of

2

WWE's increasing dependence on its international media rights agreements as a source of growth. Id. ¶¶ 139-43.

As a consequence, the complaint alleges, investor attention in early 2019 was focused on a number of international media rights agreements that were nearing expiration, id. ¶ 9, and that WWE assured investors would be renewed on favorable terms, id. ¶¶ 149-50. One such agreement was the OSN Agreement, which was originally set to expire at the end of 2019. Id. ¶ 151. Unbeknownst to investors, however, OSN informed WWE in November 2018 that it would not renew the agreement, and WWE and OSN entered into a termination agreement on December 18, 2018, formally ending the contract nine months early, effective March 31, 2019. Id. ¶¶ 154-56. Plaintiff alleges that the defendants not only did not inform the market of these developments until late July of 2019, but, instead, falsely told investors that WWE was working on "renewing" its MENA region media rights agreement. Id. ¶ 158.

Furthermore, according to the complaint, when WWE finally disclosed on July 25, 2019, the previously undisclosed early termination of the OSN Agreement, WWE sought to blunt the impact of this news by simultaneously announcing that it had reached an agreement "in principle" with the Saudi government for a media rights agreement for the MENA region that would be finalized "very soon." Id. ¶¶ 165-68. Plaintiff alleges that this

3

announcement was likewise false, and that strong circumstantial evidence shows that the parties were at the time actually far apart in their negotiations and had failed to agree to key terms. Id. ¶¶ 188-95.

The complaint further alleges that WWE's difficulties securing a media rights agreement in the MENA region led not only to disappointing earnings figures in October 2019, but also the abrupt departure of defendants Barrios and Wilson from the leadership of WWE in January 2020. It was not until February 6, 2020, however, that WWE announced that its disappointing performance in 2019 resulted from its failure to complete a media agreement with Saudi Arabia. Id. ¶ 182. WWE then also revealed its anticipation that it would not complete such an agreement in 2020 either. Id.

Finally, the complaint alleges that the defendants' misrepresentations and omissions relating to its MENA agreements during the class period amounted to a violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Moreover, plaintiff alleges that the involvement of the three individual defendants (described in more detail below) amounted to a violation of Section 20(a) of the Exchange Act.

Defendants now move to dismiss the amended complaint in its entirety for failure to state a claim under Rule 12(b)(6).

4

II.  Legal Standard

In general, for a claim to survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). After discarding allegations that amount to nothing more than legal conclusions, see Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), the court should "accept as true" what remains and "draw all reasonable inferences in plaintiff's favor." Beazley Ins. Co., Inc. v. Ace American Ins. Co., 150 F. Supp. 3d 345, 354 (S.D.N.Y. 2015) (citing In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (per curiam)). The net result must be "enough to raise a right to relief above the speculative level" for the claim to survive. Twombly, 550 U.S. at 555.

In addition, a complaint alleging securities fraud must satisfy the heightened pleading requirements of both Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). The former requires the complaint to state "with particularity the circumstances constituting fraud," Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015) (citation omitted), while the latter extends the heightened pleading requirement to the requirement of pleading allegations that strongly imply fraudulent intent.

III. Alleged Violation of Rule 10b-5

SEC Rule 10b-5 renders it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Thus, to avoid dismissal under Rule 10b-5 a complaint must allege: "(1) a material misrepresentation or [actionable] omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 157 (2008). Defendants move to dismiss plaintiff's Rule 10b-5 claim on the ground that the CAC (A) does not adequately plead any actionable misrepresentations or omissions, (B) does not plead Defendants' scienter sufficiently to meet the heightened pleading standards applicable to the claims, and (C) does not demonstrate loss causation. The Court considers each in turn.

A. Misrepresentations and Omissions

Defendants first move to dismiss plaintiff's Rule 10b-5 claim on the ground that the CAC fails to allege any actionable misrepresentations or omissions. As mentioned, Rule 10b-5 makes

6

it unlawful both to "make any untrue statement of a material
fact," and to "omit to state a material fact necessary in order
to make the statements made . . . not misleading." 17 C.F.R. §
240.10b-5(b). Thus, the CAC may state a claim either by alleging
a false statement or by alleging a "half-truth," that is, a
"literally true statement[] that create[s] a materially
misleading impression" by omitting certain information. In re
Vivendi, S.A. Sec. Litig., 838 F.3d 223, 240 (2d Cir. 2016).
Although the CAC alleges numerous purported misrepresentations,
they can be grouped into two broad categories:
misrepresentations related to the status of the OSN Agreement;
and misrepresentations related to the status of a replacement
media rights agreement with Saudi Arabia. While each group might
support a separate 10b-5 claim, the CAC alleges that they are
connected in that they both served to disguise the material
difficulties WWE was experiencing in providing media outlets for
its MENA events and prospective MENA audience.

     1. Particularity of the Allegations

     Defendants first argue that the CAC does not plead any
misrepresentation whatsoever with the particularity required by
Rule 9(b) and the PSLRA, because it does not state with
particularity "the reason or reasons why the statement is
misleading," 15 U.S.C. § 78u-4(b)(1), in terms of the relevant
audience "reasonable investor[s]." Kleinman v. Elan Corp., PLC,

706 F.3d 145, 153 (2d Cir. 2013) (citation omitted). The Court

finds, however, that the CAC does provide the requisite

particularity as to both groups of alleged misrepresentation.

2. Misrepresentations Regarding the OSN Agreement

For purposes of this motion, it is undisputed that

defendants did not disclose until July 2019 that the OSN

Agreement, due to expire at the end of 2019, had been formally

terminated as of March 31, 2019 as a result of a termination

agreement signed in December 2018. The question then is what

statements made by defendants in the interim were rendered

misleading by this nondisclosure. The complaint primarily

focuses in this regard on the numerous statements made by

defendant Barrios, then Co-President of WWE, in a February 2019

earnings call in which he explained that WWE was "working on"

the "rights renewal process outside the U.S." in "key markets"

including "the Middle East." CAC ¶ 226; see also id. ¶ 229 ("We

do want to get the international renewals completed."). The CAC

also points to statements by the WWE and individual defendants

in a February 2019 press release, an April 2019 earnings

conference, and a public presentations in May and June 2019

where they suggested that MENA media rights negotiations were

ongoing. Id. ¶¶ 237, 246, 251, 253. The CAC alleges that these

statements were misleading because at the time they were made,

OSN had already informed WWE "that it would not renew its media

rights agreement and the parties had entered into a settlement .
. . meaning that renewal of that particular media agreement . .
. was impossible." Id. ¶ 234(a). Plaintiff alleges that the
suggestion that WWE was working on "renewals" in the MENA region
and that such negotiations were "ongoing" is inconsistent with
defendants' knowledge of such early termination and the
unlikelihood of any replacement agreement with OSN or anyone
else in the immediate future.

    As mentioned, defendants do not dispute that they had
agreed to early termination of the OSN Agreement and were aware
by late 2018 that it would not be renewed; but they offer the
rather extraordinary argument that their statements that they
were working on "renewals" was not misleading because the word
"renewal" is supposedly a "term[] of art in the broadcasting
industry" that was used "to refer to distribution rights in a
particular market, not with any particular counterparty." Mem.
of Law in Support of Defendants' Motion to Dismiss ("Deft.
Mem.") at 19, ECF No. 59. Defendants argue that plaintiff and
other investors would have known this special meaning based on
other prior statements by defendants, and thus that plaintiff
could not have reasonably believed that defendants were
negotiating with or planning to renew an agreement with OSN, id.
at 20, even though that was the only previously-existing

agreement and therefore the only one that could be "renewed" in ordinary English.

Quite aside from its facial implausibility, this argument exemplifies a gross misunderstanding of the applicable heightened pleading requirements that pervades defendants' briefing. While Rule 9(b) and the PSLRA require a plaintiff to allege fraud with particularity, they in no way dispose of the traditional rule that, at the motion to dismiss stage, the Court accepts as true the complaint's well-pleaded allegations of fact and draws all reasonable inferences in plaintiff's favor, and is prohibited from engaging in any fact finding of its own. See Palin v. New York Times Co., 940 F.3d 804, 810-11 (2d Cir. 2019). Thus, rather than resolve the factual dispute over whether plaintiff should have understood the word "renewal" to carry a special meaning in this context, the Court must assume, as the complaint asserts, that it carries its ordinary meaning. Under this assumption, a reasonable investor could have interpreted defendants' discussions of "renewal" in the MENA region to indicate WWE was working with OSN to renew its preexisting distribution agreement since there was no other agreement to renew. Given WWE could not have been engaged in such renewal negotiations at the time because OSN had already terminated the agreement, the complaint has adequately explained

10

with particularity why defendants' "renewal" and "ongoing"

negotiation statements were false and misleading.

Independently, the complaint alleges, as part of the first

group of misrepresentations, that a risk disclosure included in

WWE's 2018 Form 10-K, issued on February 7, 2019, was

misleading. The disclosure warned of the risk that "failure to

maintain or renew key agreements could adversely affect our

ability to distribute our media content," and that "failure to

maintain (such as due to a breach or alleged breach by either

party) or renew arrangements with distributors and platforms . .

. could adversely affect our financial outlook, liquidity,

business and operating results." CAC ¶ 232. Plaintiff alleges

this was misleading because defendants already knew that one of

its "key" agreements, the OSN Agreement, had been terminated in

February 2019 and thus that this risk had already materialized.

Id. ¶¶ 234(a), 235.

Defendants argue that the disclosure was not misleading

because the disclosure "related to the potential effect on the

Company's ability to distribute its media content and the

potential resulting adverse effect on operating results" of the

termination of an agreement (a risk that had not occurred), not

the risk of the failure to maintain an agreement itself (a risk

that had occurred). Deft. Mem. at 22. Defendants rely for this

proposition on a Third Circuit case regarding a risk disclosure

that stated "if any of our independent distributors were to cease to do business with us, our sales could be adversely affected." Williams v. Globus Med., Inc., 869 F.3d 235, 242 (3d Cir. 2017). The Third Circuit held that this statement warned investors of "the risk of adverse effects on sales -- not simply the loss of independent distributors general." Id.

Even if this precedent were binding on this Court (which it is not), it does not, in any case, support defendants' argument. This is because the allegations of the CAC are far more particularized than the broad statement at issue in Williams. Specifically, the CAC alleges that the defendants' failure to reveal the termination of the OSN Agreement not only "adversely affect[ed] [WWE's] financial outlook, liquidity, business and operating results," CAC ¶ 232, but more particularly left WWE "scrambling to find a replacement partner," id. ¶ 163, and "put in serious jeopardy the ability to finalize a media rights agreement for the MENA region by the end of 2019," id. ¶ 234(a). Given the alleged importance of a MENA agreement to WWE's financial projections, e.g., id. ¶¶ 149, 226, plaintiff has thus adequately alleged with particularity not only that WWE failed to disclose its inability to renew a key agreement, but also that this failure had adversely affected WWE's "financial outlook" by February 2019. Plaintiff has thus alleged with

12

particularity why the February 2019 risk disclosure statement was misleading.

With respect to all the foregoing misrepresentations about the status of the OSN Agreement, defendants finally argue that plaintiff has not demonstrated that any alleged OSN-related misrepresentation was material. Defendants assert that early termination of the OSN Agreement was not material to investors because WWE had other relationships in the MENA region and that, moreover, the MENA agreements did not comprise as substantial a portion of revenue as plaintiff alleges. Deft. Mem. at 20-21; Deft. Reply at 1-2. At the Rule 12(b)(6) stage, however, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Ganino v. Citizens Utilities Co., 228 F.3d 154, 162 (2d Cir. 2000) (citation omitted). Given the complaint's repeated and particularized allegations of the importance of media rights agreements in the MENA region to WWE's financial outlook, e.g., CAC ¶¶ 149, 226 -- allegations that the Court again must accept as true at this stage -- the status of the OSN Agreement specifically is not so "obviously unimportant" as to justify dismissal on grounds of lack of materiality.

   3. Misrepresentations Regarding Saudi Arabia Agreement

The CAC also alleges that numerous statements defendants made in 2019 indicating that a media rights agreement with Saudi Arabia was underway and soon to be completed were misleading. See CAC ¶¶ 255, 256, 257, 260, 261-62, 267, 269, 271-72, 279, 283, 285. The primary statements plaintiff relies on are from July 25, 2019, when WWE released its financial results report for the second quarter of 2019 and held a conference call for analysts, media representatives and investors in which defendants McMahon, Wilson and Barrios participated. Id. ¶¶ 255-57. In the report, WWE stated that it "believe[d] it ha[d] agreements in principle with the Saudi General Sports Authority on the broad terms for" "a media rights deal in the MENA region." CAC ¶ 256. On the conference call thereafter, plaintiff alleges that McMahon stated "we are going to be close to announcing [the] deal very soon," id. ¶ 257. Plaintiff alleges that these statements could not have been true given "how far apart the parties were at this point during their negotiations," id. ¶ 264(a), and the extent to which WWE's "relationship with the Saudi government was under stress," id. ¶ 264(b). Plaintiff further alleges that the motive for these false statements was to blunt the impact of the simultaneous belated disclosure of the termination of the OSN Agreement, id. ¶ 14, thus connecting the two groups of false statements in one overall fraudulent scheme. In effect, according to the complaint, WWE was telling

14

investors not to worry about the termination of the OSN
Agreement because it was about to be replaced by a comparable
agreement with Saudi Arabia.

Plaintiff first supports its claim that defendants'
statements about the imminence of a media rights agreement with
Saudi Arabia were misleading by providing testimony from a
confidential witness ("CW-1") regarding the distance between the
parties during their negotiations. Plaintiff alleges that CW-1
is a former employee of MBC, a media company partially owned by
Saudi Arabia that was charged with negotiating on Saudi Arabia's
behalf the proposed media agreement with WWE. Id. ¶¶ 189-91.
Plaintiff alleges that when CW-1 joined MBC in the fall of 2019,
he worked on a feasibility study related to a possible broadcast
partnership between WWE and MBC, estimating the "value of the
partnership" between the companies. Id. ¶ 192. According to the
CAC, CW-1 reported that in Fall 2019, MBC and WWE "were still
worlds apart in terms of projected WWE subscribers as well as
the annual licensing fees" by tens of millions of subscribers
and dollars. Id. ¶ 193-94. Plaintiff alleges that this testimony
indicates that in July 2019 WWE could not, contrary to its
representation, have "believe[d] it ha[d] an agreement[] in
principle with the Saudi General Sports Authority on the broad
terms for" "a media rights deal in the MENA region" and likewise

15

had no basis to believe any such deal would be completed in 2019.

As an initial matter, and contrary to defendants' claim, the Court may properly take account of the alleged testimony of CW-1, even though some of his testimony is based on hearsay and indirect knowledge. For a complaint to rely on information provided by confidential sources, such a source need only be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000). This liberal standard make sense; the heightened demands of the PSLRA will often require plaintiffs to rely on the testimony of confidential sources, even where those sources offer indirect knowledge, that is, information and belief that is hearsay but plausible. Here, the CAC alleges that CW-1 worked for the company negotiating on Saudi Arabia's behalf, worked specifically on analysis related to the contemplated media rights agreement, and talked to others at MBC about developments in the deal during his time at MBC. CAC ¶¶ 192-95. It is thus probable that CW-1 would have had access to information about the prior status of the MBC deal.[1] The Court may thus take account of on CW-1's testimony.

_____

[1] The cases defendants cite to try to contradict this point, aside from not being binding on this Court, are easily

16

When credited, CW-1's testimony supports the notion that WWE's stated belief that it had an "agreement in principle" for the MENA region in July 2019 was false and misleading. Drawing all reasonable inferences in plaintiff's favor, the fact that the parties had not agreed on fundamental terms of a contract by the Fall 2019 strongly supports the inference that the defendants could not have had a near-final agreement a few months earlier.

Defendants counter that no reasonable investor could have been misled in light of WWE's concurrent warning that the "understanding [wa]s nonbinding," that it was "possible" that the "businesses development[] [would] not occur on expected terms," and that there would be a financial downside if this occurred. Reply Mem. of Law in Support of Defendants' Motion to Dismiss ("Deft. Reply") at 4, ECF No. 66. While these words of caution warn that the announced "agreement in principle" might not come to fruition in its precise form, however, they do not

---

distinguishable. In <u>Long Miao v. Fanhua, Inc.</u>, No. 18-cv-8183 (PAE), 2020 WL 996602, at *19 (S.D.N.Y. Mar. 2, 2020), the Court there held that confidential witnesses were not described with enough particularity because the description of their role could have fit almost any person at the company, the complaint provided no description of the source of their knowledge, and the reported statements were "entirely unmoored in time" -- all unlike the statements here. In <u>Glaser v. The9, Ltd.</u>, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011), the Court there did not credit a confidential witness's testimony because it appeared to rely solely and exclusively on second-hand information, again unlike the testimony of CW-1.

warn of the misrepresentation that plaintiff complains of: that
there was never an agreement in principle between the parties to
begin with. Accordingly, CW-1's testimony supports with
particularity the claim that WWE's statements about the status
of a replacement media rights agreement were misleading.

Plaintiff's allegations that there was an undisclosed
deteriorating relationship between Saudi Arabia and WWE also
support its claim that defendants' statements about the
imminence of a replacement media rights agreement were
misleading. Plaintiff alleges that tension between the parties
began when the Saudi government failed to make a timely payment
of about $60 million to WWE for a June 2019 event WWE held in
Saudi Arabia. CAC ¶¶ 214, 264(b), 275(b), 281(b). This tension
escalated in October 2019, when WWE held an event entitled
"Crown Jewel" in Saudi Arabia. Id. ¶ 281(c). Plaintiff claims
that in retaliation for the late payments, defendant McMahon cut
the live feed for the Crown Jewel event, which angered the Crown
Prince of Saudi Arabia. Id. ¶ 218. As a result, according to
plaintiff, the Crown Prince refused to let certain wrestlers
leave the country, holding them "hostage" for some hours in an
airplane before letting them take off. Id. at ¶¶ 215-22. The CAC
relies for these latter allegations on the testimony of an
unnamed former wrestler for WWE ("CW-2") who was allegedly on

the flight delayed by the Crown Prince. The CAC also relies on
news sources reporting the incident. Id. ¶¶ 209-12, 216-21.

Defendants dedicate much of their briefing to disputing the
truth of these allegations, suggesting that the relationship
between Saudi Arabia was amicable throughout the class period.
Deft. Mem. at 15-18. As previously explained, however, the Court
must accept as true the complaint's well-pleaded allegations,
without regard to defendants' competing accounts. For the same
reason, the Court is unmoved by defendants' protestations that
plaintiff's allegations are based on hearsay and unreliable news
sources. Id. at 16-18. While the quality of supporting evidence
may impact plausibility of a plaintiff's claim, a plaintiff need
not offer admissible proof of its allegations for the Court
accept them as true at this stage. Once appropriately accepted
as true, plaintiff's allegations about the deteriorating
relationship between WWE and Saudi Arabia plausibly support
plaintiff's claims that WWE's statements were misleading.
Parties with a relationship as unworkably tense as plaintiff
describes are unlikely to have reached an "agreement in
principle" at any point. Taken together with plaintiff's
allegations that the parties had not even agreed to basic terms
of a contract by Fall 2019, this second allegation supports with
particularity plaintiff's claims that the defendants' statements
about the status of a replacement MENA deal were misleading.

4. Statements of Opinion

Defendants next argue that many of the alleged

misrepresentations are nonetheless inactionable because they

"involve statements of opinion." Deft. Mem. at 23. A plaintiff

may base its fraud allegations on a defendant's statement of

opinion only where it "contain[s] one or more embedded factual

statements that can be proven false" or "implies facts or the

absence of contrary facts, and the speaker knows or reasonably

should know of different material facts that were omitted."

Abramson v. Newlink Genetics Corp., No. 19-642-CV, 2020 WL

3956263, at *5 (2d Cir. July 13, 2020). But this standard is

here met with regard to both groups of misrepresentations, as

the following examples illustrate.

First, with regard to the OSN Agreement, defendants'

statement that WWE was "working on" the "rights renewal process

outside the U.S." in "key markets" including "the Middle East"

is actionable, even to the extent it is an opinion. CAC ¶ 226.

Defendants appear to suggest that the words "working on" render

anything that follows a statement of opinion. Deft. Mem. at 24.

But even if this were the case (which is doubtful), it is clear

that what plaintiff challenges about this statement is an

"embedded factual statement[] that can be proven false."

Abramson, 2020 WL 3956263, at *5. As described above, plaintiff

challenges as demonstrably false defendants' suggestion that any

20

"renewal" process was ongoing because OSN had already told WWE that it would not renew the media rights agreement. Thus, this statement is actionable, even if it is an opinion. Further, WWE's inadequate risk disclosure statement, warning that "failure to maintain . . . or renew arrangements with distributors and platforms . . . could adversely affect our financial outlook, liquidity, business and operating results" but not revealing that the OSN Agreement had already been cancelled, id. ¶ 232, is not an opinion statement, nor do defendants provide any explanation for how it supposedly might be.

Second, with regard to the status of the Saudi Arabia replacement agreement, defendants' statement that WWE "believe[d] it ha[d] agreements in principle with the Saudi General Sports Authority on the broad terms for" "a media rights deal in the MENA region," is actionable. CAC ¶ 256. It is true that the use of the word "believe" renders the statement an opinion. Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 183 (2015). However, such an opinion can still form the basis of plaintiff's claim if plaintiff "can identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." Id. at 194. Here, as described

above, plaintiff provides the testimony of CW-1 as well as allegations about the state of the relationship between WWE and Saudi Arabia that, if taken as true, lead to the plausible inference that WWE had failed to reach anything approaching an agreement in principle in July 2019. Thus, plaintiff has plausibly alleged that WWE's statement, even though cabined with the phrase "I believe," did not "fairly align[] with the information in the issuer's possession at the time" and was thus misleading. Id. at 189.

Defendants' further argument that, evaluated in context, this latter statement could not have been misleading because it was cabined by cautionary language is unpersuasive. See id. at 190 (holding that statements must be read "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information"). Indeed, some of the language that defendants suggest is cautionary -- such as the statement that "this understanding is nonbinding" and might "not occur on expected terms," and even WWE's projection of the financial downside of the agreement falling through -- only implies more strongly that an agreement with specific terms had been reached. CAC ¶ 256.

No more persuasive is defendants' reliance on some cases where courts have held there was no misrepresentation where a statement related to an ongoing negotiation. For example, in In

22

re Express Scripts Holdings Co. Sec. Litig., 773 F. App'x 9, 13

(2d Cir. 2019), the plaintiffs challenged statements that

company's relationship with its partner was "great . . . very,

very solid"; that it "really enjoys" its relationship, which is

"business as usual" and a "two-way street"; that it was "excited

to continue productive discussions" with the partner; and that

it was "actively engaged in good faith discussions with" the

partner. These statements are far vaguer, and thus much less

likely to mislead a reasonable investor than a concrete

statement that there was an "agreement in principle."

In short, without multiplying examples, it is clear that

plaintiff has alleged at least some misrepresentations that are

actionable, even if opinion statements in part.

5.  PSLRA Safe Harbor

Defendants next argue that certain allegedly misleading

statements are inactionable because they fall within the PSLRA

safe harbor for certain "forward-looking statements." In re

Vivendi, 838 F.3d at 245 (citing 15 U.S.C. § 78u-5(c)). This

argument in unpersuasive because none of the alleged

misrepresentations -- WWE's risk disclosure, its statement that

it was "working on" the "rights renewal process outside the

U.S.," CAC ¶ 226, and its statement that it "believe[d] it ha[d]

agreements in principle" with Saudi Arabia, CAC ¶ 256 -- was

"forward-looking." Plaintiff does not allege that these

statements were misleading because they described a future that did not come to pass, but instead because they misrepresented present facts: that it was possible to renew the already-terminated OSN Agreement and that WWE had already reached an agreement in principle with Saudi Arabia. Thus, the PSLRA safe harbor does not apply, and the CAC successfully alleges at least some actionable misrepresentations.

    B. <u>Scienter</u>

    Defendants argue that even if the CAC has adequately alleged some misrepresentations, the Court should still dismiss the CAC because it fails to allege scienter. The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A complaint meets this standard "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 324 (2007). The scienter requirement is met where a complaint alleges facts showing either "1) a motive and opportunity to commit the fraud; or 2) strong circumstantial evidence of conscious misbehavior or recklessness." <u>Employees'</u> <u>Ret. Sys. of Gov't of the Virgin Islands v. Blanford</u>, 794 F.3d

297, 306 (2d Cir. 2015). Here, plaintiff has adequately alleged
scienter as to the alleged misrepresentations.

     1. OSN Agreement Statements

     First, plaintiff points to both circumstantial and motive
and opportunity evidence as to the purported misrepresentations
about the renewal of the OSN Agreement. Circumstantial evidence
of scienter includes, inter alia, evidence that defendants "knew
facts or had access to information suggesting that their public
statements were not accurate." Id. Plaintiff argues that
defendants' own admission -- through the declaration of WWE's
Vice President and General Manager, ECF No. 60-2 -- that WWE
agreed to the early termination of the OSN Agreement in November
2018 constitutes evidence that defendants must have known or
recklessly disregarded that their statements regarding the
"renewal" of the MENA media rights agreement were false. CAC ¶¶
305-08. This admission by itself is enough to indicate that WWE
was aware of the termination of the OSN Agreement and its
inability to be renewed, given that WWE was a party to the
negotiations ending the OSN Agreement. Moreover, given the
individual defendants' senior positions at WWE -- namely, CEO
(McMahon) and Co-Presidents (Barrios and Wilson) -- plus the
alleged importance of the MENA media rights agreements to their
employers' revenue, CAC ¶¶ 149, 226, and the defendants' alleged
comments to investors on the status of these agreements, the

individual defendants either knew or recklessly disregarded this information as well.

Defendants counter that such knowledge cannot be attributed to any defendant because the CAC does not include reference to "any internal reports or documents, any WWE insider accounts, any communications involving Defendants, or a description of any meeting at which any of these supposedly omitted 'adverse facts' allegedly was discussed with Defendants." Deft. Mem. at 31. But even though in some circumstances "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information," Novak, 216 F.3d at 309, this has no applicability where, as here, a representative of WWE has admitted that WWE itself negotiated, and thus must have been aware of, the early termination of the OSN Agreement, id. (stating that this rule applies where "public statements are consistent with reasonably available" information). Moreover, this admission itself discusses documentary evidence, including a "Notice of Material Breach" letter sent by WWE to OSN, a settlement proposal provided WWE by OSN, and a settlement agreement entered into by the parties, indicating that a number of internal document referenced the termination of the OSN Agreement. ECF No. 60-2. And even if this were not the case, it is virtually inconceivable that the CEO and Co-Presidents of WWE would not

26

have been aware of the formal termination by WWE of this important contract -- or so a reasonable jury could infer from the facts pleaded in the complaint. Accordingly, defendants' involvement in, or knowledge of, the early termination of the OSN Agreement constitutes circumstantial evidence supporting an inference of scienter as to the alleged misrepresentations about the OSN Agreement.

Additionally, as to defendant McMahon, the CAC provides evidence of "a motive and opportunity to commit the fraud," in the form, inter alia, of defendant McMahon's stock sales during the class period that supports a finding of scienter as to the OSN-related misrepresentations. Blanford, 794 F.3d at 306. "The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir. 2001). "Unusual insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter." Id. (internal quotation marks and citation omitted). "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." Id. at 74-75.

Plaintiff has successfully alleged that defendant McMahon's sales meet these standards. The CAC alleges that McMahon sold 3,204,427 shares of WWE stock during the class period for proceeds of more than $261 million, a very significant sum. CAC ¶ 337. Although this constituted only 10% of his shares, this sale was unusual in light of McMahon's past trading practices. Id. ¶ 343 (alleging that McMahon's sales in the class period were 10 times higher as compared to a control period). McMahon's March 27, 2019 sale was also suspiciously timed, as it occurred only few days before the OSN Agreement ended and a month before the issuance of lower-than-expected income projections for the second-quarter of 2019, which resulted in a drop in WWE's stock price. Id. ¶¶ 346, 371-72. Plaintiff alleges that it was the termination of the OSN Agreement that resulted in these lower projection, and thus that defendants' concealment of the termination of the OSN Agreement prior to the sale helped protect the value of the sale for McMahon. Id. ¶ 346. While defendants counter that McMahon only sold this stock to fund the creation of an additional sports league, Deft. Mem. at 36, this alternative explanation merely raises a factual dispute that the Court must resolve in plaintiff's favor at this stage and is therefore not enough to defeat this inference of scienter. In re EVCI Colleges Holding Corp. Sec. Litig., 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006).

2.  Replacement Agreement Statements

Second, plaintiff has alleged scienter as to the
misrepresentations related to the replacement agreement with
Saudi Arabia. As with the OSN related statements, there is
circumstantial evidence that defendants "knew facts . . .
suggesting that their public statements" about the replacement
agreement "were not accurate." Blanford, 794 F.3d at 306. As
detailed above, the testimony of CW-1 and CW-2 regarding the
distance between WWE and Saudi Arabia on a media rights
contract, and the tension between the parties, indicate that
defendants' statements about the imminence of a media rights
agreement with Saudi Arabia, including WWE's claim that
"believe[d] it ha[d] an agreement[] in principle" in July of
2019, were false. While neither of the confidential witnesses is
alleged to have direct knowledge of the defendants' state of
mind, these allegations, particularly in light of the
defendants' senior positions at WWE and the alleged importance
of the MENA replacement agreement, support the proposition that
not only WWE generally but also the individual defendants in
particular knew or recklessly disregarded that their statement
that there was in fact an agreement in principle was false.

Indeed, when taken in the context of the overarching scheme
that plaintiff alleges, an inference of scienter as to the
replacement deal statements is "at least as compelling as any

29

opposing inference one could draw from the facts alleged."

Tellabs, 551 U.S. at 324. Plaintiff does not allege merely that

defendants announced an agreement in principle without motive.

Rather, it alleges that this announcement came after WWE

suffered the unexpected early termination of its vital OSN

Agreement, which left WWE "scrambling to find a replacement

partner" in the MENA region. CAC ¶ 163. When defendants finally

revealed this troubling development after hiding it from

investors for months, plaintiff alleges that defendants

"shielded the impact of this news, and artificially maintained

the price of the stock, with their simultaneous" announcement of

an agreement in principle with Saudi Arabia. Id. ¶¶ 165-66. Such

allegations of motive, taken together with other circumstantial

evidence that defendants should have known the falsity of their

statements, perfectly plausibly supports an inference of

scienter embracing the entire alleged scheme. Accordingly, the

Court rejects defendants' arguments that the CAC fails to allege

scienter.

    C. Loss Causation

    Defendants also argue that plaintiff has failed to allege

loss causation. Loss causation requires that "the subject of the

fraudulent statement or omission [be] the cause of the actual

loss suffered." Suez Equity Inv., L.P. v. Toronto-Dominion Bank,

250 F.3d 87, 95 (2d Cir. 2001). A plaintiff may show loss

causation by alleging "(a) the existence of cause-in-fact on the
ground that the market reacted negatively to a corrective
disclosure of the fraud; or (b) that that the loss was
foreseeable and caused by the materialization of the risk
concealed by the fraudulent statement." Carpenters Pension Tr.
Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232-33 (2d Cir.
2014) (internal quotation marks and citation omitted). Here, the
complaint plausibly alleges both kinds of loss causation.
Plaintiff alleges, for example, that the lower-than-expected
income projections WWE provided on April 25, 2019 reflected a
partial materialization of the unknown risk that WWE would not
receive revenues associated with the cancelled OSN Agreement,
which had been terminated effective March 31, 2019. CAC ¶¶ 371-
73. Plaintiff further alleges that revelations about the failed
media rights deal for the MENA region on October 31, 2019,
January 30, 2020, and February 6, 2020 caused the stock price to
decline. See CAC ¶¶ 374-76, 377-79, 380-82. Accordingly,
plaintiff has alleged loss causation.

IV.   Alleged Violation of Section 20(a)

      Defendants lastly argue that plaintiff has failed to allege
a Section 20(a) claim against the individual defendants. To
survive dismissal under Section 20(a) of the Exchange Act a
plaintiff must allege: "(1) a primary violation by the
controlled person, (2) control of the primary violator by the

31

defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007). But defendants here argue only that plaintiff's Section 20(a) claim fails because there was no primary violation and none of the defendants acted with scienter. However, as indicated above, plaintiff has alleged both a primary violation and scienter as to all the individual defendants. Accordingly, plaintiff's Section 20(a) claim survives.

V.   Conclusion

While defendants have trotted out a virtual herd of objections to the CAC, on close inspection none is a winner. For the forgoing reasons, the CAC successfully states both a Rule 10b-5 and a Section 20(a) claim against all defendants, and, accordingly, defendants' motion to dismiss is denied in its entirety.

SO ORDERED.

Dated:    New York, NY

          August 6, 2020                     JED S. RAKOFF, U.S.D.J.

# EXHIBIT J

# GAINEY McKENNA & EGLESTON

### ATTORNEYS AT LAW

www.gme-law.com

501 FIFTH AVENUE
19th FLOOR
NEW YORK, NEW YORK 10017
TEL: (201) 983-1300
FAX: (201) 983-0383

95 ROUTE 17 SOUTH
SUITE 310
PARAMUS, NEW JERSEY 07652
TEL: (201) 225-9001
FAX: (201) 225-9002

Please Reply To The New York Address

March 23, 2021

**By U.S. Mail**

Mr. Vincent K. McMahon
Chairman and Chief Executive Officer
World Wrestling Entertainment, Inc.
1241 East Main Street
Stamford, CT 06902

      Re:    **Shareholder Litigation Demand**

Dear Mr. McMahon:

      The law firm of Gainey McKenna & Egleston represents Mr. Nicholas Jimenez. He is a current owner of the stock of World Wrestling Entertainment, Inc. ("WWE" or the "Company") and he purchased his WWE shares on March 26, 2019 and currently still holds those shares. *See* Exhibit A attached hereto

      Mr. Jimenez intends to retain his ownership interest through the conclusion of any further proceedings relating to the contents of this letter. This letter constitutes a formal demand on behalf of our client that WWE's Board of Directors (the "Board") investigate and commence legal proceedings against the following former and/or current directors, executive officers and agents of the Company: you, Stephanie McMahon, Paul Levesque, Frank A. Riddick, III, Stuart U. Goldfarb, Laureen Ong, Robyn W. Peterson, Man Jit Singh, Jeffrey R. Speed, Alan M. Wexler, George A. Barrios ("Barrios"), and Michelle D. Wilson ("Wilson")[1] for breach of fiduciary duties, corporate waste, and unjust enrichment (insider trading). The Board should also consider and implement corporate governance reforms designed to address and prevent the sort of wrongdoing described in this letter.

### Background and Improper Statements To The Market

      In 2014, WWE's international expansion hit a major milestone when it struck a deal with the Orbit Showcase Network ("OSN"), a Kuwaiti-controlled direct broadcast satellite provider serving the Middle East and North Africa ("MENA") region. OSN traditionally offered popular entertainment content such as movies, sporting events, and various TV shows from major U.S. and international networks and studios, in addition to local versions specifically for the MENA region.

---

[1]    Barrios and Wilson are former Co-Presidents of the Company.

Mr. Vincent K. McMahon
*Chairman and Chief Executive Officer*
*World Wrestling Entertainment, Inc.*
March 23, 2021
Page 2

On July 21, 2014, WWE and OSN formally announced a five-year exclusive media agreement, stating that WWE's flagship television program Monday Night Raw would air live on OSN, WWE's exclusive pay-per-view partner in the Middle East and North Africa through 2019.

On February 15, 2015, WWE and OSN jointly issued a release stating they were adding WWE Network to the five-year agreement as part of an expanded partnership. In the years that followed, expansion into the MENA region became a critical part of WWE's business plans and growth initiatives, as the Middle East grew to become the WWE's second-largest market by monetization. WWE's international revenues increased from $87.6 million in 2005 to $135.3 million in 2010. After a decline over the next few years, WWE's international revenues increased to $169.8 million in 2015, $189 million in 2016, and $201 million in 2017—the increase during these more recent years driven, in part, by the 2014 launch of the WWE Network—a subscription streaming network available in more than 170 countries.

In March 2018, the Saudi Press Agency announced that WWE and the Saudi General Sports Authority ("SGSA") had signed a 10-year multi-platform partnership with WWE to hold wrestling events in the country. The first event held under the Saudi partnership was the Greatest Royal Rumble, which took place on April 27, 2018. WWE hailed the event as the largest outside the U.S. in the past 16 years and a major contributor to WWE's record second quarter 2018 results. The second event was the Crown Jewel held on November 2, 2018. WWE viewed business dealings with the Saudi government as a lucrative entrance point into the MENA region and a key pillar of its business plans.

The Company routinely touted the international market and the MENA region specifically as the future of WWE's revenue generation. The Company specifically cited the partnership deals with OSN and the SGSA as a driver of adjusted OIBDA – the non-GAAP metric that WWE states "is the primary measure used by management of the Company to evaluate segment performance and make decisions about allocating resources." By early 2019, the Company was touting record breaking OIBDA of $200 million for fiscal year 2019 based primarily on revenue generated from the Middle East.

### The OSN Agreement Is Quietly Terminated

The OSN deal was prematurely terminated in December 2018. According to Carlo Nohra ("Nohra"), Vice President and General Manager of WWE – Middle East, who was the self-described principal point of contact with OSN regarding the applicable media-rights agreements, in early 2018, OSN became delinquent in the payments of rights fees to WWE. Nohra explained that in September 2018, WWE sent OSN a "Notice of Material Breach" based on the delinquent payments. OSN responded with a letter dated November 5, 2018, in which OSN's general counsel informed WWE that OSN was contemplating the future long-term funding of its business and hoped to respond to WWE about the missed payments after an upcoming board meeting.

*Mr. Vincent K. McMahon*
*Chairman and Chief Executive Officer*
*World Wrestling Entertainment, Inc.*
*March 23, 2021*
*Page 3*

According to Nohra, in November 2018, OSN sent WWE an unsolicited settlement proposal, in which OSN's general counsel informed WWE that it intended to exit its sport content business and conclude its sports coverage in early 2019. Negotiations followed, and, according to Nohra, WWE and OSN entered into a settlement agreement dated December 18, 2018 pursuant to which OSN and WWE agreed to the early termination of their media-rights agreements effective March 31, 2019, and OSN agreed to pay WWE all rights fees owed for 2018 and through March 31, 2019.

## The Company Misrepresents The Status Of WWE's Agreements In The Middle East

As early as February 2019, the Company regularly told the market that a "renewal" of a broadcasting agreement in the Middle East was forthcoming. The only such agreement was that with OSN, which was set to expire in the summer of 2019. Yet before these statements were made, the former and/or current directors listed above knew, or were reckless in not knowing, that as early as November 2018, OSN had informed WWE that the network was shutting down its sports coverage.

The true state of WWE's financial future in the Middle East went undisclosed. Despite specifically warning in public filings with the SEC that "failure to maintain or renew key agreements could adversely affect our ability to distribute our media content, WWE Network, our films and/or other of our goods and services, which could adversely affect our operating results" the Board signed a SEC filing they knew omitted material information.

During this time, the Company scrambled to find another media rights broadcaster. They settled on the SGSA. In an attempt to blunt the impact of the loss of the OSN Agreement, the Company would, starting in July 2019, publicly shift focus away from the (secretly) defunct OSN venture and begin promoting the prospects of their negotiations of a media rights agreement with the SGSA. Such a deal was critical for WWE to reach its highly publicized goal of full-year $200 million fiscal year 2019 OIBDA guidance.

To that end, by the summer of 2019, the Board caused the Company to state that an "agreement in principle" had been reached with the SGSA for a new media rights deal in the MENA region and that negotiations would be wrapped up "very soon." They were not. And according to WWE insiders, a year later a deal had yet to be finalized.

## The Truth Emerges

The truth would ultimately emerge in ***October 2019***, after Mr. Jimenez purchased his WWE's stock. On Halloween, the Company announced that it was lowering its fiscal year 2019 adjusted OIBDA guidance from $200 million to a range of $180 million to $190 million. This was in large part due to its failure to complete a distribution agreement with the SGSA. On a conference call to discuss the results, Barrios now stated that "no assurances" could be given that the deal would ever be completed.

Mr. Vincent K. McMahon
Chairman and Chief Executive Officer
World Wrestling Entertainment, Inc.
March 23, 2021
Page 4

On January 30, 2020, the purpose of the misrepresentations was made clear: After an entire year of promising, predicting, and promoting expected adjusted OIBDA of $200 million – heads rolled. WWE announced that two of its most senior and longest serving executives, Barrios and Wilson, abruptly left WWE. Days later, on February 6, 2020, the Board caused WWE to announce that WWE achieved just $180 million in adjusted OIBDA for the year.

Yet not every shareholder was harmed by the drop in WWE stock price. While in possession of material inside information regarding the true picture of WWE's Middle East media rights efforts, three WWE insiders would liquidate their personal WWE stock for proceeds in excess of $270 million. *See* Securities Order[2] at 28 ("McMahon's March 27, 2019 sale was also suspiciously timed, as it occurred only a few days before the OSN Agreement ended and a month before the issuance of lower-than-expected income projections for the second-quarter of 2019, which resulted in a drop in WWE's stock price.").

**The Securities Class Action**

As a result of the foregoing, WWE and V. McMahon, Barrios, and Wilson have been named as defendants in the Securities Action. On August 6, 2020, Judge Rakoff issued an Order in the Securities Action, denying the defendants' motion to dismiss. In the Securities Order, Judge Rakoff held that a claim for securities fraud had been stated against WWE, V. McMahon, Barrios and Wilson based upon alleged misrepresentation about WWE's media-rights contracts in the MENA region. Recently, as you are aware, WWE settled in principle with the Securities Class Action plaintiffs for $39,000,000, subject to Court approval

**Shareholder Litigation Demand**

As you are aware, by virtue of their positions as directors and/or officers of the Company and because of their ability and duty to control the business and corporate affairs of the Company, the directors and officers of WWE owe the Company and its shareholders the fiduciary duties of loyalty, due care, and candor.

As noted above, on behalf of Mr. Jimenez, we demand that a full corrective action be brought, including commencing legal proceedings against each of the current and former officers, executives and members of the Board named above, all of whom have been responsible for harming the Company as a result of the wrongdoing outlined in this letter. Claims against the disloyal directors, officers and executives should be pursued for, *inter alia*, breaches of fiduciary duty, corporate waste, and unjust enrich (insider trading). The Board should also consider and implement corporate governance reforms designed to address and prevent the breaches of fiduciary duty and lack of internal controls described herein.

---

[2]    *City of Warren Police & Fire Retirement System v. World Wrestling Entertainment, Inc., et al.*, Case 1:20-cv-02031-JSR (S.D.N.Y.) ("Securities Class Action") (D.E. 68).

*Mr. Vincent K. McMahon*
*Chairman and Chief Executive Officer*
*World Wrestling Entertainment, Inc.*
*March 23, 2021*
*Page 5*

The action that should be brought against the above-mentioned officers and directors should seek a monetary recovery for damages that include, but are not limited to:

(a)      damage to the Company's reputation and good will (including irreparable damage to the Company's reputation and credibility, banking, insurance and securities regulators, and to the Company's reputation and credibility, insurance, and financial communities);

(b)      resultant loss of business and business opportunities;

(c)      increased costs of capital;

(d)      the costs of internal investigations, auditors and outside counsel; and

(e)      legal fees, costs, and potentially substantial amounts payable in settlement or satisfaction of lawsuits.

Mr. Jimenez requests that he receive a response to the demands made herein no later than ten (10) days from receipt of this letter. Mr. Jimenez is prepared to cooperate with the Board in its investigation and would be happy to have his counsel meet with the members of the Board, if they would find that helpful.

To those ends, we look forward to your prompt response.

Very truly yours,

**GAINEY McKENNA & EGLESTON**

*/s/ Gregory M. Egleston*

Gregory M. Egleston

cc:   Susannah S. Geltman, Esq. (By Email: sgeltman@stblaw.com)
      Paul C. Curnin, Esq. (By Email: pcurnin@stblaw.com)
      Thomas J. McKenna, Esq. (By Email: tjmckenna@gme-law.com)

EXHIBIT A

Case 3:21-cv-00789-JBA   Document 1-1   Filed 06/09/21   Page 146 of 154

Page 2 of 2

**Robinhood**
85 Willow Rd., Menlo Park, CA 94025
support@robinhood.com

Nicholas Jimenez Account

03/26/2019

| EQUITIES/OPTIONS | B/S | TRADE DATE | SETTLE DATE | ACCT TYPE | PRICE | QTY | PRINCIPAL | COMM | TRAN FEE | NET AMOUNT | MKT | CAP | U/S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WWE<br>WWE CUSIP:<br>98156Q108 | B | 03/26/2019 | 03/28/2019 | M | $89.7900 | 1 | $89.79 | $0.00 | $0.00 | $89.79 | OTC | 1 | U |

**Total Quantity Bought:** 1
**Total Quantity Sold:** 0

**Total Dollars Bought:** $89.79
**Total Dollars Sold:** $0.00

# Robinhood

85 Willow Rd, Menlo Park, CA 94025
help@robinhood.com

02/01/2021 to 02/28/2021

Nicholas Jimenez Account #

**Portfolio Allocation**



■ Options   ■ Equities   ■ Cash and Cash Equivalents

● Cash and Cash
  Equivalents
  0.86%

● Equities
  99.14%

● Options
  0.00%

**Account Summary**

| | Opening Balance | Closing Balance |
|---|---|---|
| Net Account Balance | | |
| Total Securities | $ | |
| **Portfolio Value** | | |

**Income and Expense Summary**

| | This Period | Year to Date |
|---|---|---|
| Dividends | | |
| Capital Gains Distributions | | |
| Interest Earned | | |

This statement shall be conclusive if not objected to in writing within ten days (except with respect to debit card transactions). Errors and omissions exempted. Please address all communications to the firm and not to the individuals. Address changes or other material changes in your account should be directed to the office servicing your account. Kindly mention your account number. This statement should be retained for income tax purposes.

Portfolio Summary

| Securities Held in Account | Sym/Cusip | Acct Type | Qty | Price | Mkt Value | Est. Dividend Yield | % of Total Portfolio |
|---|---|---|---|---|---|---|---|
| WWE Estimated Yield 0.97% | WWE | Margin | 1 | $49.40 | $49.40 | $0.46 | 17.54% |
| Total Securities | | | | | | | |
| Brokerage Cash Balance | | | | | | | |
| Total Priced Portfolio | | | | | | | |

Account Activity

| Description | Symbol | Acct Type | Transaction | Date | Qty | Price | Debit | Credit |
|---|---|---|---|---|---|---|---|---|
| Total Funds Paid and Received | | | | | | | | |

**Executed Trades Pending Settlement**
These transactions may not be reflected in the other summaries

| Description | Acct Type | Transaction | Trade Date | Settle Date | Qty | Price | Debit | Credit |
|---|---|---|---|---|---|---|---|---|
| Total Executed Trades Pending Settlement | | | | | | | | |

# Important Information

Robinhood Securities, LLC ("RHS") carries your account as the clearing broker by arrangement with your introducing broker-dealer, Robinhood Financial LLC ("RHF"). If this is a margin account and we maintain a special miscellaneous account for you, this is a combined statement of your general account and special miscellaneous account maintained for you under Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of the special miscellaneous account as required by Regulation T is available for your inspection at your request.

The per annum rate of interest charged on debit balances in your account is shown on this statement. This rate may change from time to time in accordance with fluctuations in interest rates. Interest is computed from the 1st day of the month to the last day of the month. The interest is based on the average daily balance in your account for the number of days based on an interest year of 360 days. When calculating margin interest, free credit balances in all accounts will be offset against any debit in the margin account and the interest will be charged on the new debit balance.

We are required to report to the Internal Revenue Service all cash dividends and interest credited to your account on securities held for you. In your name, All dividends and interest credits should be included in your income tax return.

Information relative to fees and any other charges incurred in connection with listed option transactions occurring during the month has previously been furnished to you in confirmation of such transactions. A summary of the information will be made available to you promptly upon request. Exercise assignment notices for option contracts are allocated among customer short positions pursuant to a manual procedure which randomly selects from amongst all customers' short option positions including those contracts which are subject to exercise. All short American-style option positions are liable for assignment at any time whereas European style options are assigned at expiration. A more detailed description of our random allocation procedure is available upon request.

You are to promptly advise Robinhood of any material changes concerning your investment objectives or financial situation by updating your information using the Robinhood platform or by contacting help@robinhood.com.

Our financial statement is available for your personal inspection; it can also be emailed to you upon request.

RHS is a Member of SIPC, which protects securities customers of its members up to $500,000 (including $250,000 for claims for cash). Explanatory brochure available upon request or at www.sipc.org.

Any free credit balances represent funds payable upon demand which, although properly accounted for on our books and records, are not segregated, and may be used in the conduct of this firm's business as permissible under the SEC Rule 15c3-3.

Notice to Customers

RHS acts as clearing agent for your trades. Your account, which was introduced to us by RHF, is established under your name on a "fully disclosed" basis at RHS. You remain a customer of RHF.

As required, under SEC rules, both the Firm's Order Routing Report as well as information regarding specific order routing information is available free of charge upon request.

As a clearing agent, we provide securities clearance and may provide order execution based on RHF instructions. RHS will not be involved with or have any responsibility for decisions regarding securities transactions in your account. RHF will be responsible for opening, approving and monitoring all activities in connection with your account. The entry of orders and any instructions regarding the deposit or withdrawal of securities or monies should be made through RHF.

In addition to the above mentioned services, RHS will provide cashiering services, safeguarding of funds and securities while in our possession, monitoring compliance with applicable credit Regulation T and RHS internal policies, preparing and making accessible to you account records (including transaction confirmations and periodic statements of your account).

The dividend totals reflected in the Income and Expense Summary are inclusive of both taxable and non-taxable dividends.

Interest charges to your account may be based on the size and net debit balance during the interest period. These rates are subject to revision without notice in accordance with any changes in the broker call loan rate, as published in the Wall Street Journal. For more complete information regarding interest charges to customers, consult the RHF Fee Schedule, available at https://rbnhd.co/fees.

We also offer Robinhood Cash Management as an additional feature of your account. Robinhood Cash Management includes debit card access to your account and automatic sweep of uninvested cash to bank deposits. If you participate in Robinhood Cash Management, your use of the debit card, and your rights with respect to debit card transactions, will be governed by the Robinhood Debit Card Agreement, which has been provided to you and is available at https://rbnhd.co/debit-card-agreement.

In case of errors or questions about your electronic transfers, including your debit card transactions, or if you think your statement or receipt is wrong or if you need more information about a transaction listed on the statement or receipt, email Robinhood at help@robinhood.com. Robinhood must hear from you no later than sixty (60) days after you were sent the FIRST statement on which the problem or error appeared.

A. Tell Robinhood your name and account number.
B. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
C. Tell Robinhood the dollar amount of the suspected error.

Robinhood will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes Robinhood to complete our investigation.

If you participate in Robinhood Cash Management, your uninvested cash is swept into accounts at FDIC-insured program banks, where your uninvested cash will earn interest from the program banks and be eligible for FDIC insurance up to applicable limits, subject to FDIC rules. Please see the Robinhood Securities, LLC & Robinhood Financial LLC Insured Network Deposit Sweep Program Disclosures, available at https://rbnhd.co/ind-disclosure, for the terms and conditions of the sweep program, including information regarding FDIC insurance coverage.

RHF and RHS are members of the Financial Industry Regulatory Authority, Inc. ("FINRA"), and we are required to inform you of the availability of the FINRA Investor Brochure, which contains information on FINRA BrokerCheck. You may contact FINRA at 800-289-9999 or via their website www.finra.org. RHS carries your account and acts as your custodian for funds and securities deposited with us directly by you, through RHF as a result of transactions we process to your account. Any suspected inaccuracy or discrepancy in your account statement must be promptly reported to RHS. In order to protect your rights, please confirm any oral communications in writing and re-confirm your brokerage account number. General inquiries or concerns regarding your account should be directed to: help@robinhood.com.

The SEC requires all broker-dealers that route orders in equity securities and options to make available quarterly reports that present a general overview of their routing practices. The reports must identify the significant venues to which customer orders were routed for execution during the applicable quarter and disclose the material aspects of the broker-dealer's relationship with such venues. In addition, the Rule (SEC-606) requires broker-dealers to disclose, upon customer request, the venues to which the individual customer's orders were routed for the six months prior to the request, and the execution time for the orders that were executed. For further information, please contact RHS.

Statement of Financial Condition
Robinhood Securities, LLC unaudited Statement of Financial Condition as of June 30, 2020 is available on the Company's website at www.robinhood.com/legal. A paper copy may be requested at no cost by calling 1-(800)-282-1327. On June 30, 2020, Robinhood Securities, LLC. had excess net capital of $386,413,029, which was $315,419,843 in excess of the required net capital of $27,997,718.

PLEASE RETAIN THIS STATEMENT AS IT WILL BE HELPFUL IN PREPARING YOUR INCOME TAX RETURNS AND MAY BE NEEDED ALONG WITH SUBSEQUENT STATEMENTS TO VERIFY INTEREST CHARGES IN YOUR ACCOUNT. THIS STATEMENT SHALL BE DEEMED CONCLUSIVE UNLESS OBJECTED TO IN WRITING WITHIN 10 BUSINESS DAYS.

1304229

Page 1 of 2

**Robinhood**

85 Willow Rd, Menlo Park, CA 94025

support@robinhood.com

Nicholas Jimenez Account #:

03/26/2019

## Transaction Confirmation

Thank you for letting Robinhood Securities, LLC ("RHS") serve you through Robinhood Financial, LLC ("RHF").

1. Amounts due for securities transactions must be received on or before the settlement date shown.

2. All orders are received and executed subject to the applicable rules, regulations and customs of the SEC, FINRA, and the exchange or market where the order is entered, the provisions of the Securities Exchange Act of 1934.

3. Failure of customer to notify RHS in writing within five days of the receipt of this document of any concerns constitutes an acceptance of the transaction.

4. For purchase transactions in a margin account, it is agreed that sufficient cash or acceptable collateral will be deposited on or before the settlement date, or at such earlier time that payment may be demanded to satisfy applicable margin requirements.

5. Securities purchased and securities pledged as margin are or may be hypothecated for the sum due thereon or for a greater sum, under circumstances which permit commingling the therof with securities of other customers, all without further notice to the customer.

6. If shares carried for a short sale are no longer available, RHS reserves the right to decide, by random selection, which positions will be subject to a buy-in.

7. Upon written request and where available, further details of items herein will be provided including: the execution date and time, the counterparty when acting as agent, the detailed breakdown of fees and the remuneration details, if any, to RHS, or RHF for directing orders to select market participants and details of provisions that may cause a call or prepayment.

8. All transactions on this confirmation are presumed to be unsolicited unless noted otherwise.

9. Any Good Till Canceled (GTC) orders may expire or be terminated by RHS or RHF in their ordinary course of business after the order has remained open for a reasonable period of time. Please contact RHF for more specific details. Until such open orders are cancelled or cancellation by the customer, all order, the responsibility for canceling the original order rests upon the customer. Therefore, if a customer wishes to cancel an existing order, transactions resulting from the execution of the original and new order(s) will be entered into the customer's account.

10. The responsibility to cancel an open order resides with the customer. Any transactions which result from the execution of any order which the customer has not instructed RHF/RHS to cancel will be entered into the customer's account.

11. The default Cost Basis Election or tax relief method used by RHS for tax preparing is First-In-First-Out (FIFO) for Equities. Please contact RHF if you wish to change the default tax-relief method for your account or specify different tax lots for liquidation.

12. Backup Withholding - If you have not provided us with your correct social security number/tax id number, under federal law, you may be subject to a $50 penalty as well as backup withholding on certain payments.

13. RHS may receive remuneration for directing orders to particular broker-dealers or market centers for execution. Such remuneration is considered compensation to the firm. The source and nature in connection with your transactions are available upon written request. RHF, when clearing through RHS, may share in such payments or may directly receive payment for order flow for certain transactions. Details are available upon written request.

14. If you request the sale of a non-marketable or worthless security, RHF will be the buyer to that transaction. In the event a market cannot be located. In such a sale, you are deeming the security worthless and RHF thereby makes no representation regarding the present or future value of these securities. The transaction is irreversible and you will have no further claim to the securities and no claim against RHF for any losses related to the sale.

Accounts carried by Robinhood Securities, LLC Member FINRA & SIPC- support@robinhood.com Tax ID 38-4019216

---

**MKT = Market in which transaction was Executed/Cleared**
NYSE - New York Stock Exchange
NYSEA - NYSE Alternext
USE - Other US Exchange
MF - Mutual Funds
OP - Options
OTC - Over-the-Counter/NASDAQ
UND - Underwriting
FOREX - Foreign Exchange
OTH - Other

**Buy/Sell Codes**
B = Buy or Buy To Open
S = Sell or Sell To Close
BCXL = Cancel Buy
SCXL = Cancel Sell
BTC = Buy To Close
STO = Sell To Open
BTCX = Buy To Close Cancel
STOX = Sell to Open Cancel

**Account Types**
C = Cash
M = Margin
N = Non-negotiable
S = Short

**U/S: Solicitation**
U = Unsolicited
S = Solicited

**CAP = Capacity in which the firm acted:**
1 - 2,4 - 5,8 - AS AGENT
3 - AS PRINCIPAL, your broker has bought from you or sold to you and may have received a profit or loss on the transaction
6 - AS AGENT for both buyer and seller

Y McKENNA & EGLESTON
501 FIFTH AVENUE
19th FLOOR
NEW YORK, NEW YORK 10017



Mr. Vincent K. McMahon
Chairman and Chief Executive Officer
World Wrestling Entertainment, Inc.
1241 East Main Street
Stamford, CT 06902

# EXHIBIT K

# Simpson Thacher & Bartlett LLP

425 LEXINGTON AVENUE
NEW YORK, NY 10017-3954

TELEPHONE: +1-212-455-2000
FACSIMILE: +1-212-455-2502

Direct Dial Number                                                                                                    E-mail Address
212-455-2762                                                                                                     sgeltman@stblaw.com

March 30, 2021

BY E-MAIL & EXPRESS MAIL

Gregory M. Egleston
Gainey McKenna & Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017

Dear Mr. Egleston:

As independent counsel for the independent directors of the Board of Directors of World Wrestling Entertainment, Inc. (the "Independent Board"), we write to acknowledge receipt of your March 23, 2021 Litigation Demand on behalf of Nicholas Jimenez.

As you are aware, the Independent Board has created a committee of outside directors who are, and have been, reviewing the issues raised in the Demand, in order to assist the Independent Board in assessing and determining the appropriate actions to take. The committee will review the Demand and take it into account.

Please let us know if you have any questions.

Very truly yours,

Susannah S. Geltman

cc:   Thomas J. McKenna (*via email*)
      Paul C. Curnin (*via email*)

BEIJING      HONG KONG      HOUSTON      LONDON      LOS ANGELES      PALO ALTO      SÃO PAULO      TOKYO      WASHINGTON, D.C.